UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                     :

ALEX GOLDFARB,                           :     Index No. 1:18-cv-08128(DAB)

                    Plaintiff,      :

                        v.           :

CHANNEL ONE RUSSIA AND RT AMERICA,     :

                    Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# MEMORANDUM OF LAW IN OPPOSITION
## TO RT AMERICA'S MOTION TO DISMISS

ROTTENBERG LIPMAN RICH, P.C.
230 Park Avenue, 18th Floor
New York, New York 10169
T: (212) 661-3080
F: (646) 203-0281
Attorneys for Plaintiff Alex Goldfarb

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

I.     RT AMERICA IS SUBJECT TO PERSONAL
     JURISDICTION IN THIS COURT ............................................................................ 4

II.    PLAINTIFF HAS STATED A CLAIM
    AGAINST RT AMERICA ......................................................................................... 10

     1.     The Complaint States a Claim For Libel Per Se ..................................... 10

           a.    The Complaint Adequately Alleges Actual
               Malice and The Requisite Degree of Fault ..................................... 10

           b.    Walter Litvinenko's Statements Republished by RT America Are
               Defamatory and Not Protected Opinion ......................................... 17

           c.    Walter Litvinenko's Statements Are
               "Of and Concerning" Dr. Goldfarb .................................................. 22

           d.    Dr. Goldfarb's Damage Allegations Are Sufficient ....................... 24

           e.    Dr. Goldfarb's Punitive Damage Allegations are Sufficient .......... 24

CONCLUSION .................................................................................................................... 25

TABLE OF AUTHORITIES

**Cases**

Allianza Dominica v. Luna,
229 A.D.29 328 (1st Dep't 1996) ............................................................................. 18

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,
171 F.3d 779 (2d Cir. 1999) .................................................................................... 6

Best Van Lines, Inc. v. Walker,
490 F.3d 239 (2d Cir. 2007) ............................................................................. 5, 6, 8

Biro v. Conde Nast,
807 F.3d 541 (2d Cir. 2015) .................................................................................. 10

Bouveng v. NYG Capital LLC,
175 F.Supp.3d 280 (S.D.N.Y. 2016) ....................................................................... 24

Brian v. Richardson,
87 N.Y. 2d 46 (1995) ....................................................................................... 18, 21

Burger King Corp. v. Holder,
844 F Supp. 1528 (S.D. Fla. 1993) ........................................................................... 4

Burger King Corp. v. Rudzewicz,
471 U.S. 462 (1985) ............................................................................................... 9

Carlucci v. Poughkeepsie Newspapers, Inc.,
57 N.Y.2d 883 (1982) ............................................................................................ 22

Celle v. Filipino Reporter Ent., Inc.,
209 F.3d 163 (2d Cir. 2000) ................................................................................... 15

Celle v. Filipino Rept. Ent.,
209 F.3d 163 (2d Cir. 2000) ................................................................................... 11

Chaiken v. VV Publ'g Corp.,
907 F.Supp. 689 (S.D.N.Y.1995) ............................................................................ 16

Chapadeau v. Utica Observer Dispatch, Inc.,
38 N.Y.2d 196 (1975) ................................................................................... 15, 16, 17

Chau v. Lewis,
771 F.3d 118 (2d Cir. 2014) .................................................................................. 10

Church of Scientology Int'l v. Behar,
238 F.2d 168 (2d Cir. 2001)............................................................... 10

Cianci v. New Times Publishing Co.,
639 F.2d 54 (2d Cir. 1980)............................................................ 18, 21

Dibella v. Hopkins,
403 F.3d 102 (2d Cir.2005)................................................................ 24

Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,
722 F.3d 81 (2d Cir. 2013)................................................................... 4

Exxon Shipping Co. v. Baker,
554 U.S. 471 (2008)........................................................................... 24

Felter v. Houghton Mifflin Co.,
364 F.2d 650 (2d Cir. 1966)............................................................... 23

Garrison v. State of Louisiana,
379 U.S. 64 (1964)............................................................................. 11

Gentile v. County of Suffolk,
129 F.R.D. 435 (E.D.N.Y. 1990)........................................................ 20

Harte-Hanks Communications, Inc. v. Connaughton,
491 U.S.657 (1989)........................................................................... 11

Hawks v. Record Printing and Pub. Co.,
486 N.Y.S.2d 463 (3d Dep't 1985)..................................................... 16

Henderson v. I.N.S.,
157 F.3d 106 (2d Cir. 1998).................................................................. 5

Immuno AG v. Moor-Jankouski,
77 N.Y. 2d 235 (1991) .................................................................. 18, 21

In re Air Disaster at Lockerbie Scotland on December 21, 1988,
37 F.3d 804 (2d Cir. 1994)................................................................. 20

Kirch v. Liberty Media Corp.,
449 F.3d 388 (2d Cir. 2006)............................................................... 23

Konikoff v. Prudential Ins. Co. of Am.,
234 F.3d 92 (2d Cir. 2000)....................................................... 15, 16, 17

Kurzon LLP v. Thomas M. Cooley Law School,
No.12 Civ. 8352, 2014 WL 2862609 (June 24, 2014)................................................... 5

Levin v. McPhee,
119 F.3d 189 (2d Cir. 1997)........................................................................ 18, 21

Liberman v. Gelstein,
80 N.Y. 2d 429 (1992) .............................................................................. 24

Marine Midland Bank, N.A. v. Miller,
664 F. 2d 899 (2d Cir. 1981)........................................................................ 9

Milkovich v. Lorain Journal,
497 U.S 1, 18-19 (1990) ............................................................................ 21

New York Times v. Sullivan,
376 U.S. 254 (1964)................................................................................. 10

Palin v. N.Y. Times Co.,
264 F. Supp. 3d 527 (S.D.N.Y. 2017)................................................................. 12

Reynolds v. Pegler,
123 F. Supp. 36 (S.D.N.Y.1954) .................................................................... 24

Ritchie Capital Mgmt, L.L.C. v. Costco Corp.,
No. 14 Civ. 4819, 2015 WL 13019620 (S.D.N.Y. Sept. 21, 2015) ................................... 4

Schiavone Constr. v. Time,
847 F.2d 1069 (3d Cir. 1988)....................................................................... 11

Shamoun v. Mushlir,
No.12 Civ. 3541, 2014 WL 12776779 (S.D.N.Y. March 26, 2014)...................................... 5

St. Amant v. Thompson,
390 U.S. 727 (1968)................................................................................ 10

St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co. Ltd.,
No. 96 Civ. 7296, 1997 WL 357989 (S.D.N.Y. June 26, 1997).......................................... 4

Sterling Homex Corp v. Homasote Co.,
437 F.2d 87 (2d Cir. 1971).......................................................................... 4

Stern v. Cosby,
645 F.Supp.2d 258 (S.D.N.Y.2009)................................................................... 24

Stratagem Dev. Corp. v. Heron Intern, NY,
153 F.R.D. 535 (S.D.N.Y. 1994) ........................................................ 9

Sunward Electronics, Inc. v. McDonald,
362 F.3d 17 (2d Cir. 1996)................................................................. 6

Symmetra Pty Ltd. v. Human Facets, LLC,
No. 12 Civ.8857, 2013 WL 2896876 (S.D.N.Y.June 13, 2013).................... 8

Three Amigos SLJ Rest., Inc. v. CBS News,
28 N.Y.3d 82 ................................................................................ 23

Trachtenberg v. Failedmesiah.com,
43 F. Supp. 3d 198 (E.D.N.Y. 2014) .................................................... 5

U.S. v. Grady,
544 F.2d 598 (2d Cir.1976)................................................................ 20

Verragio, Ltd. v.. Malakan Diamond Co.,
No. 16 Civ. 4634, 2016 WL 6561384 (S.D.N.Y. Oct. 20, 2016) ................. 4

Walden v. Fiore,
571 U.S. 277 (2014)......................................................................... 9

Weil v. Am. Univ.,
No. 07 Civ.7748, 2008 WL 126604 (S.D.N.Y. Jan. 2, 2008)..................... 8

**Rules**

NYCPLR Section 302(a)(1)............................................................... *passim*

## PRELIMINARY STATEMENT

Plaintiff Alex Goldfarb respectfully submits this memorandum of law in opposition to the motion of defendant RT America, a.k.a. ANO TV-Novosti ("RT America") to dismiss the Complaint for lack of personal jurisdiction and failure to state a claim for libel. The claim against RT America is based on an April 1, 2018 broadcast to viewers on cable television and satellite television in New York, and throughout the United States.

Under New York law, analysis of the full context of a communication, its tone and apparent purpose is crucial in defamation cases. While paying lip service to this requirement, RT America ignores its application in this case. As set forth in detail in the Complaint, Dr. Alex Goldfarb was a close friend of Alexander Litvinenko, a former officer of the Russian Federal Security Service who became a dissident and was murdered in London on November 23, 2006 by Russian agents. (Cpt.¶ 2). An extensive United Kingdom Public Inquiry conducted by a High Court judge in 2015 and 2016 (the "UK Inquiry") concluded beyond a reasonable doubt that two Russians, Andrey Lugovoy and Dmitry Kovtun, were the murderers, and that there was a "strong probability" that they acted on behalf of the Russian state, probably on personal instructions from Vladimir Putin. (Cpt.¶ 5). The UK Inquiry specifically rejected the incredible claims of Walter Litvinenko ("Walter"), Alexander's father, that Dr. Goldfarb was the murderer, and that Dr. Goldfarb was able to obtain the radioactive element Polonium-210 that killed Alexander Litvinenko because he worked for the United States Central Intelligence Agency ("CIA"). (Cpt.¶¶ 63-66, 73).

The full context of the defamatory statements broadcast by RT America is provided by the March 4, 2018 poisoning of two Russian nationals living in England, Sergei and Julia Skripal. (Cpt.¶ 6). This poisoning of two Russian nationals on English soil had an uncanny

similarity to the murder of Alexander Litvinenko in 2006, and the government of the United Kingdom accused Russia of responsibility for the poisoning. (Cpt.¶ 6). The express purpose and intent of the April 1, 2018 RT America broadcast, as stated by the program's host, was to rebut the "national character assassination" of Russia supposedly being perpetrated by the United Kingdom by "cit[ing] the poisoning of [Alexander Litvinenko] in London as circumstantial evidence in the Skripal case. The Russians did it before, they will do it again. That's the essence of the UK allegations against Russia." (Cpt. Ex.2 at 21). It was in order to accomplish this explicitly stated purpose that RT America, knowing exactly what Walter would say, provided him with a platform to repeat his defamatory claim that it was Dr. Goldfarb, and not two Russian agents, who murdered Alexander Litvinenko.

While RT America seeks to protect itself under the cloak of journalists reporting on matters of public concern, in fact, during the relevant period RT America was effectively a foreign agent acting on behalf of the Russian government. As set forth in the accompanying affidavit of Dr. Goldfarb, in 2017, two companies, both of which are licensed to do business in New York, RTTV America, Inc.("RTTV") and T&R Productions LLC ("T&R") registered as "foreign agents" of the Russian government pursuant to the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. 611 et seq ("FARA"). Both companies listed ANO TV – Novosti (RT America) as their foreign principal.[1] (Goldfarb Aff. ¶¶ 15-16, 22-23).

The purpose of FARA is to identify foreign governments attempting to influence U.S. public opinion. (Id.¶ 15). The U.S. Department of Justice ("DOJ") determination found that

---

[1] Defendant makes a number of factual assertions in its memorandum without any supporting affidavit, including a claim that "RT America is one of the brands within the RT portfolio." (p.1) As set forth in Dr. Goldfarb's affidavit describing the FARA filings, RTTV and T&R, both of which are licensed to do business in New York, are apparently "foreign agents" acting in the United States for TV Novosti as principal. At a minimum, discovery concerning the relationship of these entities and their respective responsibility for the defamatory RT America program is warranted.

RTTV "operates in the United States on behalf of RT, for whom it is an alter ego … [S]ince at least April 5, 2007, … RTTV America has arranged for distribution in the United States of RT, the television channel, by purchasing broadcast channel access from hotels and cable companies and reselling that access to TV-Novosti 'to broadcast RT'". (Id. Ex. C at 4-5). The DOJ's announcement concerning T&R's registration stated that T&R operated studios for RT America, hired and paid all of RT America's U.S. based employees, and produced all of RT America's English language programming, which was available on cable television networks across the United States. (Id. Ex. B).

This is the context in which defendants RT America and Channel One Russia embarked on a propaganda offensive in 2018 on behalf of the Russian state to deny responsibility for the Skripal poisonings by absolving Russia and its agents of responsibility for the uncannily similar death of Alexander Litvinenko. The April 1, 2018 broadcast by RT America was part and parcel of that campaign. The intent of the broadcasts described in the Complaint, including the April 1, 2018 RT America program, was to discredit the findings of the UK Inquiry by repeating defamatory statements by Walter Litvinenko that Dr. Goldfarb was the murderer of both Alexander and his own wife, and in doing so he acted in cooperation with the CIA. The fact that RT America is an acknowledged agent of the Russian government is powerful evidence of its intent to deflect responsibility for the Skripal poisonings away from Russia by defaming Dr. Goldfarb.

As we show below, (1) by virtue of its contracts with cable television and satellite television operators pursuant to which RT America paid millions of dollars to have its programs packaged and broadcast in New York, RT America is subject to personal jurisdiction in New

York for the defamatory content of the April 1, 2018 broadcast, and (2) the Complaint adequately alleges all of the elements of a defamation claim under New York law.

## I. RT AMERICA IS SUBJECT TO PERSONAL JURISDICTION IN THIS COURT

RT America erroneously asserts that plaintiff has waived N.Y.C.P.L.R. § 302(a)(1) as a basis for personal jurisdiction because New York's long-arm statute is not mentioned in the Complaint. Fed. R. Civ. P 8(a) does not require a plaintiff to plead the basis for personal jurisdiction over a defendant. See, e.g., Sterling Homex Corp v. Homasote Co., 437 F.2d 87 (2d Cir. 1971); Burger King Corp. v. Holder, 844 F Supp. 1528, 1531 (S.D. Fla. 1993). In Ritchie Capital Mgmt, L.L.C. v. Costco Corp., No. 14 Civ. 4819, 2015 WL 13019620 (S.D.N.Y. Sept. 21, 2015), the court specifically considered jurisdiction under the long-arm statute even though, after amending its pleading and extensive motion practice, the plaintiff relied solely on general jurisdiction. The court in Verragio, Ltd. v. Malakan Diamond Co., No. 16 Civ. 4634, 2016 WL 6561384 (S.D.N.Y. Oct.20, 2016), declined to consider the stricter requirements for general jurisdiction where the plaintiff explicitly relied on the long-arm statute. Neither Ritchie nor Verragio support RT America's "waiver" argument.

A determination concerning personal jurisdiction may require a factual inquiry going beyond the complaint, so "all pertinent documentation submitted by the parties may be considered in deciding the motion." St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co. Ltd., No. 96 Civ. 7296, 1997 WL 357989, at *1 (S.D.N.Y. June 26, 1997), aff'd, 152 F. 3d 920 (2d Cir. 1998). Pleadings and affidavits should be construed "in the light most favorable to plaintiffs, resolving all doubts in their favor." Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84 (2d Cir. 2013). Here, as he is permitted to do, Dr. Goldfarb has submitted an affidavit and exhibits supporting the assertion of personal jurisdiction over RT America.

NYCPLR Section 302(a)(1), the relevant provision of New York's long-arm statute, provides that "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary … who in person or through his agent: 1. Transacts any business within the state or contracts anywhere to supply goods or services in the state. An action arises out of the activities of a defendant or its agents in New York when there is "an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." Henderson v. I.N.S., 157 F.3d 106, 123 (2d Cir. 1998). The long-arm statute also requires a showing that the defendant "purposefully avail[ed] himself of the privilege of conducting activities within New York."

In support of its motion, RT America relies primarily on inapposite cases involving defamation claims based on statements made on the internet. See Best Van Lines, Inc. v. Walker, 490 F.3d 239 (2d Cir. 2007) (website based in Iowa); Trachtenberg v. Failedmesiah.com, 43 F. Supp. 3d 198 (E.D.N.Y. 2014) (website based in Minnesota); Shamoun v. Mushlir, No.12 Civ. 3541, 2014 WL 12776779 (S.D.N.Y. March 26, 2014)(website based in Missouri); Kurzon LLP v. Thomas M. Cooley Law School, No.12 Civ. 8352, 2014 WL 2862609 (June 24, 2014) (statement on Michigan school's intranet). These cases, which are inapplicable here, stand for the proposition that posting defamatory material on a website accessible anywhere in the world, including New York, does not constitute transacting business under Section 302(a)(1), and are consistent with the refusal of New York courts to assert personal jurisdiction in cases involving "mere defamatory utterances" sent into New York "no matter how loudly." Best Van Lines, supra, 490 F.3d at 248.

For purposes of Section 302(a)(1), transacting business is defined "as purposeful activity – 'some act by which the defendant purposefully avails itself of the privilege of

conducting activities within the forum State, thus invoking the protections of its laws.'" Best

Van Lines, supra, 490 F. 3d at 246. Here, as described in Dr. Goldfarb's affidavit, RT America

has undeniably and extensively transacted business in New York. The Second Circuit has stated

that among the factors to be considered in determining whether a foreign defendant has

transacted business in New York include whether the defendant had an ongoing contractual

relationship with a New York corporation, and whether that contract required payments into New

York. Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 22-23 (2d Cir. 1996) (citations

omitted). In analyzing transaction of business, the court "must look at the totality of the

circumstances concerning the party's interactions with, and activities within, the state." Bank

Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999).

As set forth in Dr. Goldfarb's affidavit, RT America has been transacting business

in New York by virtue of its extensive ongoing contractual dealings with New York entities

pursuant to which substantial sums have been sent into New York. (Goldfarb Aff. ¶ ¶ 17-19).

This is not a case where personal jurisdiction is based on "mere defamatory utterances" sent all

over the world, including New York; rather, RT America has purposefully availed itself of the

privilege of conducting business in New York as part of its very substantial activities in the

United States.

According to a Wall Street Journal report dated January 25, 2017, RT America

had entered into unusual contractual relationships with U.S. cable television operators that made

it difficult for RT America's programming to be dropped, even after a declassified report by

federal intelligence agencies suggested that RT America was in fact a propaganda arm of the

Russian government. (Goldfarb Aff. Ex. B). The WSJ article cited a U.S. intelligence

assessment that the Russian government was spending $190 million annually on distributing RT

programming through international hotels and carriage on cable, satellite and broadcast networks. (<u>Id</u>. ¶ 13). As explained in the WSJ Article, while most cable television providers pay content providers such as HBO or ESPN for the right to carry their programming, RT America paid operators for local broadcasting of its content pursuant to contracts that prevented it from being dropped unless it showed obscene or indecent material. (<u>Id</u>.¶ 12).

A substantial portion of the millions of dollars paid to insure RT America's access to the U.S. market was targeted at New York. The WSJ article reported that pursuant to the carriage contracts RT America's programming appeared on Charter's Spectrum cable television systems (formerly Time Warner Cable) in New York and Los Angeles. As previously noted, on August 17, 2017, RTTV registered as a foreign agent under FARA. (Goldfarb Aff. ¶ 15). Because of that registration, at least some information about RT America's contacts with New York is publicly available. Those filings reveal that payments of $2 million per year were made to Time Warner Cable ("TWC"), a New York corporation (presently Spectrum), over a ten-year period for carrying RT America's programming in New York. (<u>Id</u>.¶ 18). According to TWC's website, approximately 4.7 million New York households subscribed to its cable bundle, which included RT America. (<u>Id</u>.). RT America also paid hundreds of hotels to make its programming available to their guests, including both national chains operating in New York and hotels that operate exclusively in New York. (<u>Id</u>.¶ 26). In addition to cable television, RT America paid satellite television providers Dish Network and DirectTV for the distribution of its programs in New York. (<u>Id</u>. ¶ 25).

According to the FARA website, in November of 2017 an entity called T&R Productions, LLC replaced RTTV as the conduit for making expenditures for RT America's programming. (Goldfarb Aff ¶ 22). The FARA filings indicate that from December 1, 2017

through May 31, 2018 T&R received $17, 960, 897 from RT America. (Id.¶ 24). TWC (rebranded as Spectrum after merging with Charter) continued to carry RT America programming in New York through October of 2018. (Id. ¶21).

These facts establish that for purposes of the long-arm statute RT America has both transacted business in New York and contracted to supply broadcast programming within New York. The remaining inquiry under Section 302(a)(1) is whether the cause of action arises from that business transaction. "New York courts have held that a claim 'arise[s] from a particular transaction where there is 'some articulable nexus between the business transacted and the cause of action sued upon,' or when 'there is a substantial relationship between the transaction and the claim asserted.'" Best Van Lines, supra, at 249. This requirement is satisfied here.

Dr. Goldfarb's claim has an articulable nexus with the extensive business transacted by RT America in New York i.e., the extensive payments made to insure that its programs were widely available in New York on cable television, satellite television and in hotels. This is not a case where a plaintiff is relying on the fortuitous entry of its content into New York, or a single act, such as the review of an out-of-state website posting in New York, or the receipt of a magazine sent to New York from out of state, as in Weil v. Am. Univ., No. 07 Civ.7748, 2008 WL 126604 (S.D.N.Y. Jan. 2, 2008); see also Symmetra Pty Ltd. v. Human Facets, LLC, No. 12 Civ.8857, 2013 WL 2896876 (S.D.N.Y.June 13, 2013)( jurisdiction is more likely to lie when the allegedly defamatory statements were purposefully directed at New York "as opposed to reaching the forum fortuitously, as by an internet post accessible by the world at large"). In Symmetra, the court held that it had jurisdiction under CPLR 302(a)(1) over a

defamation claim because of "defendant's purposeful transactions of business in New York and/or a causal link between this transaction of business and the claim alleged." Id.at *6.

In light of RT America's extensive New York business dealings, the court's exercise of personal jurisdiction in this case comports with constitutional due process. By contracting to pay for the broadcast of its programming in New York, RT America has established "meaningful contacts, ties, or relations" with New York, and has "purposefully avail[ed] itself of the privilege of conducting activities within the forum state." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 474-5 (1985). RT America's conduct in contracting to pay millions of dollars to have its programs broadcast in New York over an extended period of time has created sufficient "suit related" contacts to satisfy the requirement of "a substantial connection with the forum state." Walden v. Fiore, 571 U.S. 277, 284 (2014).

While Dr. Goldfarb respectfully submits that personal jurisdiction over RT America has been established, at the very least the court should allow him to proceed with jurisdictional discovery. District courts have broad discretion in deciding whether to allow jurisdictional discovery. See, e.g., Marine Midland Bank, N.A. v. Miller 664 F. 2d 899, 904 (2d Cir. 1981); Stratagem Dev. Corp. v. Heron Intern, NY, 153 F.R.D. 535, 547 (S.D.N.Y. 1994) (allowing jurisdictional discovery where plaintiff had made a sufficient start to establishing a reasonable basis for the court to assume jurisdiction). If there is any doubt about personal jurisdiction over RT America, in light of the facts alleged in the Complaint and in Dr. Goldfarb's accompanying affidavit, jurisdictional discovery should be permitted. [2]

---

[2] In particular, the acts of RTTV and T&R as agents of the defendant are relevant pursuant to CPLR 302(a)(1) as the statute applies to acts by a defendant "or through an agent".

## II.     PLAINTIFF HAS STATED A CLAIM AGAINST RT AMERICA

### 1.  The Complaint States A Claim For Libel Per Se

To state a claim for libel under New York law, in addition to publication to a third party, a  plaintiff must allege a public figure "must show that the statements it complains about were (1) of and concerning the plaintiff, (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice, that is, either knowledge of the falsity or reckless disregard of the truth".  Church of Scientology Int'l v. Behar, 238 F.2d 168, 173 (2d Cir. 2001). (Dr. Goldfarb acknowledges that for purposes of this litigation he is a public figure.)  An allegation of special damages or per se actionability is also required.  Chau v. Lewis, 771 F.3d 118,127 (2d Cir. 2014). RT America mistakenly asserts that other than publication the Complaint fails to support any of the required elements for a defamation claim.

### a.  The Complaint Adequately Alleges Actual Malice and The Requisite Degree of Fault

Allegations of actual malice are sufficient when enough facts are pled to make out a plausible claim that malice might reasonably be inferred.  Biro v. Conde Nast, 807 F.3d 541, 546 (2d Cir. 2015) (allegations of actual malice were not plausible where the facts alleged were insufficient to plausibly suggest that the publisher had reason to question the allegedly defamatory statements or to entertain serious doubts about its truth.)  Here, the Complaint alleges facts sufficient to create a plausible inference that the false statements at issue were made with "actual malice," that is, that RT America had knowledge that the statements it republished were false or with reckless disregard as to their falsity.  New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964).

Reckless disregard can be established by evidence that a defendant "entertained serious doubts as to the truth of his publication," St. Amant v. Thompson, 390 U.S. 727, 731

(1968), or acted with a "high degree of awareness of [a statement's] probable falsity," <u>Garrison v. State of Louisiana</u>, 379 U.S. 64, 74 (1964). In cases involving the publication of a third-party's allegations recklessness may be found where "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports". <u>Harte-Hanks Communications, Inc. v. Connaughton</u>, 491 U.S.657, 688 (1989). In <u>Harte-Hanks</u>, the Supreme Court held that a newspaper acted with actual malice by publishing allegations of criminal misconduct by a judicial candidate because before the story was published the newspaper knew about, and ignored, the testimony of five witnesses who had denied the informant's allegations, as well as a tape recording that "raise[d] obvious doubts about [the] veracity' of the source of the allegations.

While actual malice is subjective, the courts have recognized that a defendant will rarely admit that it acted with serious doubts about the truth of a statement. <u>Celle v. Filipino Rept. Ent.</u>, 209 F.3d 163, 183,186 (2d Cir. 2000) (finding actual malice based on circumstantial evidence that defendant "entertained serious doubts about the truth of a headline"). Therefore proof of actual malice can be based on circumstantial evidence, which can include evidence of the dubious nature of the defendant's sources, the inherent improbability of a story, and the existence of obvious reasons to doubt the accuracy of a story. <u>Id</u>. "[O]bjective circumstantial evidence can suffice to demonstrate actual malice. Such circumstantial evidence can override defendants' protestations of good faith and honest belief that the report was true." <u>Id</u>. at 186, <u>quoting</u> <u>Schiavone Constr. v. Time</u>, 847 F.2d 1069,1090 (3d Cir. 1988). The appropriateness of evidence sufficient to establish actual malice must be considered on a case by case basis. <u>Id</u>. at 183.

When multiple actors are involved in the publication of a defamatory statement, the plaintiff must identify the individual responsible for the publication and prove that the

individual acted with actual malice. RT America's contention that the Complaint failed to name a specific individual responsible for the publication of Walter's defamatory statements is mistaken; the Complaint specifically identifies Oksana Boyko as the person who interviewed Walter on the April 1, 2018 broadcast. Ms. Boyko's deliberate omission of crucial facts known to her concerning the UK Inquiry and false implication that all investigation materials were classified contributed to the seeming plausibility of Walter's defamatory statements.

RT America relies on Judge Rakoff's decision in Palin v. N.Y. Times Co., 264 F. Supp. 3d 527 (S.D.N.Y. 2017) in support of its argument that the Complaint fails to allege actual malice with respect to Ms. Boyko. In Palin, however, it was only after full briefing of a motion to dismiss, an evidentiary hearing to determine the specific individual or individuals who were responsible for publishing the defamatory statement, and further briefing, that the court held that specific facts that plausibly evidence actual malice had not been alleged. Id. at 532, 537. In dismissing the complaint, the court observed that "[w]hat we have here is an editorial, written and rewritten rapidly in order to voice an opinion on an immediate event of importance [gun control after an attack on members of Congress and aides], in which are included a few factual inaccuracies…that are very rapidly corrected." Id. at 540. It is reasonable to believe that, in addition to Ms. Boyko, RT America producers, editors and executives whose identities are currently unknown and unknowable to Dr. Golfarb participated in the creation of the defamatory program. Just as in Palin, Dr. Goldfarb should be permitted to have discovery concerning their identity and facts relevant to their actual malice.

The Complaint adequately pleads "plausible grounds" that Ms. Boyko – and others at RT America whose identities may be learned during discovery—acted with actual malice, i.e.,"had a subjective awareness of either falsity or probable falsity of the defamatory

statement, or acted with reckless disregard of its truth or falsity." <u>Celle v. Filipino Reporter Ent.,</u> <u>Inc.</u>, 209 F.3d 163, 182 (2d Cir. 2000).

Defendant asserts that Ms. Boyko's state of mind regarding the UK inquiry could not be established by "generally pointing to the reporting history of TV Novosti". It is implausible that any political journalist in Russia, especially one interviewing Walter, would not know of the finding of the UK Inquiry that found that Alexander Litvinenko had been murdered by Andrey Lugovoy and Dmitry Kovtun, and no one else. For example, the UK Inquiry has been mentioned in Russian Google over 119,000 times. (Goldfarb Aff. 30). A reasonable inference is that Ms. Boyko's failure to confront Walter with the findings of the UK Inquiry was a deliberate omission evidencing actual malice.

RT America asserts that Ms. Boyko's false statement, made without citing a source, that all of the investigation materials in the Alexander Litvinenko case have been classified by the British government was a mere "research failure". A reasonable inference however could be made that her false statement was made deliberately and with actual malice. The false claim that all investigation materials in the Litvinenko case had been classified is a lynchpin of the false narrative pushed by RT America to undermine and attack overwhelming evidence set forth in the report of the UK Inquiry that Lugovoy and Kovtun are the murderers. That false claim also sets the context for Walter's false statement that he had no access to the evidence, when in fact all of the relevant evidence is publicly available, and creates a false equivalence between two alleged "theories" of Alexander Litvinenko's murder: one supposedly based on the "classified" evidence, the other, advanced by the victim's father.

As set forth in Dr. Goldfarb's affidavit, ten days prior to the April 1 broadcast, there is evidence that Ms. Boyko and/or others at RT America had seen a specific, explicit

reference to the UK Inquiry and a debunking of the "classified case materials" false statement. On March 21, 2018, Marina Litvinenko, Alexander's widow, gave an interview to the Russian news agency RIA-Novosti. (Goldfarb Aff. Ex.31). She was reacting to the March 20, 2018 Channel One program in which Walter uttered the same falsities, and the host pushed the same fake narrative as in the RT America April1, 2018 program. In that interview Ms. Litvinenko referred to the fact that the UK Inquiry concluded that Lugovoy and Kovtun had killed her husband based on evidence presented in open court, and that Walter's claim that the conclusion was based on classified evidence is false. (Id.¶32).

In addition, during her March 21 interview Mrs.Litvinenko revealed that Dr. Golfarb's wife had cancer. (Goldfarb Aff ¶ 33). This was the first and only time that the cause of Dr.Goldfarb's wife's death had been publicly disclosed prior to as of that date. (Id.). Ms. Boyko, therefore, could not possibly have learned about Dr. Goldfarb's wife cancer from any other source, and the March 21 RIA- Novosti report must have been the reason for Ms. Boyko's question on the April 1, 2018 program: "She had cancer, I hear?" This is powerful evidence that Ms. Boyko and/or others at RT America had seen Mrs. Litvinenko's March 21, 2018 interview and therefore knew about the UK Inquiry's findings and that the "classified evidence" claim was false, even if—as seems to be implausible—such knowledge was lacking prior to March 21, 2018.

Moreover, the fact that Ms. Boyko posed a question -- "You mean Goldfarb's wife. She had cancer, I hear?" --does not mean she did not in fact know the answer. In light of the compelling evidence that Ms. Boyko knew about the UK Inquiry's finding that Alexander Litvinenko was killed by Lugovoy and Kovtun, and not by Dr. Goldfarb, Ms. Boyko must also have known that Dr. Goldfarb had no motive to murder his wife because she supposedly "knew

too much."  Ms. Boyko's question "She had cancer, I hear?" cannot be construed as a serious challenge to Walter's false statement that Dr. Goldfarb killed his wife to cover up his murder of Alexander Litvinenko. Ms. Boyko's failure to confront Walter with the findings of the UK Inquiry, and to challenge his claims in any meaningful way, is strong evidence that she acted with actual malice.

RT America argues that some of Ms. Boyko's questions to Walter negate any inference of actual malice because they "attempt to explain contrasting viewpoints with respect to the alleged defamatory statement."  Ms. Boyko cited two "contrasting viewpoints": that of unnamed "British colleagues" who point to "a chemical trace" left by Lugovoy in London, and that of Mrs. Litvinenko, who "sincerely accuses Russian authorities" of killing her husband Alexander.  In fact, Ms. Boyko's handling of "contrasting viewpoints" reinforces the defamatory effect of Walter's statements by misleading viewers into believing that the facts about Alexander Litvinenko's murder by Russian agents have not been conclusively established, but instead are a fair subject for debate.  The fact that Alexander Litvinenko was killed by Lugovoy and Kovtun was established beyond reasonable doubt in the UK Inquiry. The presentation of a fact on one hand and a malicious lie on the other as two so-called "contrasting viewpoints" is nothing less than a crude disinformation technique intended by RT America to use Walter's lies concerning Dr. Goldfarb to give some credence to the Russian regime's defense of the allegations against it arising from the Skripal poisonings.

RT America also mistakenly asserts that the Complaint fails to allege that it acted in a "grossly irresponsible manner," citing Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92 (2d Cir. 2000). Konikoff relied on the New York Court of Appeals decision in Chapadeau v. Utica Observer Dispatch, Inc., 38 N.Y.2d 196, 199 (1975), where the court stated that in cases of

"legitimate public concern" a plaintiff must allege that "the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." This standard was satisfied by the newspaper defendant in <u>Chapadeau</u> where the article at issue "was written only after two authoritative sources had been consulted and … not published until it had been checked by at least two persons other than the writer. This is hardly indicative of gross irresponsibility." <u>Id</u>. at 200.

 <u>Konikoff</u> involved a real estate appraiser's claim that she was defamed in the report of an outside investigator that a company disseminated to its shareholders. The Second Circuit concluded that it was not "grossly irresponsible" for a company to publish the full report of a respected independent law firm based on 85 interviews and review of 50,000 documents in response to demands from investors and governmental agencies, as "the company acted responsibly in selecting and interacting with the investigator and disseminating the results as a whole." <u>Konikoff</u>, <u>supra</u>, 234 F.3d at 103, 105. <u>See</u> <u>also</u> <u>Chaiken v. VV Publ'g Corp.</u>, 907 F.Supp. 689, 697 (S.D.N.Y.1995) (no gross irresponsibility where two editors and fact checkers reviewed article by author who had published many stories in nationally known publications without any issues).

 A wide variety of factors are relevant to the intensely factual question of whether the publisher of a defamatory statement acted with gross irresponsibility, including whether sound journalistic practices were followed, whether there was any reason to doubt the accuracy of the statements, and whether the truth was readily accessible. <u>Hawks v. Record Printing and Pub. Co.</u>, 486 N.Y.S.2d 463, 464 (3d Dep't 1985). These factors all support a finding that RT America acted with gross irresponsibility in broadcasting Walter's lies. The readily accessible

findings of the UK Inquiry were indeed known to Ms. Boyko, and more than created doubt about Walter's statements. Not surprisingly, as an acknowledged agent of the Russian government, RT America's conduct exhibited the very opposite of sound journalistic practices. Indeed, two journalists resigned from their positions with RT America because they could no longer tolerate its dishonest practices. (Goldfarb Aff. ¶ 34).

RT America notes that the <u>Konikoff</u> court observed the "anomaly" that in some cases, such as the "rebroadcast of a public official's news conference despite the broadcaster's knowledge that one of the speaker's statements, a defamatory one, was likely false" actual malice might exist but the broadcaster's actions would be protected as responsible journalism under <u>Chapadeau</u>. <u>Konikoff, supra</u>, 234 F.3d at 104. This theoretical anomaly does not support RT America's motion. RT America did not act as a responsible journalist but rather in a manner consistent with its role as a propaganda outlet. The republication of Walter's years old lies is not remotely comparable to a timely broadcast of a news conference. "Ordinarily a communication made with 'actual malice' is also made in violation of the <u>Chapadeau</u> standard," <u>id.</u>, and this is exactly such a case.

The Complaint contains specific factual allegations that RT America, a registered Russian agent under FARA, acted with actual malice, <u>i.e.</u>, knowingly or at least recklessly, by providing Walter with a television broadcast platform to make false and defamatory statements about Dr. Goldfarb with the intent of creating doubt about Russia's role in the Skripal's poisonings, and was grossly irresponsible in so doing.

### b. Walter Litvinenko's Statements Republished by RT America Are Defamatory and Not Protected Opinion

As a threshold matter, the Second Circuit has noted the "black letter law that one who republishes a libel is subject to liability as if he had published it originally, even though he

attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement". Cianci v. New Times Publishing Co., 639 F.2d 54, 61 (2d Cir. 1980). "Since falsity is a sine qua non of a libel claim and since only assertions of fact are capable of being proven false…a libel action cannot be maintained unless it is premised on published assertions of fact." Brian v. Richardson, 87 N.Y. 2d 46, 51 (1995).

Walter's statements that Dr. Goldfarb murdered Alexander Litvinenko in collaboration with the CIA, and that Dr. Goldfarb murdered his wife, are assertions of fact and not opinions. The relevant factors for distinguishing factual assertions from nonactionable opinion are "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader context are such to 'signal readers or listeners that what is being read or heard is likely to be opinion, not fact.'" Id. The court must consider "the content of the whole communication, its tone and apparent purpose" and "false statements are actionable when they would be perceived as factual by the reasonable person." Immuno AG v. Moor-Jankouski, 77 N.Y. 2d 235, 254 (1991), see also Levin v. McPhee, 119 F.3d 189, 197 (2d Cir. 1997). In Allianza Dominica v. Luna, 229 A.D.29 328, 329 (1st Dep't 1996) the court applied these factors to hold that accusations of sexual harassment and sexual abuse made in a cable television program were actionable as susceptible of a defamatory meaning and were not nonactionable statements of opinion despite "cautionary language … such as 'they say' or 'rumor in the streets say'".

Walter's statements during the Apri1, 2018 broadcast concerning Dr. Goldfarb had a readily understandable precise meaning and any allegedly cautionary language is insufficient to make the statements non- actionable opinion:

OB: I know you personally think that his former friend Alexander Goldfarb is connected to his death. A shady character?

WL: He is a CIA guy. It's CIA that killed my son.

OB: What was his motive? Why are you so sure that it was him? (obvious reference to Dr. Goldfarb)

WL: Motive? I think that he would have left like I did. He was as smart as I am. You know, as long as you remain obedient you live; as soon as you rebel you get killed. This is what happened to Berezovsky, this is what happened to this lady who said, "Walter, Walter, Alex killed Alexander.

OB: You mean Goldfarb's wife. She had cancer.

WL: No, she did not have cancer. So young… woman. They just killed her. Because she knew too much and spoke too much. And when she was saying that, they told me she was a drug addict, and now they say she had cancer. They lie all the time. (obvious reference to Dr. Goldfarb as a "CIA guy")

Walter's statements concerning Dr. Goldfarb are capable of being shown to be demonstrably false. As set forth in detail in the Complaint, the UK Inquiry established beyond a reasonable doubt that two Russian agents murdered Alexander Litvinenko, and that Dr. Goldfarb had nothing to do with the murder.

The UK Inquiry report establishing the falsity of Walter's statements is admissible under Federal Rule of Evidence 803(8) which provides an exception to the hearsay rule in civil litigations for statements in reports from of public agencies containing "factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of the information or other circumstances indicates lack of trustworthiness." The UK Inquiry was

established by the UK government pursuant to the Inquiries Act of 2005, and Sir Robert Owen, a British High Court judge, conducted thirty-four days of public hearings. (Cpt.¶ 58). Both the hearing transcripts and The Inquiry Final Report are available online. (Cpt.¶¶ 58, 59). The extensive hearings resulting in a well substantiated final report are compelling indicia of trustworthiness. See Gentile v. County of Suffolk, 129 F.R.D. 435, 450, 458 (E.D.N.Y. 1990) (admitting factual findings in report of NY State Temporary Commission of Investigations concerning police misconduct). Rule 803(8) is equally applicable to factual findings made in foreign investigations. See, e.g., In re Air Disaster at Lockerbie Scotland on December 21, 1988, 37 F.3d 804, 827 (2d Cir. 1994); U.S. v. Grady, 544 F.2d 598, 604 (2d Cir.1976).

The cause of Alexander Litvinenko's death is an ascertainable fact, and the UK Inquiry establishes that Walter's claim that Dr. Goldfarb was responsible is false. In light of that factual finding, the report also establishes that Walter's claims that Dr. Goldfarb was able to commit the murder because he was involved with the CIA, and that Dr. Goldfarb murdered his wife because she knew too much about Alexander's murder, are false.

RT America's decision to dredge up Walter's demonstrably false lies about Dr. Goldfarb over eleven years after the fact was made in the context of its role in attempting to muddy the waters in the aftermath of the Skripal incident. The entire purpose of presenting Walter's statements was to convey that he was credible, and not merely spewing unsubstantiated opinions. Indeed, the stated reason by Ms. Boyko for inviting Walter to speak was to consider "doesn't London itself have the capability, intent and motive for this kind of national character assassination?" Why would Ms. Boyko have invited Walter to speak on this question unless she intended to create the impression in the viewers' minds that Walter had valuable and credible information to offer?

As the <u>Cianci</u> court observed that "[i]t would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words 'I think'. To call charges of serious crimes merely an expression of 'opinion' would be to indulge in Humpty Dumpty's use of language." <u>Id.</u> at 64. <u>See also</u> <u>Milkovich v. Lorain Journal</u>, 497 U.S 1, 18-19 (1990) (statement that "in my opinion John Jones is a liar" implies knowledge of facts leading to that conclusion and "[s]imply couching such statements in terms of opinion does not dispel these implications" and such statements "can cause as much damage to reputation as the statement, "Jones is a liar'").

The cases cited by RT America finding that the statements at issue were nonactionable opinions rather than statements of fact are readily distinguishable from the allegations in this case. <u>Levin</u> involved the reporting of five conflicting accounts which were explicitly presented as "versions" of a fire that remained unsolved, 119 F.3d at 197; <u>Brian</u> involved an Op Ed page article advocating an independent investigation based on "mere allegations to be investigated rather than facts," 87 N.Y. 2d at 53; and the claim in <u>Immuno AG</u> was based on assertions in a letter to the editor in a technical journal, which were clearly intended "to voice the conservationist concerns of this partisan group, 77 N.Y. 2d at 254.

Even if statements may fairly be characterized as opinions, hypothesis or conjecture, "they may be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader." <u>Levin</u>, <u>supra</u>, 119 F.3d at 197. As described in the Complaint, there was a close relationship between Dr. Goldfarb, Alexander Litvinenko and Boris Berezovsky, a prominent Russian who was granted asylum in the UK in 2003. (Cpt.¶¶ 19-26). Berezofsky and Dr. Goldfarb were among the few people allowed to visit Alexander Litvinenko while he was in the hospital after being poisoned. (Cpt. ¶ 34) After

Alexander's death, Russian propagandists disseminated a false narrative that Berezofsky had Alexander killed because he supposedly feared that Alexander would implicate Berezofsky in alleged immigration fraud. (Cpt.¶ 40).   A UK court ultimately awarded defamation damages to Berezofsky because the immigration fraud charges were false. (Cpt.¶ 41).

It is in this context that Walter's statement, after referring to the CIA's involvement in Alexander's murder, that "they told me openly that this was mafia meaning Berezofsky and Goldfarb" implicates the rule concerning the undisclosed basis of an opinion. Walter claimed that the source of his "information" was certain Russians living in the UK, but he would not reveal the identities of these alleged informants supposedly because "I don't want to set them up." Who are these unnamed people? Do they really exist?  What suggests that they are reliable sources of information? What undisclosed additional facts about Dr. Goldfarb did they supposedly reveal to Walter?  Walter was clearly implying to the viewer that his statement implicating Dr. Goldfarb in the "mafia" is based on the existence of undisclosed facts and therefore is actionable.

For the reasons stated above, Walter's statements about Dr. Goldfarb were false statements of fact, and not protected opinions, and RT America is liable for republishing Walter's false statements.

### c.   Walter Litvinenko's Statements Are "Of and Concerning" Dr. Goldfarb

For defamation law purposes, statements alleged to be defamatory are "of and concerning" a plaintiff where "the reading public acquainted with the parties and the subject" would recognize the plaintiff as a person to whom the statement refers. Carlucci v. Poughkeepsie Newspapers, Inc., 57 N.Y.2d 883,885 (1982). "It is not necessary that the world should understand the libel; it is sufficient if those who know the plaintiff can make out that she is the

person meant." Felter v. Houghton Mifflin Co., 364 F.2d 650, 651 (2d Cir. 1966). The "of and concerning" requirement is satisfied if the defamatory statement "could have been understood by a reasonable reader as being, in substance, actually about" the plaintiff. Kirch v. Liberty Media Corp., 449 F.3d 388,399 (2d Cir. 2006).

RT America's reliance on Three Amigos SLJ Rest., Inc. v. CBS News, 28 N.Y.3d 82 is misplaced. In that case, the plaintiffs were independent entities that provided services to a club that, according to a television report, allegedly engaged in illegal activity. None of the plaintiffs was named in the report. Here, by contrast, Dr. Goldfarb was named directly three times during the broadcast. Any reasonable person watching the broadcast would understand that the defamatory statements referred to Dr. Goldfarb. RT America's assertion that Walter's statement that "Dr Goldfarb is a CIA guy, It's CIA that killed my son" did not accuse Dr. Goldfarb of murdering Alexander Litvinenko is also mistaken. Any reasonable person watching the program would have understood the statement as accusing Dr. Goldfarb; this is evidenced by Ms. Boyko's next question to Walter, "What was his motive? Why are you so sure that it was him? Obviously, the "his" and "him" in her questions referred to Dr. Goldfarb, as Ms. Boyko clearly understood, as would any reasonable reader. In any event, "[a]t this stage of the litigation, Plaintiffs need only plead sufficient facts to make it plausible – not probable or even reasonably likely- that a reader familiar with each Plaintiff would identify him as the subject of the statements at issue". Elias, supra, 872 F.3d at 105 (allegations sufficiently "of and concerning" two plaintiffs who were unnamed and identified only by their relationships with a fraternity where alleged rape occurred).

### d. Dr. Goldfarb's Damage Allegations Are Sufficient

Statements that accuse the plaintiff of a serious crime are defamatory per se. Liberman v. Gelstein, 80 N.Y. 2d 429, 435 (1992). In cases of defamation per se, no allegation of special damages is required. Id. Special damages are damages resulting from economic or financial loss. Id. While a plaintiff in a defamation action who has not alleged special damages can not recover damages for economic harm, damages for emotional distress and to reputation are recoverable. Bouveng v. NYG Capital LLC, 175 F.Supp.3d 280, 335, 351 (S.D.N.Y. 2016) (upholding jury award of $1.5 million in compensatory damages as well as punitive damage award of $1 million).

### e. Dr. Goldfarb's Punitive Damage Allegations are Sufficient

Punitive damages are available under New York law "to punish … outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights." Dibella v. Hopkins, 403 F.3d 102,122 (2d Cir.2005). An award of punitive damages in a defamation case can be based on a showing that a defendant acted with "hatred, ill will or spite" concerning the plaintiff. Stern v. Cosby, 645 F.Supp.2d 258, 286 (S.D.N.Y.2009) (allegation that defendant attempted to induce defamatory statements about plaintiff sufficient to plead punitive damage claim); Reynolds v. Pegler, 123 F. Supp. 36 (S.D.N.Y.1954) (upholding jury award of punitive damages of $100,000 where compensatory award was $1 based on finding of ill will and spite). The Supreme Court has recognized that "heavier punitive awards have been thought to be justifiable … when the value of injury and the corresponding compensatory awards are small." Exxon Shipping Co. v. Baker, 554 U.S. 471, 494 (2008). The Complaint alleges that RT America published what it knew full well were Walter's lies portraying Dr. Goldfarb as a murderer; this is a paradigmatic example of conduct evidencing ill will or spite. While Dr.

Goldfarb believes that the compensatory damages alleged in the Complaint will be proven to be significant, in any event, this is exactly the type of case where a substantial award of punitive damages would be warranted regardless of the amount of compensatory damages awarded.

## **CONCLUSION**

For the foregoing reasons, RT America's motion to dismiss should be denied in all respects. Alternatively, plaintiff should be granted jurisdictional discovery and discovery concerning the individuals at RT America responsible for the April 1, 2018 broadcast.


Dated: New York, New York
       March 18, 2019


                                        ROTTENBERG LIPMAN RICH, P.C.


                                        By: _____
                                            Bertrand Sellier, Esq.
                                            Richard E. Rosberger, Esq.
                                        230 Park Avenue, 18th Floor
                                        New York, New York 10169
                                        T: (212) 661-3080
                                        F: (646) 203-0281
                                        Attorneys for Plaintiff Alex Goldfarb