UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
ALEX GOLDFARB,

                        Plaintiff,

        -against-                          Civil Action No. 1:18 -CV-08128 (DAB)

CHANNEL ONE RUSSIA and RT AMERICA,

                        Defendants.
------------------------------------------------------------------ X

## AFFIDAVIT OF MELISSA HOOPER

# AFFIDAVIT OF MELISSA HOOPER

## INTRODUCTION

1.      My name is Melissa Hooper. I am a lawyer and an expert on the legal and political systems of the Russian Federation, and on human rights and rule of law in the country. I received a law degree from the University of California at Berkeley in 1997. After that I litigated complex state and federal court cases in the United States for nine years before transitioning to NGO and policy work.

## SUMMARY OF CONCLUSIONS

2.      It is my expert opinion that if Dr. Goldfarb were required to litigate this case in Russia, it would be impossible for him to receive a fair trial. The Russian security service, or FSB (Federalnaya Sluzhba Bezopasnosti) has already made clear statements indicating their interests in the case, and the judge hearing the case will rely on those statements in determining the ruling in the case. It will be impossible for Dr. Goldfarb to have a trial with an independent judge who will hear the evidence rather than rule according to the wishes of the FSB because this case is of such a high profile and has political implications. It is also quite likely that if he traveled to Russia, Dr. Goldfarb would be arrested before he would even be able to prosecute the case. Transferring this case to Russia would effectively deny Dr. Goldfarb his day in court. Furthermore, it would in essence be an arrest warrant for Dr. Goldfarb.

## QUALIFICATIONS

3.      I am the Director of Human Rights and Civil Society programs at Human Rights First. I have followed and studied human rights issues in Russia since 2004, when I first moved to the region. I lived in Moscow from the beginning of 2011 to the end of 2014,

1

where I was the Director of the American Bar Association Rule of Law Initiative in Russia. I managed a staff of up to 15 people, up to $5 million in funding streams, as well as nationwide programs occurring all over Russia on issues of minority rights protection, anti-corruption policy and litigation, use of international human rights standards in local courts, appealing to international human rights bodies, general advocacy skills, protection of NGOs under a changing legal framework and political situation, and policy development in areas of business law, anti-corruption, criminal law, and human rights. Our office in Russia closed in 2015, voluntarily, after we received a notice from the Russian government that our NGO would be removed from the list of registered NGOs. At that time, many NGOs were being placed on what was called the "foreign agent" list, or on a list of "undesirable" organizations. We were lucky that was not our fate, because simply being delisted would allow the organization to apply to re-open in the future. With that understanding, we shut down.

4.      As part of my work I have monitored many trials against or involving individual human rights defenders, journalists, members of minority communities, opposition political party members, and political prisoners. From 2012 to 2014 I attended trials on a regular basis. I was there to review whether the trial procedures complied with international standards of due process, fairness, and equal protection of law. The trials I monitored included trials of Alexei Navalny, opposition activist Sergei Udaltsev, defendants in the Bolotnaya cases, Pussy Riot members, and proceedings concerning members of LGBT communities. I also monitored legal developments in Russia, such as the passage of new laws curtailing religious rights, free speech, NGO activity, freedom of

association, and freedom of movement, of which there were many at that time. At present there continue to be many laws violating these rights and freedoms as well.

5.      I continue to monitor issues related to human rights, rule of law, and legal developments in Russian courts now as a director at Human Rights First. I am a member of a number of policy working groups in Washington, D.C. that bring together current and former members of the State Department, think tank researchers, and policy experts to discuss policy and fact developments. We also discuss strategies the United States might adopt to urge greater observance of rule of law in Russia and to provide support to pro-democracy groups there.  I serve on the Board of Directors of the Free Russia Foundation and the Board of the bipartisan Transatlantic Democracy Working Group.

6.      I have authored dozens of reports, articles, and speeches on human rights issues in Russia, and specifically on the government's treatment of those critical of its policies, covering in particular the period from 2010 to the present. My work includes the following recent reports and articles on human rights and legal issues in Russia: "Russia's Bad Example" (Report on use of new laws and legal actions to curtail the work of NGOs in Russia), "Russia's Traditional Values Leadership" (Report on use of religious language and beliefs as justification for attacking rights of LGBT persons, women's rights, and curtailing free speech and free assembly), "Russia's Toolkit for Undermining Democracy" (Factsheet on antidemocratic strategies Russia uses at home and abroad); "Helsinki Summit: A Review of Vladimir Putin's Record of Human Rights Violations and Attacks on Democratic Institutions" (Factsheet on rights violations in Russia ahead of President Trump's meeting with President Putin); and "The Non-Governmental sector: Pro-Russia Tools Masquerading as Independent Voices" (Article

on the Kremlin's use of government-organized NGOs to push disinformation and work against human rights protection, in Russia and in Europe). In the last two years I have given lectures on the misuse of the justice system in Russia to target individuals that speak out in disagreement with the Kremlin, at Yale, NYU, Columbia, Fordham, Harvard, Georgetown, and American University, as well as at a number of other conferences. In 2017, I testified in Congress regarding Russia's weaponization of disinformation abroad. In 2018, my work was cited several times by the Senate Committee on Foreign Relations in its major report: Putin's Asymmetric Assault on Democracy in Russia and Europe: Implications for National Security.[1]

7.      After leaving Russia in 2014, I visited in 2015 and again briefly in 2016. During these years and since, I have followed and studied numerous trials in Russia that have had political significance, including trials of protestors that have spoken out against government actions and policies – such as the Bolotnaya protestors, youth that participated in Navalny-led protests, and average citizens protesting health care and trash policies, and I have monitored the government's harsh treatment of those who speak critically online of its decisions and actions, such as initiation of the war in Ukraine.

8.      I have been accepted as an expert on human rights conditions in Russia and the countries of Central Asia in eight federal jurisdictions in asylum cases and in cases concerning Guantanamo detainees from the former Soviet Union. My testimony in these thirty-plus cases has concerned treatment of opposition figures, minority communities, and those critical of the government. Specifically, in each case my testimony detailed the

---

[1] https://www.foreign.senate.gov/imo/media/doc/Cardin%20Russia%20Report%20Embargoed%20Committee%20Print.pdf

4

methods the Russian government uses to silence critics, such as arbitrary and baseless arrests, application of false criminal charges, use of vaguely-worded legal statutes to charge individuals targeted by the government, fabrication of evidence, fabrication of witness testimony, use of broad and ill-defined legislation to apply to conduct that should be protected, use of torture and ill treatment, disappearances, and extrajudicial killings. In addition, I have testified regarding the functioning (or lack thereof) and reliability of the legal system as well as the politicized nature of judicial decision-making in certain types of cases in Russia.

**EVIDENCE AND CONCLUSIONS**

9.      According to the United States Department of State, the Russian Federation has a highly-centralized authoritarian political system with a pervasive climate of impunity. The government generally does not investigate abuses by police or other state actors and does not hold them accountable. The State Department has documented numerous severe deficiencies in the legal system, including the use of bribery to subvert judicial independence, and the failure to allow criminal defendants the lawyer of their choice – instead forcing a "pocket" attorney on them (so-called because the lawyer is in the pocket of law enforcement). The State Department also notes that judicial independence is not guaranteed, with judges subject to influence from the executive branch or security forces, especially in high-profile or politically-sensitive cases. Says the 2018 report: "The outcomes of some trials appear predetermined."

10.     An April 2019 report issued by the Free Russia Foundation in partnership with five other organizations – a report to which I contributed advice, guidance, and issues for inclusion – supports the State Department conclusions. The report notes (referencing

5

political scientist Maria Popova and the organization Freedom House) that Russia's judiciary is widely-recognized to lack independence from the executive branch.[2] In political cases, notes the report judicial decisions are "driven by the executive". According to Maria Popova, "in high-profile cases, legal outcomes... are entirely predictable if one knows the preferences of the political sovereign: the Kremlin always wins." Even if the Kremlin's preference is unclear, judges try to guess the politically correct outcome. Says the report: "Political influence on the judiciary is facilitated through both the hiring process – the President nominates judges to the highest courts and appoints other federal judges – and the promotion process, as career advancement within the judiciary is effectively tied to compliance with Kremlin preferences." (internal quotation marks omitted). Several judges have been dismissed for not following the state's instructions.

11. A 2018 commentary by expert Olga Romanova for the Carnegie Moscow Center reinforces this assessment. In the commentary, which concerns a high-profile case involving the Russian banking system, Romanova writes that when hiring judges, the Russian court system does not seek experienced lawyers or outside experience, it seeks "efficient personnel who know how to follow orders."[3]

12. These descriptions are consistent with my own observation of the functioning of the legal system in Russia. This declaration will explain and provide background regarding the issues discussed in the declaration of Dr. Alex Goldfarb.

---

[2] https://www.perseus-strategies.com/wp-content/uploads/2019/04/The-Kremlins-Political-Prisoners-May-2019.pdf (see pages 16-17)
[3] https://carnegie.ru/commentary/75316

6

13.     Dr. Goldfarb states that if this court were to cede jurisdiction to Russia, that it is likely that he would be arrested for the murder of Alexander Litvinenko upon entering the country. This concern is credible, and it is my opinion that this is very likely to happen. This is because the Federal Security Service (FSB) and state officials have made statements that he is a security threat and participated in the murder of Litvinenko. This use of disinformation like this is generally used to communicate the Kremlin's perspective, which is viewed as a message to lower state officials and law enforcement. Generally, lower level law enforcement and security service are not given specific orders regarding what to do to a particular individual, but know that they must interpret these "messages" from the top in the broadest way possible, in order to please superiors and leaders in the Kremlin. Therefore, if Dr. Goldfarb were to attempt to enter Russia, the border security would very likely use the statements that he is a security threat to deny him entry, and the security service would use the same statements to take custody of him and begin the process of charging him with criminal offenses. The officers will likely not determine what they will charge until later, after consultation with high-level FSB officers.

14.     As stated by Dr. Goldbarb, one common method of accomplishing an arrest is to plant evidence, drugs, or other illegal materials on the individual during the arrest. I can attest that this is true. In addition to planting drugs, as was done in the Oyub Titiev case cited by Dr. Goldfarb, I witnessed numerous other cases where banned religious materials or election materials were planted. In one case I witnessed my neighbor, a campaign manager for Mr. Alexei Navalny, dragged from his apartment by police in 2013. Police later said they found illegal "campaign materials" in his apartment. The police said this

before they even entered the apartment. Another common method is to allege charges of fraud. This method was used with opposition figure Alexei Navalny, and his brother Oleg Navalny, as well as with well-known theater director Kirill Serebrennikov who was targeted because of the political anti-Kremlin messages in his theater work.

15.    Dr. Goldfarb further states that he will not be able to obtain a fair trial in Russia. Based on my experience monitoring and studying the Russian justice system for the last 10 years, I can confirm this is true. As discussed in the State Department 2018 Report, the justice system in Russia is controlled by the executive branch in high-profile or politically-sensitive cases, which is precisely what this case is. It concerns a former FSB officer who was killed in a way that communicates it was a hit by the FSB, in a foreign country, and Dr. Goldfarb is one of the key figures that pushed for an inquiry to discover the major facts linking the FSB to Mr. Litvinenko's death. In a case such as this, the verdict will be predetermined. The judge hearing the case will have a very clear sense that he or she must rule in a way consistent with the FSB statements that Dr. Goldfarb is a security risk and a danger to Russia. Dr. Goldfarb's statements will not be taken as true, nor will those of his witnesses. The evidence he would offer in court will either be excluded as evidence, or will simply be ignored.

16.    As described in the reports referenced above from the Carnegie Moscow Center and the Free Russia Foundation (and others), it is common knowledge in Russia, and among those who study Russia's legal and political systems, a term "telephone justice" is often used. This is a colloquial way of saying that when a trial is of any concern to higher-ups in the government, the legal proceedings are preordained. Amnesty International's latest annual report on human rights in Russia states that in 2018 their

international trial monitors continued to report systematic violations of the right to fair trial in specific court cases. Trials of a political nature were often swift, occurring so quickly that it was not possible for the court to guarantee protection of individual rights. Amnesty provides the example of cases occurring after a March 2018 protest: Tverskoy District Court in Moscow considered 476 cases in 17 working days. In August, Aleksandr Eivazov, the former Secretary of the October District Court in St. Petersburg, was arrested for purportedly "interfering in the work of the court." In fact, he was a whistleblower who had witnessed the repeated violation of court procedures, judicial ethics, and worker's rights in the court, and had sent several complaints to authorities. He also shared this information on social media. His complaints were not addressed, and instead he was arrested.

17. I have witnessed this myself. In a case involving a Bolotnaya protester in late 2012, I observed a young prosecutor trying the case. When asked by the judge the substance of the case and the charges, the prosecutor – who was obviously trying one of his very first cases – was unable to formulate a coherent description of the case. He was flustered and confused, and didn't seem to have even read the file. The prosecutor's presentation was so bad that observers in the courtroom began to laugh at him. Even the judge laughed. The defense lawyer, a well-known advocate associated with Memorial Human Rights Center in Moscow, made a very eloquent and clear presentation, explaining why the charges were unfounded and did not apply to the defendant. However, in that very case, where the prosecutor was unable to explain why the person in the courtroom should be held accountable, the judge ruled for the prosecution a mere half an hour later.

18. This trend is also very clearly observed in the numerous cases against Alexei Navalny, who has been tried numerous times for administrative offenses related to his protests, and on fraud charges that were used to apply political pressure. For example, Navalny and an associate Pyotr Ofitserov were charged in 2013 with embezzlement related to a timber company, even though testimony in the case indicated that the crime had not been committed. At the time of the 2013 trial, a Kremlin statement noted that if Navalny was convicted he would not be allowed to run for mayor against the Kremlin-chosen candidate that year. This statement was a direct signal to the judge, and Navalny and Ofitserov were convicted.[4] Navalny appealed his conviction to the European Court of Human Rights, which found in 2016 that Navalny's and Ofitserov's conduct was legal, and the criminal charges were not a foreseeable application of the law.[5] The upshot of the European Court's ruling is that the charges were fabricated.

19. Ahead of Navalny's retrial in 2017, the Kremlin made another statement. This time, the Kremlin noted that Navalny would be prohibited from running in the presidential election against Vladimir Putin in 2018 if he were convicted of a crime, such as embezzlement in the Kirov case.[6] Kremlin spokespersons specifically cited this case in their messaging, again making it very easy for the judge to understand what the outcome should be. Navalny and Ofitserov were again found guilty and the verdicts were upheld on appeal. Navalny was consequently confined to house arrest and prohibited from running for president in 2018. In 2019, the European Court ruled that the house

---

[4] http://www.rapsinews.com/judicial_news/20130718/268220778.html
[5] ECHR 071 (July 4, 2016) http://hudoc.echr.coe.int/eng?i=001-161060.
[6] https://www.rferl.org/a/russia-navalny-court-upholds-embezzlement-verdict/28465569.html

arrest applied to Alexei Navalny was politically-motivated and designed to limit his political activity.[7]

20.     Navalny and his brother, Oleg, were also charged with fraud and money-laundering in a separate case in 2014. Alexei Navalny was given a suspended sentence and Oleg was required to serve his sentence of three and a half years. The sentencing of his brother to prison time and of Alexei Navalny to house arrest was used to pressure Navalny to reduce his public criticism of the Kremlin and to stop organizing protests.[8] He did not heed the pressure, which likely resulted in the 2017 verdict in the Ofitserov case.

//

//

//

//

//

---

[7] https://www.rferl.org/a/russia-navalny-echr-violated-rights-house-arrest/29870131.html; ECHR 127 (April 9, 2019) http://hudoc.echr.coe.int/eng?i=001-192203.

[8] https://www.rferl.org/a/oleg-navalny-released-from-russian-prison-after-3-1-2-years/29326978.html

21. It is my expert opinion that if Dr. Goldfarb were to be required to litigate this case in Russia, it would be impossible for him to receive a fair trial. The national security service would dictate the outcome, and essentially has already done so in making public statements about Dr. Goldfarb in connection with the death of Mr. Litvinenko. It is also likely that Dr. Goldfarb would be arrested before he would even be able to initiate this case. Transferring this case to Russia would effectively deny Dr. Goldfarb his day in court; and would in essence be an arrest warrant for Dr. Goldfarb.

22. I certify that this declaration is true and correct under the laws of the United States of America, signed this 13 day of May, 2019 in Washington, D.C.

_____
MELISSA HOOPER

SUBSCRIBE AND SWORN TO BEFORE ME
THIS 13Th DAY OF May, 2019
BY J. Peoples
NOTARY PUBLIC
My Commission Expires February 14, 2023