**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEX GOLDFARB, <br><br>                 Plaintiff, <br><br>    v. <br><br> CHANNEL ONE RUSSIA <br><br>                 Defendant. | Case No. 1:18-cv-08128 (JPC) |

## DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Rule 56.1(a) of the Local Rules of the United States District Court for the Southern District of New York, Defendant Channel One Russia ("Defendant" or "Channel One") respectfully submits the following statement of material facts as to which there is no genuine issue to be tried in support of Channel One's Motion for Summary Judgment against Plaintiff Alex Goldfarb ("Plaintiff" or "Goldfarb").

## THE PARTIES

*Plaintiff*

1.	Plaintiff is a self-described "distinguished microbiologist" and "noted human rights activist who has worked with, among others, Andrei Sakharov." [Compl., ECF No. 5, ¶ 11]. He has worked with the philanthropist George Soros and, during the 1990s, "spent much of his time in Moscow directing various Soros projects" and a "major program" for the Soros Foundation. [Compl. ¶ 20; Deposition of Alex Goldfarb ("Goldfarb Dep.") 168:5-11; 171:19-

173:4].[1] During this time, Plaintiff "spent between one-third and one-half of my time in Russia." [Goldfarb Dep. 172:23-25].

2.     Plaintiff has also served as the CEO of the International Foundation for Civil Liberties ("IFCL"). [Compl. ¶ 30]. The activities of the IFCL and Boris Berezovsky were the subject of a Manhattan District Attorney's investigation in the early 2000s. [Goldfarb Dep. 36:18-38:6].

3.     At that time, Berezovsky, IFCL, and Plaintiff "were channeling tons of money, probably millions, to various NGOs and human rights groups and independent media . . . it was a relatively big operation, and all of this was funded by Berezovsky, who sent money to [IFCL]. So he was transferring money from all kinds of places to our accounts in the US, and we spend them the way essentially -- I ran it. It was mostly my operation." [*Id.* 37:3-25].

4.     Plaintiff is the "author of a widely circulated book," "enjoys considerable public standing in Russia and around the world, including the United States" and is often "invited to take part in news programs, talk shows, conferences and documentaries" both in the United States and internationally, the subject of which are, broadly, "Russian affairs." [Compl. ¶ 108]. Indeed, he was a "quite well-known character in the Russian -- widely known in their circles." [Goldfarb Dep. 169:6-7].

5.     Plaintiff and Marina Litvinenko wrote the book *Death of a Dissident* because "[t[here was a lot of public interest . . . there was tremendous interest because we had a story to

---

[1] Excerpts of Declarations are attached as Exhibits 1-4 to the Declaration of Kendall Wangsgard ("Wangsgard Decl.") filed herewith:
        Ex. 1: Alex Goldfarb
        Ex. 2: Natalia Nikonova
        Ex. 3: Dmitry Borisov
        Ex. 4: Alexey Pimanov

tell and because we wanted to tell the world what we believe happened at the time." [*Id.* 208:8-14]. It was a matter of public concern. [*Id.* 208:20-22].

6.     Plaintiff believes that the death of Mr. Litvinenko has become "a permanent fixture in the discourse of West-Russia relations to this day." [*Id.* 208:23-209:11].

7.     During time that Plaintiff spent in Russia, he "met and befriended" the then-wealthy Russian entrepreneur, Boris Berezovsky, as well as the late Alexander Litvinenko. [Compl. ¶¶ 19-20]. Messrs. Berezovsky and Litvinenko both later fled Russia and settled in the United Kingdom. [*Id.* ¶¶ 23, 24, 26]. In 2003 and 2006, the Russian government requested, but was not granted, extradition of Berezovsky for economic crimes and plotting to overthrow President Putin. [*Id.* ¶ 26].

8.     At that time, Berezovsky had already obtained asylum from the United Kingdom. [*Id.*]. Berezovsky died in 2013, and the coroner—unable to rule out foul play—entered an open verdict. [*Id.* ¶ 56].

9.     On August 4, 2010, Russian Deputy Prosecutor General Alexander Zvyagintsev wrote to then British Home Secretary Theresa May and, among other things, in that letter characterized Plaintiff as an "accomplice" of Berezovsky in Mr. Litvinenko's murder. [Goldfarb Aff., ECF No. 63 ¶ 5 & Ex. 1]. It also stated that Plaintiff was "a co-conspirator in the alleged 2003 plot to defraud the UK authorities into granting asylum to Mr. Berezovsky." [*Id.*].

10.     As recently as June 2013, a visa application for Plaintiff to enter Russia was denied "in a categorical form" and such denial was "a high-level decision." [Goldfarb Aff., ECF No. 63 ¶ 3]. Or, stated another way, he was informed that the attempt to secure him a visa "was denied by the foreign ministry at an executive level in categorial terms, so [he is] essentially persona non grata." [Goldfarb Dep. 176:15-20].

11.     Even before that, in 2004 or 2005, a friend of his working in the travel industry approached the Russian Consulate in New York and inquired if Plaintiff had any chance of getting a visa to enter Russia. [*Id*. 173:17-24; 177:8-17]. This was an attempt by Plaintiff to "see if I'm on the blacklist." [*Id*. 177:18-178:2; 178:8-10]. Indeed, "people who are denied visas -- and there's several -- are referred to as people being blacklisted. So I have a couple of friends who are blacklisted, so from that I figured out that I'm one of them." [*Id*. 178:13-17].

12.     Plaintiff believes that "the prohibition on my travel to Russia is still in effect" as of, at least, May 9, 2019. [Goldfarb Aff., ECF No. 63 ¶ 3].

13.     Plaintiff "has spoken with many journalists" about the events underlying his Complaint (to wit, the death of Mr. Litvinenko) to such a degree that he does not recall them all. [Pltf. Interrog. Response No. 2].[2] These include Channel One Russia, Radio Liberty, *The Daily Beast*, BBC, Radio Echo Moscow, Voice of America, *The Guardian*, BuzzFeed, WTOP Radio, *Politico*, and *The Wall Street Journal*. [*Id.*].

14.     Indeed, shortly after Mr. Litvinenko's death, there were various op-ed pieces by Plaintiff in the *New York Times*, *The Washington Post*, *The Wall Street Journal*, *The Guardian*, the *Daily Telegraph*, "and so on." [Goldfarb Dep. 203:15-22].

15.     Over the years, Plaintiff has also been on the "Today Show," "Good Morning America," "PBS NewsHour" and on CNN in the United States, and BBC and New 4 in the United Kingdom. [*Id*. 203:23-204:13].

16.     Plaintiff has spoken at conferences and has been on documentaries, mostly about Mr. Litvinenko, starting from his death and ending with the public inquiry, and perhaps also the Skripals. [*Id*. 204:8-24]. This includes the Frontline Club in London, BBC News Night, the

---

[2] Relevant portions of Plaintiff's Interrogatory Responses dated Sept. 3, 2021, are attached as Exhibit 5 to the Wangsgard Decl.

Oxford Union Society, the Canadian Broadcasting Corporation, Radio Canada, and the Atlantic Council. [*Id*. 205:7-206:21]. Indeed, as he describes it, "[o]ver the years, particularly with Litvinenko and later with Skripal, people would call from all over the world, you know, to put me for two minutes on some news program, and I don't even remember their names." [*Id*. 206:9-14].

17.     Further, he has discussed this specific case widely, including with: the staff of the Atlantic Council in Washington, D.C.; the Free Russia Forum in Vilnius; Open Russia in London and The Hague. These discussions are in the context of his public appearances at these venues, and with members of the audience. [Pltf. Interrog. Response No. 5]. He has also discussed this case with several U.S. Senators and Congressmen and their staffs, including with: Sen. Johnson; Sen. Shaheen; Congressman McGovern; Congressman Cohen; Congressman Keating; Congressman Hultgren; and Congressman Albio Sires. [*Id.*]. He has also discussed the case with Deputy Assistant Secretary of State Chris Robinson, Shannon McGuire of USAID, and Andrew Stevenson, a British lawyer. [*Id.*; *see also* Goldfarb Dep. 210:10-211:4; 211:19-212:2; 213:9-16].

18.     With respect to the British Intelligence Services, Plaintiff "never received any money from them" but "met them a couple of times in London." [Goldfarb Dep. 187:5-9]. This was "during Litvinenko's lifetime when they were around asking questions about matters of interest to them." [*Id*. 188:16-22].

19.     The first such meeting was in 2002 or 2003, and was arranged by Mr. Litvinenko. [*Id*. 189:8-12]. The last time was probably in 2005. [*Id*. 189:13-17]. Plaintiff provided information to the British Intelligence Services insofar as he "answered their questions." [*Id*. 190:6-7].

20.     There were three meetings with British Intelligence. [*Id*. 190:9-192:24]. During these three meetings, Plaintiff was approached regarding (i) possible contacts with Russian biologists in relation to Iraqi weapons before the 2003 war, (ii) whether a member of Berezovsky's entourage (whom Plaintiff knew "quite well") was actually a Russian asset, and (iii) for information regarding a former Russian security officer whom Mr. Litvinenko wanted to have leave Russia. [*Id.*]. Mr. Litvinenko was on the payroll of the British Intelligence services at this time. [*Id*. 194:18-21].

21.     Plaintiff describes that he also "had contact with the CIA without I believe working for them." [*Id*. 197:3-7]. Once was "during the Soviet times. They were interested in a couple of colleagues of mine back in Russia, so it should have been sometime [19]81 or [19]82. And essentially that was it. I didn't provide them any meaningful information other than general." [*Id*. 197:9-16].

22.     The other time Plaintiff "was in touch with the CIA is when I brought the Litvinenkos to the American Embassy in Ankara." [*Id*. 197:17-19]. That meeting was arranged by Plaintiff. [*Id*. 197:22-198:4].

23.     In this respect, Plaintiff describes that, "I believe that technically I could be called an asset, but substantively I'm not" [*Id*. 243:8-16], though he denies being a "member" of the CIA. [*Id.* 240:6-9].

24.     With respect to the FBI, Plaintiff describes that "the FBI talked to me probably two or three times and once even bought me lunch." [*Id*. 198:19-21]. The first was because the FBI was interested in what Plaintiff was doing with a member of the Soviet mission at the UN. [*Id*. 198:22-24].

25.     The other time, Plaintiff describes, "they talked to me quite a lot. They were investigating the disappearance of an American in Chechnya. It was a kind of famous case, and I was involved with this American. . . ." [*Id*. 199:9-13]. This was probably in or around the year 2000. [*Id*. 199:16-17]. Plaintiff knew the American "as part of the Soros Operation" in Moscow who also worked very closed with the Department of Defense. [*Id*. 201:11-13, 17-19].

26.     In 1975, *The Harvard Crimson* published an article, in which Plaintiff is cited as saying that he was initially refused permission to emigrate from the Soviet Union "on the grounds that he possessed secret military and warfare information important to the security of the Soviet state." [Goldfarb Dep. Ex. B].[3] He denies this and contends that it was a false excuse to deny him permission to leave. [Goldfarb Dep. 138:3-20].

<u>Channel One</u>

27.     Channel One is a Joint-Stock Company incorporated under the laws of Russia, with its principal place of business in Moscow. [Am. Ans., ECF No. 117, ¶ 12; Declaration of Larisa A. Nasonova filed herewith ("Nasonova Decl.") ¶ 5; Declaration of Timur Siraziev filed herewith ("Siraziev Decl.") ¶ 3]. The registered address of Channel One is Akademika Koroleva Street 19, 127427, Moscow, Russia and Channel One conducts business only in the Russian Federation. [Am. Ans. ¶ 12].

28.     Channel One adheres to the principles of pluralism of opinions in the material that it broadcasts. [*Id*. ¶ 95].

29.     Channel One's operations structure is divided into various separate Directions (or Directorates). [Nasonova Decl. ¶ 6; Siraziev Decl. ¶ 4]. These include, for example, the Direction of Information Programs, the Direction of Special Projects, the Direction of Public and

---

[3] Attached as Exhibit 6 to the Wangsgard Decl.

Political Broadcasting, the Direction of Social and Publicistic Programs, the Films Direction, and the Sports Direction. [*Id.*].

30.    These are formal separations. [Nasonova Decl. ¶ 7]. Each Direction is engaged in the production of programs in a specific area of broadcasting. [*Id.*]. Each has its own independent manager who makes independent decisions regarding the composition and content of related programs, its own staff subordinated to the head of the Direction, its own goals and rating tasks, its own budget, and so forth. [*Id.*].

31.    This formal separation serves the purpose of optimization of management structure, increasing the competitiveness of outgoing broadcasts and deep narrow professional qualifications of specialists, depending on the area of broadcasting. [*Id.* ¶ 8].

32.    Entertainment talk shows are the purview of Special Projects. [Deposition of Natalia Nikonova ("Nikonova Dep.") 6:10-11; Nasonova Decl. ¶ 10; Siraziev Decl. ¶ 23].

33.    Different departments do not or very rarely have communications with each other in terms of creative or programming material. [Nikonova Dep. 28:20-24; Nasonova Decl. ¶ 12].

34.    As the host of "Let Them Talk" describes it:

> [B]roadly speaking, the informational department is about news, is about daily news and information, is about the news reports, and the program which is called "Time" is like end-of-the-day news, while our directorate is more about entertainment of social nature, I would say. It has nothing to do with the news, although from time to time our topics cover the information which is covered by the news department as well, but we tackle it from a different angle, view, and we provide totally different overage. Again, our program is a tabloid per se.

[Deposition of Dmitry Borisov ("Borisov Dep.") 67:2-15].

> [C]ontrary to popular belief, quite often the directorates or the departments live in different worlds, and the synergy that might be assumed as existing in one company does not always take place. . . .

8

[Borisov Dep. 68:5-12].

35.     Further, due to the separation among Directions, information obtained by one (e.g., the Direction of Information Programs) is *not* shared with others (e.g., the Direction of Special Projects). [Nasonova Decl. ¶¶ 11-12; Siraziev Decl. ¶¶ 23, 28].

36.     There is also no centralized repository (e.g., a database) where different Directions can search for or review material created or maintained by the others. [*Id*. ¶ 13].

## ALEXANDER LITVINENKO

37.     Alexander Litvinenko was a Russian-born, British-naturalized former officer of the Russian Federal Security Service. [Compl. ¶¶ 1-2; 18].

38.     Mr. Litvinenko, with the assistance of Berezovsky and Plaintiff, left Russia in late 2000 and settled in London with his family. [*Id*. ¶ 24]. Mr. Litvinenko fled Russia while on release from jail pending trial for official misconduct. [*Id*. ¶ 18]. He later was granted asylum in the United Kingdom. [*Id*. ¶ 25].

39.     From at least November 1, 2000, until his death on November 23, 2006, he lived in London with his wife, Marina Litvinenko (a/k/a "Maria Carter") and their son. [*Id*. ¶¶ 2, 24]. Plaintiff describes himself as "close friends" with Mrs. Litvinenko. [Goldfarb Dep. 17:5-6].

40.     In 2002-2003, Mr. Litvinenko wrote two books highly critical of the Russian government and institutions. [Compl. ¶ 25]. During this time, the non-profit run by Plaintiff provided grants to Mr. Litvinenko to enable him to publish. [*Id*. ¶ 30]. That organization was funded by Berezovsky. [*Id.*].

41.     In the weeks preceding his death, Mr. Litvinenko was in hospital in London. [*Id*. ¶¶ 32-34]. Two of the few permitted visitors were Plaintiff and Walter Litvinenko, father of

Alexander.[4] [*Id.* ¶ 34]. The morning following his death, Plaintiff read a statement ostensibly from Mr. Litvinenko accusing Putin of ordering his poisoning. [*Id.* ¶ 36]. While it was signed by Mr. Litvinenko, the statement was not written by him. Rather, it was drafted by his lawyer. [Goldfarb Dep. 231:24-232:3].

42.     However, Mr. Litvinenko "didn't have any evidence other than a hunch" with respect to his accusations against Putin. [*Id.* 251:22-252:8].

43.     With respect to the public statements following Mr. Litvinenko's death, Plaintiff describes that he acted as a "friend, spokesman." [*Id.* 232:22-233:5].

44.     As described by Plaintiff, "[b]ased on official statements of the Russian Prosecutor General Office ("PGO"), Russian investigators give credence to the theory . . . that Mr. Berezovsky and I killed Mr. Litvinenko." [Goldfarb Aff., ECF No. 63 ¶ 4; *accord* Goldfarb Dep. 182:3-23 ("I would say it's the official position of investigators in the [Russian] prosecutor's office" that Western intelligence, including potentially Plaintiff, played a role in Litvinenko's death but this is "the investigation rather than the government position.")].

## PLAINTIFF IS, BY HIS OWN ADMISSION, A PUBLIC FIGURE

45.     Plaintiff, by his own acknowledgment, has had a wide-ranging public persona both before Mr. Litvinenko and certainly after. [Goldfarb Dep. 206:25-207:6].

46.     In relation to this lawsuit, Plaintiff has written that "Regarding Marina Litvinenko and myself, the defendants will easily prove that we are public figures and therefore we're covered by this caveat or this rule." [Goldfarb Dep. Ex. G,[5] 228:5-8]. By this "caveat or rule," Plaintiff refers "here to the actual malice." [Goldfarb Dep. 228:2-9; *see also* 229:2-8; 230:7-18].

---

[4] References to Walter Litvinenko include "Walter" and references to Alexander Litvinenko are "Mr. Litvinenko."
[5] Attached as Exhibit 7 to the Wangsgard Decl. (as translated more formally than by Plaintiff in the deposition: "As far as Marina Litvinenko and I are concerned, the defendants will prove with ease that we are public figures, which means that this rule applies to us.").

He makes these statements with the benefit of legal research. [Wangsgard Decl. Ex. 7; 227:9-12]. Indeed, when he refers to actual malice, it is based on his familiarity with applicable libel law and in the legal sense. [Goldfarb Dep. 228:21-229:8].

47.     Further, as he stated, "I would believe that we are public figures, which we are, and that means that the standard applies to us, the standard of actual malice." [*Id*. 230:15-18]. At a minimum, Plaintiff is what he would "call [a] limited purpose public figure with regard to a large -- a large area of discourse like connected to Russia, Putin, and all that" [*Id*. 230:19-231:5] and with respect to Litvinenko "definitely." [*Id*. 231:6-9]. This has been the case "following the moment I read out Litvinenko's deathbed statement to the press on the day he died, and on and on and on." [Goldfarb Dep. 231:19-21].

48.     On September 28, 2018, *The Washington Post* published an opinion piece written by Plaintiff titled "I'm a critic of Putin's regime. Russian state TV is accusing me of murder."[6] There, he writes, among other things:

> This month I filed a defamation lawsuit against two Russian state television channels that have falsely accused me of murdering the Russian ex-spy Alexander Litvinenko . . . [C]urrent U.S. law offers me and people who share my fate little in the way of viable defense.
> * * *
> U.S. law gives strong protections to the media against libel claims. To win the case I have to prove, among other things, "actual malice" – that the broadcasters either knew they were lying when they broadcast the lies, or acted with reckless disregard for the truth or falsity of their reports.

### WALTER LITVINENKO

49.     Since at least as early as February 2, 2012, Walter Litvinenko has accused his son of being a traitor. [Compl. ¶ 47].

---

[6] Attached as Exhibit 8 to the Wangsgard Decl.

50.     Since at least as early as May 31, 2012—in an interview with former defendant RT—Walter Litvinenko has accused Plaintiff of murdering his son. [*Id.* ¶ 48].

51.     Walter Litvinenko received the "small amount" [Nikonova Dep. 31:21] of 34,843 rubles in reimbursement for his appearance on the Channel One program "Let Them Talk." [Nasonova Decl. ¶ 21]. This was the equivalent of approximately US $603 in late March 2018. [*Id.*]. This is not a large amount by the standard of "Let Them Talk" and, indeed, it is well within (and even at the lower end) of the range of what guests often receive in conjunction with their appearance. [*Id.* ¶ 25].

52.     Payment to reimburse guests for their costs in appearing on a program are highly typical [Nikonova Dep. 29:25-30:8] and "standard." [Nasonova Decl. ¶ 23]. The payment Walter Litvinenko received was solely reimbursement, and there was no additional remuneration paid to him. [Nikonova Dep. 30:9-14; Nasonova Decl. ¶¶ 22, 24].

## OVERVIEW OF THE CHANNEL ONE PROGRAMS AT ISSUE

### *"Let Them Talk"*

53.     Channel One's television program "Let Them Talk" is a popular talk show format program. [Am. Ans. ¶ 83]. The program is produced by Channel One in Moscow, broadcast by Channel One solely in Russia, and is aired in the Russian language. [*Id.*; Compl. ¶ 82].

54.     Dmitry Borisov is the host of "Let Them Talk." [Compl. ¶ 99; Borisov Dep. 19:16-18].

55.     This is an entertainment polemical show designed to cover topical and socially important events in the form of free discussion. [Am. Ans. ¶ 83]. For these purposes, experts, heroes, guests, and spectators are invited to the studio. They are given the opportunity to freely express their views on an issue. [*Id.*].

56.     This is a "program of entertainment nature." [Nikonova Dep. 14:15-16]. Or, as described by the host, it is "about destinies and the fates of the people compared to just dry news in the news reports." [Borisov Dep. 19:22-24].

57.     It can also be described as a "tabloid." [*Id*. 25:8; 67:14-15].

58.     The views expressed by the experts, heroes, guests, spectators, and other participants of the shows do not depend on the wishes of the host or editorial group. [Am. Ans. ¶ 83]. By design, a particular episode has a primary subject and the editors "invite people with various opinions in connection with that topic and [ ] let them engage in live discussion." [Borisov Dep. 20:6-10].

59.     One aspect of what makes "Let Them Talk" interesting is "when it is not obvious and it's not clear what the actual facts are." [*Id.* 27:1-12 ("the fact that [it was] unclear made it more interesting for our program to discuss because, as part of our program, we discuss various opinions in various situation[s], and if the -- if it were clear later on, it would not be as interesting, and it did not necessitate for us to air one program after another dedicated to this topic [i.e., the poisonings] because what makes our program interesting is when it is not obvious and it's not clear what the actual facts are.")].

60.     As described by Mr. Borisov:

> In our program, it's a cocktail of opinions, where we have 10 to 15 participants, the heroes of the program, so-called, and 10 to 15 experts, and the number of those varies. So we immerse ourselves in that cocktail of opinions, in the discussion and we never know where this discussion might lead us to.

[Borisov Dep. 83:2-8].

61.     Plaintiff describes "Let Them Talk" as "a talk show which most of the times focus on high profile cases which are not really political. So they like very much their producers and

their presenters to expose family squabbles, among other things." [Goldfarb Dep. 224:21-25]. It is not a news program, it is a talk show. [*Id*. 225:6-7]. It might be evocative of, as an American equivalent, Oprah Winfrey or Geraldo Rivera but definitely not *60 Minutes*. [*Id*. 225:8-19 ("probably close to Oprah Winfrey . . . or . . . Geraldo Rivera, is this kind of program. That's what it reminds me of.")].

62.     Within Channel One, "Let Them Talk" is part of the Direction of Special Projects, headed by Natalia Nikonova. [Nikonova Dep. 10:19-11:11; Nasonov Decl. ¶ 10]. Other programs under the Direction of Special Projects include "Let's Get Married!" "Fashion Verdict," "In Reality," "Tonight," and "The Big Game." [Nikonova Dep. 6:10-16, 12:8-11, 13:14-17].

63.     Ms. Nikonova has never been responsible for any news programs [*Id*. 8:13-14, 9:25-10:5]; instead, she specializes in talk shows. [*Id*. 10:4-5].

64.     Ms. Nikonova is responsible for general management of "Let Them Talk." [*Id*. 11:7-11].

65.     The episodes of "Let Them Talk" at issue aired on March 20, 2018, April 4, 2018, and April 10, 2018. [Compl. ¶¶ 83-90; 99-107].

66.     "Let Them Talk" is filmed in live-to-tape mode, a special type of shooting a story where a journalist/host is constantly in the frame and participates in the events/discussion surrounding him. [Def. Interrog. Response 18].[7] This usually goes on the air immediately after a short technical montage (*e.g.*, cutting out pauses between the statements of guests, superimposing illustrative or previously recorded photo and video materials). [*Id.*]. The "Let Them Talk" programs broadcast on March 20, 2018, and on April 10, 2018, were broadcast a

---

[7] Relevant portions of Defendant's Interrogatory Responses dated Feb. 7, 2022, are attached as Exhibit 9 to the Wangsgard Decl.

few hours after their shooting. [*Id.*]. The "Let Them Talk" program broadcast on April 4, 2018, was filmed on March 26, 2018. [*Id.*].

67.     With respect to the March 20, 2018, episode of "Let Them Talk," Ms. Nikonova and her team selected topics "which might be interesting for the audience" and, at that time, the Skripal poisoning "topic was hot, it was like all the yellow press was talking about that." [Nikonova Dep. 14:13-22].

68.     Walter Litvinenko was invited to appear on the March 20, 2018 "Let Them Talk" episode as "an individual who lost a close relative in an incident." [Borisov Dep. 38:2-4; *see also* Nikonova Dep. 18:17-25 (Walter "was in a similar situation. His son got poisoned, also poisoned in London.")]. Indeed, the program needed guests who would "show emotions" because it was a "program of entertainment nature" that "need[ed] participants who can show emotions." [Nikonova Dep. 19:2-7]. His appearance was only known to Mr. Borisov immediately before the program began, which is standard for the program, as Mr. Borisov "learn[s] about the actual pool of participants right where the program begins or is about to begin because there's no time to discuss that prior to the program." [Borisov Dep. 39:5-9, 17-18].

69.     Mr. Borisov did not do any personal research prior to the March 20, 2018 episode of "Let Them Talk." [*Id.* 31:24-32:3].

70.     Nor was it determined that research after the March 20, 2018 program was immediately warranted. Rather, "a decision was made to invite Walter Litvinenko [back] probably because his statements were not clear enough, and Kovtun also was invited just probably to make sure that we understood him correctly." [*Id.* 81:2-13].

71.     Further, Mr. Borisov did not ask any of his staff to look into the allegations because they "sounded so strange and unfounded, that in [his] opinion they did not require

looking into. But after [Walter] repeated those allegations during his second appearance, I then asked why we did not contact Goldfarb, and we subsequently gave him an opportunity to provide his response." [*Id*. 84:5-20].

72.     Because the topic of the program was the Skripal case, Ms. Nikonova had no idea that Walter Litvinenko might mention Plaintiff on that program. [Nikonova Dep. 15:19-16:4]. Indeed, neither Ms. Nikonova nor her team "had the slightest idea that Walter Litvinenko might mention Dr. Goldfarb. So this idea did not come across my mind. It just did not." [*Id*. 18:11-16].

73.     Nor was Ms. Nikonova aware that Walter Litvinenko had accused Plaintiff of murdering Mr. Litvinenko. [*Id*. 19:13-17].

74.     Likewise, Ms. Nikonova was not aware in advance of the opinion of another guest, Andrey Lugovoy, that Mr. Litvinenko was poisoned by Plaintiff. [*Id*. 22:19-24].[8]

75.     Walter Litvinenko's statements were a shock and a surprise to the program's host, Mr. Borisov. [Borisov Dep. 55:17-22, 55:24-56:5, 56:14-57:15; 95:3-6]. Mr. Borisov also believes that they surprised "the majority of the audience on that program." [*Id*. 56:16-17].

76.     Plaintiff acknowledges that Channel One, and "Let Them Talk" in particular, specialize in the themes of "family squabbles." [Goldfarb Dep. 224:11-17]. This is one reason that Plaintiff did not sue Walter Litvinenko—the person who actually uttered the key statements—because he did not want the lawsuit to be portrayed as a family squabble. [Goldfarb Dep. Ex. F,[9] 222:14-19].

---

[8] During his deposition, Plaintiff asserted that Lugovoy was a British intelligence asset who had been vetted by Mr. Litvinenko's MI-6 handlers. [Goldfarb Dep. 258:7-14]. When asked if "Lugovoy was a British intelligence asset, and in that capacity associated with the British government and he had a role in [Litvinenko's] murder, does that mean the British government had a role in [Litvinenko's] murder based on these inferences?" Plaintiff replied, "No, I believe he was a double agent" who "fooled the Brits." [*Id.* 261:4-14].
[9] Attached as Exhibit 10 to the Wangsgard Decl.

*"Man and Law"*

77.     The program "Man and Law" is a popular weekly program that gives an author's view to the events in the political, economic and social life of Russia. [Am. Ans. ¶ 96]. The program is produced in Russia by an independent production company, "TV Company 'Ostankino'" and aired in Russia and in the Russian language. [*Id.*; Compl. ¶ 82].

78.     "Man and Law" is licensed pursuant to an agreement between "TV Company 'Ostankino'" and Channel One. [Deposition of Alexey Pimanov ("Pimanov Dep.") 14:3-5].

79.     The themes of this program include the fight against organized crime, the investigation of corruption, and criminal stories. [Am. Ans. ¶ 96]. In other words, criminality and Russian criminal law. [Pimanov Dep. 15:13-25].

80.     Alexey Pimanov is responsible for the production of "Man and Law" and is the host of the program. [*Id*. 14:6-11; 16:2-4]. Mr. Pimanov is solely responsible for selecting the topics of his program, which in general are taken from the public space. [*Id*. 16:6-15].

81.     As host of "Man and Law," Mr. Pimanov provides commentary on presentations prepared by journalists working for him. It is Mr. Pimanov's expressed opinion that Russian involvement in the cases of the Skripals and Mr. Litvinenko are outrageous and untrue. [Pimanov Dep. 23:3-24 ("All mass media of world and Russia, all Western press, were saying that the West is accusing Russia in poisoning of Alexander Litvinenko and Sergei Skripal, and that is not true."); *id.* 23:25-24:8 (stating that in his "personal opinion" the allegations against Russia were "not true" based on his "reading of the Western and Russian press.")].

82.     In the episode of "Man and Law" at issue, Mr. Pimanov describes that with respect to the death of Mr. Litvinenko, "there were a lot of versions, and therefore we were discussing all of them . . . we were not confirming any of those versions." [*Id*. 30:8-11].

83.     The editors of the "Man and Law" episode at issue sought to connect with Plaintiff to discuss the allegations made against him, but they were unable to locate a telephone number for him prior to airtime. [*Id*. 38:16-39:10].

84.     Mr. Pimanov had no knowledge of the interview of Plaintiff conducted by Ms. Agalakova on March 23, 2018. [Pimanov Dep. 37:4-7; Siraziev Decl. ¶ 26; Nasonova Decl. ¶ 18].

85.     The episode of "Man and Law" at issue aired on March 30, 2018. It was provided by the production company to Channel One the day before the broadcast. [Def. Interrog. Response No. 18].

## THE CHANNEL ONE PROGRAM *NOT* AT ISSUE

86.     As noted above, *supra* ¶¶ 29-31, the various Directorates within Channel One are wholly separate.

87.     For example, the Direction of Information Programs is responsible for news reporting and news programming, including the program "Evening Time," which Plaintiff has not identified as implicated in his claimed defamation. [Nasonova Decl. ¶ 9; Siraziev Decl. ¶¶ 5, 7-12].

88.     Relevant Direction of Information Programs employees included Timur Siraziev and Zhanna Agalakova. [Siraziev Decl. ¶¶ 7, 13]. Ms. Agalakova is identified in paragraph 94 of the Complaint. [Compl. ¶ 94]. The Direction of Information Programs employs approximately 800 individuals. [Nasonova Decl. ¶ 9].

89.     Mr. Siraziev is a Channel One reporter within Information Programs and is based in Channel One's London bureau of which he is the Head. [Siraziev Decl. ¶ 1]. He has no role

with respect to "Let Them Talk" or "Man and Law," which have nothing to do with Information Programs. [*Id.* ¶ 5].

90.     In March 2018, Mr. Siraziev was working on a spot for the program "Evening Time," which is a regular news program broadcast on Sunday evenings to give a final scope of the news of the week. [*Id.* ¶ 7].

91.     The product on which Mr. Siraziev was working was inspired by a recent European Union summit where the poisoning of Sergei and Yulia Skripal was discussed. [*Id.* ¶ 8]. In other words, Mr. Siraziev was working on recent cases of strange Russian deaths. [*Id.*].

92.     In addition, the prior June, *BuzzFeed News* had published an article "From Russia with Blood: 14 Suspected Hits on British Soil That the Government Ignored."[10] Both Berezovsky and Mr. Litvinenko are mentioned in that article.

93.     The "Evening Time" spot dedicated to Mr. Siraziev's "strange deaths" story was slated to last up to approximately ten minutes. [Siraziev Decl. ¶ 9].

94.     It is the regular practice of the Direction of Information Programs, when working on reports about central current events, to collect as much material as possible. [*Id.* ¶ 10]. This provides the Information Programs department the opportunity to take an essential portion for a relevant spot in a short time. [*Id.*]. The result is typically the collection of far more information than is needed or able to be aired. [*Id.*].

95.     As related to Mr. Litvinenko, both his father, Walter, and Plaintiff were obvious and known associates. [*Id.* ¶ 12]. Mr. Siraziev's group therefore sought, and obtained, statements from both men. [*Id.*]. However, at no time was the death of Mr. Litvinenko the focus or main inquiry of the "Evening Time" spot. [*Id.* ¶ 11].

---

[10] Available at https://www.buzzfeednews.com/article/heidiblake/from-russia-with-blood-14-suspected-hits-on-british-soil (June 15, 2017).

96.     Plaintiff is located in the greater New York area. [Compl. ¶ 11]. Channel One Directorate of Information Programs correspondent Zhanna Agalakova was also local to New York. [Siraziev Decl. ¶ 13].

97.     Consequently, Mr. Siraziev asked Ms. Agalakova if she could film a discussion with Plaintiff. [*Id.* ¶¶ 13-14]. This type of favor between colleagues is common. [*Id.* ¶ 14]. Mr. Siraziev provided Ms. Agalakova with some general topics during a telephone call. [*Id.*]. There was no formal outline or script and Ms. Agalakova acted on the request of her colleague, Mr. Siraziev. [*Id.* ¶ 14; Def. Interrog. Response No. 5].

98.     On March 22, 2018, Ms. Agalakova reached out to Plaintiff to request an interview, and he readily agreed. [Compl. ¶ 94]. The interview occurred the following day. [*Id.*; Siraziev Decl. ¶ 15].

99.     The conversation did not delve deeply into any given topic, and it covered a range of material. [*Id.* ¶ 16]. For instance, the questions related to the *BuzzFeed News* publication, the possible role of Russia in the strange deaths, Russian foreign policy as a whole, and people about whom Goldfarb could give information. [*Id.*]. In turn, Goldfarb spoke about the Skripals, Berezovsky, Mr. Litvinenko, Nikolay Glushko, Alexander Perepilichnyy, and others. [*Id.*].

100.    The materials for the taped interview lasted 30 minutes and 2 seconds. [*Id.* ¶ 17; Nasonova Decl. ¶ 19]. Approximately 15 minutes of the interview was dedicated to Russian foreign and domestic policy generally. [*Id.*]. Approximately 14 minutes of the interview was dedicated to the Russian link between the death of the individuals mentioned in the June 2017 *BuzzFeed News* publication. [*Id.*]. Plaintiff's discussion about his role with respect to the case of Mr. Litvinenko lasted approximately 100 seconds. [*Id.*].

101.     Ultimately, the editorial group of "Evening Time" did not find any part of Plaintiff's interview that could be used in the final cut. [Siraziev Decl. ¶ 18]. Indeed, Plaintiff did not give any new information beyond that which could be obtained from open sources or which was previously given by him at other times. [*Id.*].

102.     In addition, the editorial group of "Evening Time" did not find that Walter Litvinenko, in his interview, gave any new details or information that could be used in the final cut. [*Id.* ¶ 19].

103.     Ultimately, Mr. Siraziev and his team determined that they did not need this branch of the story and *no material from either interview* was used for the spot. [*Id.* ¶ 20]. This is unsurprising, as a significant amount of information is necessarily not used for a ten-minute spot. [*Id.* ¶ 21]. Thus, Timur Siraziev, author and initiator of the interview of Goldfarb for the Direction of Information Programs, made the decision as to what to include therein. [*Id.*; Def. Interrog. Response No. 6].

104.     When Ms. Agalakova conducted the interview of Plaintiff in New York, she was assisted by Channel One's New York-based cameraman, Boris Leonov. [Siraziev Decl. ¶ 22]. Mr. Leonov transmitted the video to Moscow to the Direction of Information Programs for use in news programs. [*Id.*] It was not transmitted to any other division, was not provided to Channel One management, and was not made available for general access by employees. [*Id.*].

105.     Indeed, Director of the Direction of Special Projects, Ms. Nikonova, had no idea at the time that the interview on March 23, 2018 had occurred. [Nikonova Dep. 28:17-24; Siraziev Decl. ¶¶ 24-25].

106.     Nor did Mr. Borisov. [Borisov Dep. 65:17-66:3; Siraziev Decl. ¶¶ 24-25].

## THE CHANNEL ONE BROADCASTS AT ISSUE

*March 20, 2018 "Let Them Talk"*

107.    The March 20 airing of "Let Them Talk" was "wholly devoted to the Skripal poisoning," [Compl. ¶ 83; *accord* Nikonova Dep. 14:9-15:2]. The host, Dmitry Borisov, noted in the show's opening that the "whole world [was] talking about" the Skripal poisoning [Compl. Ex. 2 at 2], and the show was going to discuss "Russian-British relations and notable incidents" involving the poisoning of Russian dissidents on British soil, including most recently the Skripals. [Borisov Dep. 37:16-23].

108.    The host's opening statement observed that the "press is full of theories and dramatic accusations against Moscow coming from London" and the Skripal case brought to mind "[p]revious mysterious deaths" of Russian defectors in the United Kingdom, including "Boris Berezovsky, Alexander Litvinenko, [and] Vladimir Pasechnik and now of Berezovsky's pal Nikolai Glushkov." [Compl. Ex. 2 at 2]. The show's discussants even drew comparisons to the 2004 poisoning of former President of Ukraine, Viktor Yushchenko. [*Id.* at 2-3, 16].

109.    The March 20 broadcast involved a live discussion among the host and seventeen additional participants representing a wide array of perspectives, including two members of the Russian Parliament (Duma), two historians, two attorneys, a UN bioweapons expert, a forensics expert, a retired police officer, a public activist, a writer, and several journalists from Russia and Ukraine. [*Id.* at 2]. It also included the key figure relevant here—Walter Litvinenko, the father of Alexander Litvinenko.

110.    Walter Litvinenko was invited because his son, Alexander Litvinenko, was poisoned in similar circumstances to the Skripals. [*See* ¶ 68, *supra*; Nikonova Dep. 18:17-25].

111. Discussion of Plaintiff came via Walter's statements and the guests' reaction thereto, beginning approximately 40 minutes into the show, and continuing for approximately seven minutes of the hour-long show. [Compl. Ex. 2 at 12-14]. The evidence is undisputed that those involved in producing the March 20 broadcast engaged in no substantial discussion or research of the Litvinenko incident beforehand [Borisov Dep. 31:24-32:3, 37:16-23], and did not know that Walter Litvinenko would suggest that Plaintiff was involved in his son's poisoning. [Nikonova Dep. 15:19-16:4, 18:12-16, 19:13-17]. Even the host did not know beforehand that Walter would be a guest. [Borisov Dep. 39:5-10, 17-18].

112. Walter's statements on the March 20 show recounted what he saw and heard when visiting his son at the London hospital, where he died in Walter's arms. [Compl. Ex. 2 at 12]. He expressed his belief that Andrey Lugovoy (also a guest on the show) was not his son's killer, opining, "*I think* he was poisoned several times. Not one time. Even in the hospital they kept poisoning him *that's what I believe.*" [*Id*. (emphasis added)].

113. Walter stated that the day after his son's death, a "huge crowd gathered" at the hospital, in a "kind of a rally." [*Id.*]. Present at the rally was Plaintiff, and two additional friends of his son, Akhmed Zakayev and Boris Berezovsky. [*Id.*] Walter stated that when he told the crowd that his killers had "struck his [son's] heart with [a] radioactive agent, a new kind of radiation," "Plaintiff reacted "hit[ting] me like this in the ribs" (motioning with his hands). [*Id.*]. Walter then speculated that "I said something too early that was not yet useful to them . . . ." [*Id.*]. Walter then recounted that he saw Plaintiff's wife, weeping, *who said to him* in English,[11]

---

[11] Plaintiff makes much ado about the fact that Walter asserted that Plaintiff's wife spoke to him in English. But as Plaintiff's own complaint shows, Walter (a physician) had studied English and while he does not speak it, he "understood the meaning" conveyed by Plaintiff's wife. Compl. ¶ 63. Plaintiff adduces no evidence to support his subsequent conclusory allegation that "Walter . . . did not speak English at all." Compl. ¶ 118.

"Walter, Walter. Alex killed Alexander." [*Id.*]. Walter clarified, "Alex, is Goldfarb, she openly told me that Goldfarb [was the murderer]." [*Id.* at 12-13 (emphasis added)].

114.    After hearing these allegations, the show's host asked Walter, "So do you believe an associate of Boris Berezovsky killed your son?," to which Walter ambiguously replied, "Goldfarb! While Sasha was at hospital, he flew to the  USA three times. I came to Akhmed [Litvinenko's friend] and say, 'Akhmed, what is this [all about]?' And Akhmed says, 'Listen, he is CIA.' Alex [Goldfarb] is. That is [why] he was interested in raising this outcry, all that dirt which they are throwing also today on Putin. . . . [they] were  saying, 'Now Putin will never rise back. This is the end of him! We've torn him into pieces!'" [*Id.* at 13]. The show's host replied, "Who said that?" and Walter replied, "Alex, Goldfarb." [*Id.*].

115.    Walter's statements triggered surprise by other discussants. Independent journalist Andrey Karaulov was the first guest to respond:

> *An incredible account* of a man who for three days sat at Litvinenko's deathbed. *We heard your monologue. Absolutely sensational*. Would anybody in the world, BBC, CNN, anyone request this tape and show what you said today, *your testimony* especially you naming Goldfarb, Berezovsky's right hand, who is actually an agent, member of the American Central Intelligence Agency, and here is *your present monologue*, which *no one except us in Russia, no one in the world wants to wants to hear*!

[*Id.* (emphasis added)].

116.    The host of the show then said Walter's statements were "very interesting" and wondered why Walter was not "glowing now," since Walter had been in close proximity to his son for several days and polonium-210 is "super toxic." [*Id.*]. Guest Maxim Shingarkin then piped in on this theme, opining that "there should have been scores of corpses there, dozens of dead people." [*Id.*].

117.    The conversation then turned to Mario Scaramella, the Italian who had lunch at a sushi bar with Litvinenko on the day he was poisoned. Walter observed that he was the "Italian they put in a  hospital" due to suspected polonium-210 poisoning. [*Id*. at 13-14]. Walter proclaimed, "Totally idiotic. Their (London's) police force is non-existent!" intimating that Scaramella's exposure to polonium-210 should reinforce the notion that he (Walter) and others who had spent time with Litvinenko "should be glowing now." [*Id*. at 14]. Guest Karaulov was clearly upset by this line of reasoning, proclaiming, "The blame is on us the journalists, how foolish we've been. No one thought of [it]. I did not think of calling you and inviting you for an interview. Had your story been aired on Channel One Skripal would have been alive today." [*Id.*].

118.    After a commercial break, the host began, "we discuss the sensation of recent days in Britain. The poisoning of Sergei Skripal and his daughter. In this context everyone remembers the poisoning of Alexander Litvinenko in Britain. His father, Walther Alexandrovich in this studio is sitting next to Andrey Lugovoy who had been named the murderer of Alexander Litvinenko. So Walter . . . said he considers CIA complicit in the murder . . . . you even said you know who specifically did it?" to which Walter replied, "Yes. Goldfarb. It was his work." [*Id.*]. The host then said, "And you know that it was Alexander Goldfarb . . . from what you've heard from Alexander's own wife," to which Walter replied, "Yes the wife. She told me about that." [*Id*.].

119.    The conversation turned toward an equally freewheeling discussion of other recent mysterious poisoning deaths. [*Id.* at 14-16]. They debated whether Berezovsky actually committed suicide, whether Ukraine may have been involved, and the poisoning of former Ukrainian President Victor Yushchenko. [*Id.*].

*March 30, 2018 "Man and Law"*

120.    Like the March 20 broadcast of "Let Them Talk," the March 30 broadcast of "Man and Law" focused on the recent Skripal poisoning, because "all of the mass media of Russia and the world was talking about it." [Pimanov Dep. 21:11-17]. Plaintiff's complaint concedes that of the approximately 60-minute broadcast, there were only "two fragments" containing allegedly defamatory content, [Compl. ¶ 96], which together total three minutes and 42 seconds of airtime. [*Id.*].

121.    During this period, a reporter for "TV Company 'Ostankino,'" Natalia Shigapova, [Pimanov Dep. 22:14-18], narrated a short film discussing the 2006 Litvinenko poisoning. [Compl. ¶ 96]. The film begins with Shigapova's voiceover, describing the "sensational" allegation by Walter (on "Let Them Talk") that Plaintiff may be involved in his son's murder: "With all these outrageous accusations [of poisonings by Russia] they did not even hear in the West - or did not want to hear - a sensational [piece of] news: the father of fugitive Lt. Colonel of FSB Alexander Litvinenko who in 2006 was poisoned with Polonium, named the murderer of his son." [Compl. Ex. 2 at 19].

122.    The film then cuts to Shigapova's interview with Walter, who refutes the British accusation that Russian agents were responsible for the death of his son. Walter says, "Lugovoy had nothing to do with it. And Scaramella had nothing to do with it." [*Id.*]. When the reporter asks, "And who had?" Walter replies, "So far *I think* there is only one who had, Goldfarb personally." [*Id*. (emphasis added)]. The reporter then provides a short voiceover explaining who "Goldfarb" is, describing him as "an Israeli and American citizen, the head of Foundation of Civil Liberties founded by Boris Berezovsky, a former associate of George Soros." [*Id.*].

123.    The voiceover then stated that "Litvinenko's father has his *own explanation*. Alexander in fact died in his arms, but neither Walter [ ] himself nor those who visited his son in the hospital during the three weeks did not get any radiation. This led [Walter] to think that his son was poisoned already in the hospital." [*Id.*].

124.    The reporter then asked Walter, "Who visited [Litvinenko] in the hospital?" to which Walter replied, "Everybody. Goldfarb too." *Id.*  Walter then repeated what he had said during "Let Them Talk"—namely, that he had been told by Akhmed Zakayev that Plaintiff "is a CIA agent" and that Plaintiff's wife had told him that "Alex [Plaintiff] killed Alexander." [*Id.* at 19-20]. Andrey Lugovoy, in a recorded interview, then observed that "Goldfarb was professionally involved in nuclear physics"[12] so "this *could well have been his idea and probably his practical doing*." [*Id.* at 21]. The voiceover reporter then concludes, "So here is Litvinenko's *father's theory*. Alexander was poisoned by the CIA together with MI-5 and MI-6 in order to discredit Russia. It was done by the hands of Alex Goldfarb. He administered Polonium at the hospital." [*Id.*].

*April 4, 2018 "Let Them Talk"*

125.    The April 4 "Let Them Talk" was the show's first follow-up to the March 20 show, fourteen days earlier, in which Walter Litvinenko made his sensational allegations.

---

[12] There is ample basis for a Russian to think this. Plaintiff began his Ph.D. studies at, and worked for, the Atomic Energy Institute, which as its name suggests, was a nuclear research center "with a particular focus on atomic energy." [Goldfarb Dep. 111:10-12, 17-21, 115:5-7]. He left Russia to work for the Weismann Institute in Israel, which had a famous leak of Polonium-210. [*Id.* 159:14-25]. He concedes that the Soviet Union initially denied him an exit visa on grounds that he possessed "secret military and warfare information" from his work at the Atomic Energy Institute, though he denies that is true. [*Id.* 138:6-20, 139:18-25, 140:17-141:7]. He admits that a 1975 piece in the *Harvard Crimson* stated, "Goldfarb said he was initially refused permission to emigrate on the grounds that he possessed secret military and warfare information important to the security of the Soviet state" but also claims that this does not mean he actually possessed such information. [*Id.* 137:14-25, 138:2-20]. Finally, Plaintiff worked as a translator for well-known nuclear physicist Andrei Sakharov, who is credited with the design of the Russian hydrogen bomb. [*Id.* 117:17-21, 120:18-121:20].

126.    In addition to Walter and Kovtun, the April 4 show included seventeen additional guests. Like the March 20 show, the April 4 show's focus was not Litvinenko but the Skripals' poisoning, and the show's first thirty-three minutes of discussion centered around guest Victoria Skripal (a relative of the poisoned individuals), her knowledge of her relatives' activities, her attempt to obtain a British entry visa to visit her poisoned relatives, and the Skripals' unknown current condition.

127.    After a commercial break approximately thirty-three minutes in, the host introduced a one-minute voiceover video which stated:

> *Theories* multiply like mushrooms after the rain and in the process it turned out the ex-spy while in Britain, could get close to the crowd around Boris Berezovsky who had long lived in London. This group reported had included Alexander Litvinenko and a long-time associate of Berezovsky Alex Goldfarb. The murder of Litvinenko, the mysterious death of Boris Berezovsky and the poisoning of Sergei Skripal could be links in the same chain as was indirectly asserted by Walter Litvinenko the father of the late agent. On the previous show he said *he believes* the *probable murderer* of his son was Goldfarb who, he said, *could be* a CIA agent. So whose path in reality could the ex-spy Sergei Skripal cross? Or perhaps the actual target was his daughter and if so why only she is out of coma?

[Compl. Ex. 2 at 26].

128.    The host then recounted that "[a] *sensational statement* was made on the last program by Walter," and then turned to Lugovoy and stated, "So, look here, you heard everything that Walter Litvinenko said on our program. *No one was prepared for that version. It truly became one of the most discussed news, at least in our country*." [*Id.* (emphasis added)].

129.    He asked Lugovoy, "Did it surprise you?" to which Lugovoy replied "No, it did not surprise me. We aired this version 12 years ago when the events happened. *We discussed several versions* very thoroughly including the role of Berezovsky's people. The *main version was that in the case of Litvinenko the interests of both Berezovsky and secret services were*

*affected*. And of Berezovsky's circle. By contrast, in the case of Skripal I think the top leadership of UK was involved from the start." [*Id.* at 26-27 (emphasis added)].

130.     The host later introduced Walter, stating, "[i]f it's true what they say in Britain [about Russian involvement], we have here in the studio at least one man who was near Polonium. This is Walter Litvinenko, the father of Alexander Litvinenko who came here again to tell us about the impact of his *sensational interview on our last program*." [*Id.* at 27] (emphasis added). Walter then related that "[o]nly Russian" media, not Western, had shown any interest in the shocking accusations he made during the March 20 show. [*Id.*]. The host also asked Walter if he would be willing, based on his assertions, to "greet Dimitry Kovtun?" to which Walter replied, "Why not?" [*Id.* at 28].

131.     The host then welcomed Kovtun, stating, "Good evening Dmitry! I know that when our editors talked to you about the *version* [provided by Walter] that Alexander Goldfarb *could be complicit* in the murder of Alexander Litvinenko you put forward a *rather sensational supposition* regarding the possible relationship of Alexander Goldfarb and . . . " to which Kovtun interjected "the former wife of Alexander [Litvinenko] you mean?" [*Id.*]. The host confirmed that the "former wife" referred to Litvinenko's wife, Marina. [*Id.*]. [13]

132.     Kovtun related that "we saw them [Plaintiff and Marina Litvinenko] together all the time, they wrote a book together, they prepared for the hearings together" and their closeness "*makes one think* that she is of course under someone's influence and does not make her own decisions." [*Id.* (emphasis added)]. The host responded, "So *you think* she is under Goldfarb's influence?" to which Kovtun replied, "*I think* yes." [*Id.* (emphasis added)].

---

[13] Plaintiff concedes he is "close friends" and colleagues with Marina, and they communicate often. [Goldfarb Dep. 16:20-17:6, 20:13-21:4].

133.    The discussion with Kovtun then devolved to a discussion of Boris Berezovsky's possible involvement in missing Russian plutonium, British intelligence's knowledge thereof, and the mysterious circumstances of Berezovsky's death in 2013. [*Id.* at 28-29]. The host then brought up Kovtun's assertion that Marina and Plaintiff were in "a kind of warm relationship," and Kovtun replied "He is still in a kind of warm relationship with Marina Litvinenko." [*Id.* at 29]. The host then said, "You said she is influenced by him" and Kovtun responded, "I said he influences her in a certain way directs her. . . . He formulates her position her opinions, convinces her to make false statement in the Public Inquiry hearings, for example." [*Id.* at 29-30]. A question followed, "Why does she listen to him?" and Kovtun responded, "Probably because he in some way commands her respect." [*Id.* at 30]. And, following another question, "Respect, or . . .?" and Kovtun ambiguously replied, "Respect, maybe more by now, I don't. . . ." [*Id.*].

134.    Guest Andrey Karaulov, an independent journalist, then expressed anger that western media had not reported on Walter's "*sensational*" allegations, except for "in England independent journalists published more than 100 blogs and articles *saying it was unexpected*, how can we not trust a father, but at least in a half of them repeat like a carbon [copy] that you [Walter] have been bribed by Channel One." [*Id.* (emphasis added)]. The host later turned to Walter, inquiring "You say you're sure Boris Berezovsky was killed, you're sure your son was killed, as you've said here by the Western secret services. We now know Sergei Skripal was poisoned. Do you think these things are connected?" [*Id.*]. Walter replied, "You know. I will tell you. I am *99% sure Goldfarb did it. Maybe 1%, I'd give to criminals*. Maybe." [*Id.* (emphasis added)]. Walter then opined that the British were aware that his son was not murdered by Russia,

that the British are "murderers" and that Britain refused to share with him the post-mortem medical records of his son. [*Id.* at 31].

*April 10, 2018 "Let Them Talk"*

135.    The April 10 "Let Them Talk" broadcast once again focused on the Skripal poisoning, as Yulia Skripal had been recently discharged from a British hospital. [Wangsgard Decl. Ex. 11 at COR000148].[14] The first half of the show focused on the pattern of poisonings being blamed upon Russia and guests repeatedly worried that the West was blaming Russia as an excuse to initiate a coming war. [*Id.* at COR000149 ("preparation to a big war"); COR000153 ("the edge of war"); COR000155 ("their current goal is to get us into this mess [in Syria]"); COR000156 ("Theresa May is ready to drag the world into a big war in order to cover up crime in the Skripal case"); COR000161 ("close to a serious armed conflict"; "a possible war"); COR000162 ("third world war"; "nuclear war"); COR000163 ("big war"); COR000164 ("We mustn't let the British drag us and Americans into a war"); COR000165 ("a hot war")].

136.    At approximately thirty-two minutes into the show, the host asked a question of guest Andrey Lugovoy about Vladimir Terluk, another Russian dissident who had obtained asylum in the UK. Lugovoy replied:

> [E]verything related to Goldfarb and his Foundation for Civil Liberties founded by Berezovsky. Using as a model the way Berezovsky got his asylum, Goldfarb, Felshtinsky and Litvinenko decided to set up a trade selling British citizenship. They told me - Dmitry Kovtun will confirm: Guys, let's find someone in Russia who has been pursued by the Russian law; we'll strike a deal with that person; the price will be one million dollars; he will make several harsh statements against Russian authorities, make sure he is photographed preferably as he is being detained in one of the skirmishes that we all see. Then we get him over to London via a third country, he makes appropriate statements, the Foundation for Civil liberties - it has been registered in New York – endorses him; and he gets asylum.

---

[14] The Complaint, ECF No. 5, Ex. 2, and the video at Exhibit 3 only begin at minute 27:00 of the program. A full transcript of the program was produced by Channel One in discovery and the portion covering minute 00:00-27:00 is attached to the Wangsgard Decl. as Ex. 11.

[Compl. Ex. 2 at 33-34].

137.    The host then asked if the Foundation for Civil Liberties was the "one where Goldfarb is vice-president" and Lugovoy (accurately) responded, "The president." [*Id.* at 34]. A guest on the show, attorney Alexander Treschev, chimed in, stating, "they have realized several such scenarios and a number of people got immunity through them, that is, this industry has since developed and become large-scale; we know that dozens of people, maybe several dozen got asylum this way, being crooks, traitors and thieves . . . ." [*Id.*].

138.    Another guest, Alexander Ionov, the Vice President of an international human rights foundation, noted that the Russian dissidents who fled to Russia "have always fiercely criticized Russia. More importantly, they have criticized not simply Russia but the Russian president, the Russian justice system, saying that they are being persecuted. [*Id.* at 34-35].

139.    The next segment of the show involved the airing of a taped audio interview with Plaintiff, in which Plaintiff was given the opportunity to rebut the statements made about him. Question included directly asking Plaintiff, "Litvinenko's father has accused you of killing his son. How do you respond to him?" [*Id.* at 37]. Plaintiff deflected the question, responding:

> I can respond: [Walter] is no father to him, he abandoned him when the boy was two years old, later he milked him [financially], and later when Berezovsky stopped giving him money he returned to Moscow. He is worse than Lugovoy because Lugovoy at least carried out an order while the father betrayed his son for an apartment in Moscow.

[*Id.* at 37].

140.    The discussion then shifted to the allegation that Plaintiff was involved with the CIA and Litvinenko's widow (Marina), and the host turned to Lugovoy, stating, "you, Andrey, have called [Plaintiff] on the air a *likely CIA agent*, didn't you, Andrey?" to which Lugovoy

responded, "Well, a CIA agent, firstly, *Litvinenko's father said that* and also I know that he

emigrated from Russia in the Soviet time and I know *from his own words* that in the 1990ies he

was on the so-called black list, he was on the list of people whose entry into the Russian

Federation was prohibited. These lists area not compiled arbitrarily, so apparently he was a threat

to the security of Russian Federation." [*Id.* at 38 (emphasis added)]. Lugovoy then stated that

"Goldfarb and Marina Litvinenko maintain [a] *close business relationship*, they have several

books together, and no doubt they keep moving in this direction somehow." [*Id.* (emphasis

added)].

141.    The final relevant segment of the show involved a brief discussion with Walter

Litvinenko, who was asked to respond to "everything Alexander Goldfarb said about you in our

interview." [*Id*. at 39]. Walter responded that Plaintiff "is a liar like the whole of the CIA. Like

the whole of America lies about Russia. So he lies about me." [*Id.* at 40].

## THE ALLEGEDLY DEFAMATORY STATEMENTS

142.    In support of his complaint, Plaintiff identifies five allegedly actionable

statements that allegedly suggest he may have been involved in: (1) the death of Litvinenko, (2)

the death of his third wife; (3) affiliation with the U.S. Central Intelligence Agency ("CIA"),

[Compl. ¶ 116]; (4) a scheme to defraud the UK into granting asylum to Berezovsky, and an

illegal business scheme to help Russian criminals obtain UK asylum; and (5) subornation of false

testimony (perjury) by Litvinenko's widow in a British inquiry proceeding. [*Id*. ¶¶ 128, 130].

143.    Of course, the "allegation of belonging to the CIA [is] not slander per se."

[Goldfarb Dep. 238:14-15]. "It's not defamatory" or "slanderous to be accused of being a CIA

agent" [*Id.* 238:21-24] and "that alleging someone belongs to the CIA by itself is not

defamatory." [*Id.* 239:2-5; 241:10-12].

144.     Further, Plaintiff "would say the accusation that I'm a murderer wouldn't stand by itself because nobody would believe that all of a sudden I would go and kill my good friend and my own wife. So, it's an incredible allegation which any reasonable person wouldn't take seriously." [Goldfarb Dep. 242:8-14].

**CHANNEL ONE OFFERED PLAINTIFF AN OPPORTUNITY FOR REBUTTAL**

145.     As a group, the "Let Them Talk" production team discussed the possibility of giving Plaintiff an opportunity to respond to the accusations. [Nikonova Dep. 23:16-18].

146.     Indeed, Ms. Nikonova told her group that "we should give this opportunity to Dr. Goldfarb, not immediately, but at some point in the future." [Nikonova Dep. 23:21-25].

147.     And Mr. Borisov "asked our editors why Dr. Goldfarb was not invited, and I shared my opinion that he should be contacted, invited, and an interview with him should be taped giving him an opportunity to rebut the allegations, and that interview was conducted and subsequently aired." [Borisov Dep. 63:22-64:6; 74:15-18; 103:4-6; 104:9-16].

148.     Indeed, it was "to give him an opportunity to comment [on] what was said by Walter Litvinenko about -- whether he is connected to the death of his son." [Borisov Dep. 106:3-6]. "It was one of the most serious allegations, and therefore we wanted to give an opportunity to Dr. Goldfarb to rebut that allegation." [Borisov Dep. 106:20-23].

149.     Ms. Nikonova's team shared with her that Mr. Borisov also suggested giving Plaintiff and opportunity to respond. [Nikonova Dep. 23:25-24:2].

150.     Of particular interest to the editorial team was Plaintiff's answers to the accusations voiced by Walter Litvinenko and, further, Plaintiff's opinion on the Skripal case. [Nikonova Dep. 26:15-22]. Yet, Mr. Borisov was surprised as Plaintiff "was going on and on about the personality of Walter Litvinenko, but didn't give too much of an answer" about the

accusations made against him. [Borisov Dep. 108:2-7]. He even had to ask his colleagues "Is that all?" in light of the non-answers provided by Plaintiff. [*Id.* 108:9-15].

151.    Ms. Nikonova and Mr. Borisov believed that Channel One aired Plaintiff's opinion. [Borisov Dep. 10:13-11:2].

152.    Ms. Nikonova had no knowledge of the of the interview of Plaintiff conducted by Ms. Agalakova on March 23, 2018. [Nikonova Dep. 28:17-24; Siraziev Decl. ¶¶ 22-25, 27-28; Nasonova Decl. ¶¶ 15-17].

153.    Mr. Borisov had no knowledge of the interview of Plaintiff conducted by Ms. Agalakova on March 23, 2018. [Borisov Dep. 65:17-66:2; Siraziev Decl. ¶¶ 22-25, 27-28; Nasonova Decl. ¶¶ 15-17].

## **PLAINTIFF'S SUIT**

*Background*

154.    The allegations underlying Plaintiff's suit "implicate political matters in which the Russian government holds a keen interest." [Goldfarb Aff., ECF No. 63 ¶ 10]. Indeed, the political significance of the entire Litvinenko story "is illustrated by the fact that it will be explored in two upcoming productions in London" – a play and an opera. [*Id.* ¶ 11].

155.    The opera, "The Life and Death of Alexander Litvinenko," in fact, has played in London and is based on Plaintiff's book that he co-wrote with Marina Litvinenko. [Goldfarb Dep. 16:8-14]. A miniseries on British television titled "Litvinenko" is also scheduled for later this year. [*Id.* 17:11-15].

*Motive for Bringing the Suit*

156.    Plaintiff's motive in bringing this suit is to make a statement, and he has brought suit in the United States because he feels the "standard of proving a defamation in the US is

much higher than in the UK, and thereby it would carry a bigger weight, so to say." [*Id*. 26:14-19]. Thus, if he could win in the United States, "from the standpoint of . . . public impact, it would be a much higher victory" and "a larger moral victory." [*Id*. 26:12-27:5 ("So I wanted to have this case decided based on a higher legal standard.")].

157.    His opinion of Channel One is that it is "a propaganda operation [ ] serving the interests of the Russian government and spreading lies and fake news, . . . which are politically motivated on various issues." [*Id*. 65:5-15].

158.    Plaintiff's views for many decades have been anti-Russian government. [*Id*. 120:14-17; 130:16-23].

159.    Plaintiff maintains or maintained a variety of Internet blogs. [*Id*. 214:10-215:13]. These are authored by him and him alone. [Goldfarb Dep. 216:19-217:21].

160.    In one such post, for example, he explained that "in case we win, we have a possibility -- we'll get a possibility to significantly interfere with the commercial activities of Channel One . . . in the US, Europe, and elsewhere." [Goldfarb Dep. Ex. J,[15] 249:19-250:4].

161.    Plaintiff is soliciting donations for this lawsuit via the crowdfunding website GoFundMe and has raised tens of thousands of dollars through both an English- and Russian-language GoFundMe page. [Def. Counterclaim, ECF No. 117 ¶ 17; Pltf. Ans. ECF No. 118 ¶ 17]; Wangsgard Decl. Ex. 13 and 14].[16]

162.    In a June 19, 2018 update on his blog, Plaintiff all but admitted that the "guarantees of freedom of speech in a free society" precluded his success on the merits; he was

---

[15] Attached as Exhibit 12 to the Wangsgard Decl. (as translated more formally than by Plaintiff in the deposition: "[B]ut if we win, we will be able to significantly impede the commercial activities of Channel One and RT in the US, Europe, and other countries. . .").
[16] And available at:
https://www.gofundme.com/f/suing-russian-propaganda-tv
https://www.gofundme.com/f/dv7a2

pressing ahead because, in his words, he believed it to be "absurd." [Def. Counterclaim, ECF No. 117 ¶ 20; Wangsgard Decl. Ex. 15].

## ALLEGATIONS REGARDING ACTUAL MALICE

163.    Plaintiff contends that actual malice is supported by "the fact that [the] lies have been revived, repackaged and broadcast years later as part of a well-orchestrated propaganda campaign" [Compl. ¶ 81], that Channel One chose to discount the judicial findings of an inquiry conducted by a foreign government [*Id*. ¶ 89], and Channel One's "handling of Dr. Goldfarb's attempts to respond to its defamatory broadcasts." [*Id*. ¶ 124].

## PLAINTIFF'S CLAIMS OF SEVERE EMOTIONAL DISTRESS ARE UNSUPPORTED

164.    Plaintiff also claims that due to the "nature of the defamatory statements," he should also recover for intentional infliction of emotional distress. [*Id*. ¶ 133].

165.    Plaintiff has had no changes in health since the events that gave rise to this suit in March 2018. [Goldfarb Dep. 12:9-22]. Likewise, he has not received any medical treatment in relation to the alleged conduct of Channel One. [*Id*. 12:23-13:6].

166.    In the past ten years—encompassing the time before the events giving rise to this lawsuit to the present—Plaintiff has never seen a psychologist or a psychiatrist for any reason. [*Id*. 13:14-19]. Indeed, he has never sought any sort of mental health treatment as a result of the four programs at issue aired by Channel One. [*Id*. 13:20-24].

167.    Plaintiff has stipulated that he is not relying "on any medical or psychiatric testimony of any kind and there is nothing in his medical records that would be germane to his claim." [Wangsgard Decl. Ex. 16].

168.    In addition, while perhaps "there are many bad actors around the world who want to harm Americans in general and the American Jews in particular, and the American Jews who

are CIA agents cumulatively much more" [Goldfarb Dep. 245:16-21], "nobody articulated that they are going to kill me because they believe I'm the CIA." [*Id*. 247:7-13].

169.    Indeed, none of the CIA-hating individuals alluded to by Plaintiff have ever specifically threatened him. [Goldfarb Dep. 254:2-5].


Date:   May 31, 2022
        Washington, D.C.

                                            Respectfully submitted,

                                            /s/ *David B. Rivkin, Jr.*
                                            David B. Rivkin, Jr.
                                            Elizabeth Price Foley
                                            Kendall E. Wangsgard
                                            BAKER & HOSTETLER, LLP
                                            Washington Square, Suite 1100
                                            1050 Connecticut Ave., N.W.
                                            Washington, D.C. 20036
                                            T:  202.861.1500
                                            F:  202.861.1783
                                            drivkin@bakerlaw.com
                                            efoley@bakerlaw.com
                                            kwangsgard@bakerlaw.com

                                            *Counsel for Defendant Channel One Russia*