**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEX GOLDFARB, | |
| Plaintiff, | Case No. 1:18-cv-08128 (JPC) |
| v. | |
| CHANNEL ONE RUSSIA | ORAL ARGUMENT REQUESTED |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF
CHANNEL ONE RUSSIA'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS**

BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., N.W.
Washington, D.C. 20036

*Counsel for Defendant Channel One
Russia*

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND........................................................................................................2

ARGUMENT..................................................................................................................................3

   I.   PLAINTIFF IS A "PUBLIC FIGURE"............................................................................ 4

   II.  PLAINTIFF CANNOT PROVIDE CLEAR AND CONVINCING EVIDENCE OF
       FALSITY OR ACTUAL MALICE ................................................................................. 5

      A.  Subjective Belief the Statements Could Be True........................................................ 6

          1.   Litvinenko's Death.............................................................................................. 6

          2.   CIA Involvement ................................................................................................ 8

          3.   Death of Plaintiff's Third Wife......................................................................... 11

          4.   Asylum Fraud.................................................................................................... 11

          5.   Subornation of Perjury ..................................................................................... 12

      B.  Walter Litvinenko's Prior Statements Do Not Establish Actual Malice ................... 14

      C.  Plaintiff's Prior Interviews With Defendant Do Not Establish Actual Malice........... 16

      D.  The UK Inquiry Does Not Establish Actual Malice ................................................. 18

      E.  Re-publication Cannot Establish Actual Malice........................................................ 23

   III. A REASONABLE VIEWER WOULD CONCLUDE THE STATEMENTS WERE
       MERE OPINIONS.......................................................................................................... 23

      A.  The Language Used Indicates the Statements Were Opinions ................................... 24

      B.  Both the Context and Social Context Indicates the Statements Were Opinions......... 25

   IV. SUMMARY JUDGMENT ON DEFENDANT'S ANTI-SLAPP COUNTERCLAIM
       IS WARRANTED ........................................................................................................... 27

CONCLUSION...............................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld,*
  80 N.Y.2d 130 (N.Y. 1992) ................................................................................................25

*Albert v. Loksen,*
  239 F.3d 256 (2d Cir. 2001) ..............................................................................................12

*Alfajr Printing & Pub. Co. v. Zuckerman,*
  646 N.Y.S.2d 858 (N.Y. App. Div. 1996) .........................................................................11

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..........................................................................................3, 6, 8, 12

*Behr v. Weber,*
  568 N.Y.S.2d 948 (N.Y. App. Div. 1991) .........................................................................25

*Biro v. Conde Nast,*
  963 F. Supp. 2d 255 (S.D.N.Y. 2013) ...............................................................................23

*California v. Green,*
  399 U.S. 149 (1970) ...........................................................................................................20

*Celle v. Filipino Reporter Enters., Inc.,*
  209 F.3d 163 (2d Cir. 2000) ...........................................................................4, 22, 23, 26

*Chau v. Lewis,*
  771 F.3d 118 (2d Cir. 2014) .........................................................................................23, 24

*Cohen v. Cowles Media Co.,*
  501 U.S. 663 (1991) .............................................................................................................1

*Condit v. Dunne,*
  225 F.R.D. 100 (S.D.N.Y. 2004) .......................................................................................11

*Contemporary Mission v. N.Y. Times Co.,*
  842 F.2d 612 (2d Cir. 1988) .............................................................................................4, 5

*Cox Broadcasting Corp. v. Cohn,*
  420 U.S. 469 (1975) ..........................................................................................................3, 5

*Dongguk Univ. v. Yale Univ.,*
  734 F.3d 113 (2d Cir. 2013) ...........................................................................................6, 17

*Flamm v. Am. Ass'n of Univ. Women*,
    201 F.3d 144 (2d Cir. 2000)..................................................................23

*Ganske v. Mensch*,
    480 F. Supp. 3d 542 (S.D.N.Y. 2020)...............................................1, 26

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)........................................................................3, 5

*Goenaga v. March of Dimes Birth Defects Found.*,
    51 F.3d 14 (2d Cir. 1995) ......................................................................4

*Golub v. City of N.Y.*,
    334 F. Supp. 2d 399 (S.D.N.Y. 2004)...................................................26

*Gross v. N.Y. Times Co.*,
    82 N.Y.2d 146 (N.Y. 1993) ..................................................................26

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)...................................................................3, 6, 16

*Hobbs v. Imus*,
    698 N.Y.S.2d 25 (N.Y. App. Div. 1999) ...............................................25

*Huggins v. Povich*,
    No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996)...........25

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988)................................................................................1

*Immuno AG v. Moor-Jankowski*,
    77 N.Y.2d 235 (N.Y. 1991) ..................................................................23

*La Luna Enters. v CBS Corp.*,
    74 F. Supp. 2d 384 (S.D.N.Y. 1999).......................................................1

*Levin v. McPhee*,
    119 F.3d 189 (2d Cir. 1997)..................................................................26

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991)...........................................................................5, 6

*McDougal v. Fox News Network*,
    489 F. Supp. 3d 174 (S.D.N.Y. 2020).............................................15, 25

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)...............................................................5, 6, 11, 17

*Palin v. N.Y. Times Co.*,
    --- F. Supp. 3d ---, 2022 WL 599271 (S.D.N.Y. Mar. 1, 2022)..............................................27

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019)..............................................................................................17

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986)...........................................................................................................5

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014).................................................................................1

*Reuland v. Hynes*,
    460 F.3d 409 (2d Cir. 2006)..............................................................................................26

*Rinaldi v. Holt, Rinehart & Winston*,
    42 N.Y.2d 369 (N.Y. 1977) *cert. denied*, 434 U.S. 969 (1977)....................................3, 12

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)..........................................................................................6, 11, 16, 18

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (N.Y. 1986) ........................................................................................23, 24

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000)..................................................................................................4

**Statutes**

Inquiries Act of 2005 (UK) c 12  ..........................................................................13, 19, 20

**Secondary Sources**

*Peskov: The Litvinenko Case is Feeding Anti-Russian Hysteria*,
    RIA Novosti (Jan. 22, 2016).................................................................................................7

*Kremlin Does Not Perceive Litvinenko Death Investigation Results as Verdict*,
    TASS News Agency (Jan. 21, 2016) ................................................................................7, 8

*One-Third of Russians Consider Litvinenko Case Provocation: Opinion Poll*,
    RT News (Jan. 23. 2007) .....................................................................................................8

*Jennifer Alban, Russia Bans George Soros Foundation as State Security 'Threat'*,
    REUTERS (Nov. 30, 2015) .................................................................................................10

## PRELIMINARY STATEMENT

This is a defamation action initiated by Alex Goldfarb ("Plaintiff" or "Goldfarb") against Channel One Russia ("Defendant" or "Channel One"), arising from statements made on four television programs during March and April of 2018. All four broadcasts focused on the March 4, 2018, poisoning of a Russian defector, Sergei Skripal, and his daughter, Yulia, in London, and the British government's accusation that Russia was behind the act. The broadcasts compared the Skripals' poisoning to other high-profile poisonings of Russian expats on British soil, including the 2006 death of Alexander Litvinenko, a former Russian FSB agent who died of Polonium-210 poisoning. The British government has also pinned Litvinenko's poisoning on Russia.

The shows' Russian participants opined that, contrary to the view espoused by British authorities, it was not Russia but Western governments that likely played a role in the deaths. One individual opined as possibly playing a role in Litvinenko's death was Plaintiff, a well-known anti-Putin critic. Plaintiff alleges that the statements published on Defendant's shows constitute libel per se and intentional infliction of emotional distress.

Defendant moves for summary judgment on the basis that Plaintiff, an admitted public figure, has failed to carry his heavy burden of proving by clear and convincing evidence that the statements were false or made with "actual malice," as required by the First Amendment of the U.S. Constitution and article I, § 8 of the New York Constitution.[1]

---

[1] Defendant also moves for summary judgment regarding Plaintiff's cause of action alleging intentional infliction of emotional distress, which likewise requires clear and convincing proof of actual malice. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) ("We conclude that public figures . . . may not recover for the tort of intentional infliction of emotional distress by reason of publication . . . without showing in addition that the publication contains a false statement of fact which was made with 'actual malice'"). It is well-settled that a plaintiff cannot avoid First Amendment limits by merely repackaging the same reputational injury as another tort. *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991); *Ganske v. Mensch*, 480 F. Supp. 3d 542, 556 (S.D.N.Y. 2020); *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 730-31 (S.D.N.Y. 2014) ("Courts in this circuit consistently dismiss intentional infliction of emotional distress claims where plaintiff alleges no facts beyond those necessary to sustain another tort claim.") (collecting cases, including dismissals in light of defamation allegations); *La Luna Enters. v CBS Corp.*, 74 F. Supp. 2d 384, 392 (S.D.N.Y. 1999).

1

## **FACTUAL BACKGROUND**

Plaintiff alleges that the statements constitute libel per se because they suggest that he may have been involved in: (1) the death of Litvinenko; (2) the death of Plaintiff's third wife; (3) affiliation with the CIA; (4) a scheme to defraud the UK into granting asylum to Boris Berezovsky, and an illegal business scheme to help Russian criminals obtain UK asylum; and (5) subornation of false testimony (perjury) by Litvinenko's widow in a British inquiry proceeding. *See* Defendant's L.R. 56.1 Statement of Material Facts (hereinafter, "SOF") ¶ 142. Plaintiff also claims that he should also recover for intentional infliction of emotional distress. *Id.* ¶ 164.

The four broadcasts were aired on different shows, "Let Them Talk" and "Man and Law." Compl. ¶¶ 82-90, 96, 99-107. Three of the four (March 20, April 4 and April 10) involved "Let Them Talk," SOF ¶ 65, a talk show of approximately one-hour duration produced by Defendant's Special Projects directorate. *Id.* ¶¶ 32, 62. The Special Projects directorate is responsible for all of the Defendant's "entertainment" shows, including those such as "Fashion Verdict," "In Reality," "The Big Game," and "Let's Get Married!" *Id.* ¶ 62. It is one of several divisions, or directorates, within Defendant's corporate structure,[2] *id.* ¶ 29, each of which is formally separated from the others, with its own manager, staff, programming, budget, and so forth. *Id.* ¶¶ 30-31. Information obtained by one is not shared with the others, and there is no central corporate repository for information obtained by the various directorates. *Id.* ¶¶ 35-36.

"Let Them Talk" is filmed in live-to-tape mode, and usually goes on the air after a short technical montage (*e.g.*, cutting out pauses, superimposing illustrative or previously recorded photo/video materials). *Id.* ¶ 66. Plaintiff concedes that "Let Them Talk," is a tabloid-style talk show "probably close to Oprah Winfrey . . . or . . . Geraldo Rivera, is this kind of program.

---

[2] Others include the Direction of Information Programs, which handles Defendant's news programming, Public and Political Broadcasting, Social and Publicistic Programs, Film, and Sports. SOF ¶ 29.

That's what it reminds me of." *Id.* ¶ 61. *Accord* ¶¶ 34, 57 (show is a "tabloid"). The show typically invites over fifteen guests "with various opinions in connection with [a] topic and [the show] let[s] them engage in live discussion." *Id.* ¶ 58. Having a broad array of guests ensures that viewers are immersed in a "cocktail of opinions." *Id.* ¶ 60.

The March 30 broadcast involved "Man and Law," a show that is not produced by the Defendant but a third-party entity, "TV Company 'Ostankino,'" which licenses the program to the Defendant, where it airs weekly. *Id.* ¶¶ 77-78. It focuses on criminality and crimes connected to Russia. *Id.* ¶ 79. The content of the four shows is elaborated extensively in the SOF.

## ARGUMENT

Under the First Amendment, "there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). In furtherance of this principle, defamation will not lie for statements uttered about a public figure, unless the plaintiff proves, by clear and convincing evidence, that the statements were both (1) false; and (2) made with "actual malice." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 490 (1975); *Rinaldi v. Holt, Rinehart & Winston*, 42 N.Y.2d 369, 379-80 (N.Y. 1977) *cert. denied*, 434 U.S. 969 (1977); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). Plaintiff here can prove neither.

As stated in *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242 (1986), in ruling on summary judgment, the "judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. "When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*." *Id.* There is no genuine issue if the evidence presented by Plaintiff "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Id.* Conclusory or speculative allegations of either falsity or actual malice will not suffice, nor will

conclusory contentions that movant's witnesses are not credible. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 19 (2d Cir. 1995). It is "not enough for the plaintiff merely to assert that the [trier of fact] might, and legally could, disbelieve the defendant's denial of legal malice." *Contemporary Mission v. N.Y. Times Co.*, 842 F.2d 612, 621-22 (2d Cir. 1988) (summary judgment). Summary judgment is the time when Plaintiff must "put up or shut up" and produce affirmative evidence establishing both falsity and actual malice clearly and convincingly. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). As elaborated below, Plaintiff has utterly failed to carry this burden.

## I.    <u>Plaintiff Is A "Public Figure"</u>

It is undisputed that Plaintiff is a public figure. "Those who have voluntarily sought and attained influence or prominence in matters of social concern are generally considered public figures." *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). Plaintiff describes himself as "the author of a widely circulated book" who is often "invited to take part in news programs, talk shows, conferences and documentaries" on "Russian affairs" both domestically and abroad. SOF ¶ 4. He confesses to being a "quite well-known character in the Russian -- widely known in their circles, *id.*, and "there was a lot of public interest . . . there was tremendous interest" in Litvinenko's death, which he characterizes as a matter of "public concern." *Id.* ¶ 5. He has written various op-eds on Litvinenko's death, *id.* ¶ 14, appeared often on television and radio shows, and documentaries. *Id.* ¶¶ 15-16. He concedes that he had a wide-ranging public persona both before Litvinenko and certainly after. *Id.* ¶ 45. He met extensively with members of Congress and the State Department regarding Litvinenko's death. *Id.* ¶ 17.

Plaintiff agrees that Defendant "will easily prove that we [himself and Litvinenko's widow, Marina] are public figures" subject to the actual malice standard, *id.* ¶ 46, and at a minimum he is a "limited purpose public figure with regard to a large -- a large area of discourse

like connected to Russia, Putin, and all that." *Id*. ¶ 47. He even stated that he "wanted" to have this case decided on the actual malice standard. *Id*. ¶ 156.

Defendant agrees. Plaintiff has "achieve[d] such pervasive fame or notoriety" on an issue of unrelenting world significance (Russia) that he is a "public figure for all purposes and in all contexts." *Gertz*, 418 U.S. at 351. Even if he is not an "all purpose" public figure, however, he is certainly a public figure for the "limited range of issues" relevant here, *id.*, relating to "Russia, Putin, and all that," including Litvinenko. SOF ¶ 47. The actual malice standard applies.

**II.   Plaintiff Cannot Provide Clear and Convincing Evidence of Falsity or Actual Malice**

Defendant bears no burden here; it need not prove the relevant statements are *true*. It is Plaintiff's burden to prove, by clear and convincing evidence, that the statements are *false*, *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986), and that Defendant acted with actual malice. *Cox Broadcasting*, 420 U.S. at 490. Regarding falsity, the Supreme Court has explained:

> [t]here will always be instances when the factfinding process will be unable to resolve conclusively whether the speech is true or false; it is in those cases that the burden of proof is dispositive. Under a rule forcing the plaintiff to bear the burden of showing falsity, there will be some cases in which plaintiffs cannot meet their burden despite the fact that the speech is false. The plaintiff's suit will fail despite the fact that, in some abstract sense, the suit is meritorious.

*Hepps*, 418 U.S. at 776.

Similarly, the actual malice standard "exacts a correspondingly high price from the victims of defamatory falsehood" because "many deserving plaintiffs . . . will be unable to surmount the barrier of the *New York Times* test." *Gertz*, 418 U.S. at 342. Actual malice is a purposefully high bar; negligence will not suffice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 288 (1964); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991). It is a subjective state of mind. *Masson*, 501 U.S. at 510; *Contemporary Mission.*, 842 F.2d at 621, necessitating that Plaintiff proffer "affirmative evidence" even though evidence of the defendant's subjective

state of mind (actual malice) "is likely to be within the possession of the defendant[.]" *Anderson*, 477 U.S. at 257; *see also Sullivan*, 376 U.S. at 279-80. "Reckless disregard," in turn, means that "the defendant must have made the false publication with a 'high degree of awareness . . . of probable falsity,' or must have entertained serious doubts as to the truth of his publication." *Harte-Hanks*, 491 U.S. at 667 (citations omitted); *Masson*, 501 U.S. at 510. Where a publisher of a third-party's statements has no "obvious reasons to doubt the veracity of the informant or the accuracy of his reports," he acts in good faith, not reckless disregard of the truth. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

As elaborated below, the unrebutted evidence shows Defendant's personnel[3] neither knew the statements were false nor recklessly disregarded the truth but instead, subjectively believed the accusations against Plaintiff could be true.

**A.**     **Subjective Belief the Statements Could Be True**

*1.     Litvinenko's Death*

Defendant broadcasts its shows only in Russia, and they are aired solely in the Russian language. SOF ¶¶ 53, 77. The evidence is replete (and unrebutted) that the Russians—including the guests, hosts and producers of the broadcasts in question—sincerely believed that British accusations of Russian involvement in Litvinenko's death (and the Skripal's poisonings) was a setup by the U.S. or UK intelligence, possibly with the help of Ukraine. *See* Compl. Ex. 2 at 2-8, 26-29, 33; Wangsgard Decl. Ex. 17 at COR_000130-31, 135; Ex 11 at COR_000164. As the sworn testimony of the host/producer of "Man and Law" stated, "All mass media of world and

---

[3] Plaintiff's broad allegations against Channel One as an entity fail, as elaborated further *infra* Section II.C. "When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013); *see Sullivan*, 376 U.S. at 287 ("[T]he state of mind required for actual malice would have to be brought home to the persons in the [defendant's] organization having responsibility for the publication of the [statement].").

Russia, all Western press, were saying that the West is accusing Russia in poisoning of

Alexander Litvinenko and Sergei Skripal, and that is not true." SOF ¶ 81. He stated that in his

"personal opinion" the allegations against Russia were "not true" based on his "reading of the

Western and Russian press." *Id*. The episode also discussed multiple explanations. *Id.* ¶ 82.

Similarly, the host of "Let Them Talk" stated under oath that at the time the broadcasts

took place, it was "unclear" who had committed the poisonings, including Litvinenko, and:

> the *fact that [it was] unclear made it more interesting for our program to discuss* because, as part of our program, we discuss various opinions in various situation[s], and if the -- if it were clear later on, it would not be as interesting, and it did not necessitate for us to air one program after another dedicated to this topic [i.e., the poisonings] because *what makes our program interesting is when it is not obvious and it's not clear what the actual facts are.*

*Id.* ¶ 59 (emphasis added). When asked directly if he believed the accusations against Russia,

Lugovoy and Kovtun were true, the producer/host of "Man and Law" said "no," because it was

his "personal opinion." *Id.* ¶ 81.

That Defendant's personnel likely *believed* the statements about Plaintiff is evident from

Plaintiff's own admissions. He admits, for example, that "it's the official position of

investigators in the [Russian] prosecutor's office" that Western intelligence, including potentially

Plaintiff, played a role in Litvinenko's death. *Id.* ¶ 44. He also admits that in August 2010, the

Russian Deputy Prosecutor wrote to the British Home Secretary, asserting that he was an

"accomplice" of Berezovsky in Litvinenko's murder. *Id.* ¶ 9. The Russian prosecutors' position

was reinforced by other statements made by high-ranking Russian officials, who consistently

denied Russian involvement and criticized the British government for its politicization of

Litvinenko's death to create anti-Russian (and anti-Putin) hysteria. *See, e.g., Peskov: The*

*Litvinenko Case is Feeding Anti-Russian Hysteria*, RIA Novosti (Jan. 22, 2016) (Wangsgard

Decl. Ex. 18); *Kremlin Does Not Perceive Litvinenko Death Investigation Results as Verdict*,

TASS News Agency (Jan. 21, 2016) (Wangsgard Decl. Ex. 19).[4] Plaintiff even acknowledges that Russians are "unable and devoid of any other sources of information so that they lost any ability to have a rational judgment or to use common sense when they -- even when they hear grotesque lies." Goldfarb Dep. 220:15-23.

All of the evidence points in one direction: Russians subjectively believed that Western intelligence, not Russia, was complicit in Litvinenko's death. Thus, the only logical conclusion is that Defendant's personnel *subjectively believed* it was possible that Plaintiff played a role in Litvinenko's death, particularly given Plaintiff's (and his close friend, Litvinenko's)[5] longstanding association with Western intelligence, discussed extensively below. That is enough to grant summary judgment in favor of Defendant, given Plaintiff's burden of proving, by clear and convincing evidence, that individual actors within Defendant's organization *knew* the statements were false or had serious doubts about their truth. *Anderson*, 477 U.S. at 254.

2.      *CIA Involvement*

Plaintiff's claims relating to statements about his possible CIA association similarly fail for lack of clear and convincing evidence of falsity or actual malice. Plaintiff concedes that an "allegation of belonging to the CIA are not slander per se," SOF ¶ 143, and indeed is not "defamatory" or "slanderous" at all. *Id*. Although Plaintiff denies being a "member" of the CIA, he conceded in his deposition that "technically I could be called an asset." *Id.* ¶ 23.

Plaintiff assisted both British and U.S. intelligence on numerous occasions. *Id.* ¶¶ 18-25. The agencies sought his cooperation on matters relating to possible biological weapons in Iraq,

---

[4] Also illustrative is a roughly contemporaneous 2007 Russian poll, conducted by the All-Russian Public Opinion Research Center, which found that one-third of Russians "consider Litvinenko's case a provocation aimed against Russia" and only one-tenth "believe that Russian security services were behind Litvinenko's death." *See One-Third of Russians Consider Litvinenko Case Provocation: Opinion Poll*, RT News (Jan. 23. 2007) (Wangsgard Decl. Ex. 20).
[5] It is undisputed that Litvinenko was a paid asset of British Intelligence. Compl. ¶ 28; SOF ¶ 20.

Berezovsky's ties to a Georgian oligarch (whom Plaintiff also knew "quite well"), *id.* ¶ 20, information about another former FSB officer, *id.*, and information about a "couple of colleagues of mine back in Russia." *Id.* ¶ 21. Plaintiff admits that he connected the CIA to Litvinenko, having "brought the Litvinenkos to the American Embassy in Ankara" to meet with the CIA. *Id.* ¶ 22. Plaintiff arranged that meeting. *Id.*

Plaintiff also admits that the FBI talked to him "two or three times," and "once even bought me lunch." *Id.* ¶ 24. The FBI spoke with him about a member of the Soviet Mission at the UN." *Id.* They also spoke to Plaintiff regarding the disappearance of an American in Chechnya, *id.* ¶ 25, whom Goldfarb knew "as part of the Soros Operation" and whom "worked very closely with the Department of Defense." *Id*. Oddly, during his deposition, Plaintiff asserted that Lugovoy—whom Britain accused of murdering Litvinenko—was a British intelligence asset. SOF ¶ 74 n.8. He stated that Litvinenko met Lugovoy at the bar where Litvinenko was allegedly poisoned because Lugovoy had been vetted by Litvinenko's handlers at MI-6. *Id.* He was then asked, if "Lugovoy was a British intelligence asset, and in that capacity associated with the British government and he had a role in [Litvinenko's] murder, does that mean the British government had a role in [Litvinenko's] murder based on these inferences?," to which Plaintiff replied, "No, I believe he was a double agent" who "fooled the Brits." *Id.* No such information has ever been made public, but Plaintiff's view that Lugovoy was British intelligence further supports the view that British intelligence might have been involved in Litvinenko's poisoning.

Defendant and its guests, particularly Walter Litvinenko, Kovtun and Lugovoy, would have been aware of Plaintiff's connections to British and U.S. intelligence. They were undoubtedly aware, for example, that Plaintiff's close friend Litvinenko was a paid MI-6 asset. *See* SOF ¶ 20. They were also aware that Plaintiff was "blacklisted" and unable to obtain an

entry visa to visit Russia. Compl. Ex. 2 at 38 (Lugovoy statement). As Lugovoy (a former FSB officer) stated, "These lists are not compiled arbitrarily, so apparently he was a threat to the security of the Russian Federation." *Id*.

Plaintiff concedes that in 2013, a Russian talk show tried to obtain a Russian entry visa for him, which was denied "in a categorical form" in a "high-level decision" by the Russian government. SOF ¶ 10. He believes that "the prohibition on my travel to Russia is still in effect." *Id.* ¶ 12. Plaintiff admits that he wanted "to see if I'm on the blacklist," *id.* ¶ 11, and that "[p]eople who are denied visas . . . are referred to as people being blacklisted." *Id*. He concludes that he was, therefore, on the blacklist at least in 2004 or 2005. *Id.*

Plaintiff's inability to obtain a Russian entry visa may well be because he is believed to pose a threat to Russian security, which would be logical since the Russian government believes he was involved in Litvinenko's death. *Id.* ¶ 44. In addition, Plaintiff worked for many years (1991-2000) in Moscow, running a "major program" for the Soros Foundation. *Id.* ¶ 1. During this period, Plaintiff spent "between one-third and one-half of [his] time in Russia." *Id*. By 2015, however, Russia banned two branches of the Soros Foundation on grounds that they represented a "threat to the foundation of the constitutional system of the Russian Federation and the security of the state." *See* Jennifer Alban, *Russia Bans George Soros Foundation as State Security 'Threat'*, REUTERS (Nov. 30, 2015) (Wangsgard Decl. Ex. 21).

Regardless of whether Russia's accusations against the Soros Foundation are true, it is highly likely that by March-April 2018 when the relevant broadcasts were made, Defendant and its guests knew Plaintiff worked for Soros, Compl. Ex. 2 at 19, and anyone who ran Soros's Moscow operation would likely be considered aligned with Western intelligence. This makes it

highly likely that Defendant's personnel subjectively believed that someone such as Plaintiff, who ran major Russian programs for Soros, may have been associated with the CIA.

Under all these circumstances, the statements relating to Plaintiff's possible CIA connection were highly likely to be considered *true* by the Russians who uttered them. Plaintiff has adduced no clear and convincing evidence of falsity or actual malice.

### 3. Death of Plaintiff's Third Wife

Plaintiff conclusorily alleges that Defendant's guests accused Plaintiff of murdering his wife, Svetlana. Compl. ¶ 116.[6] The basis of Plaintiff's claim is Walter's statement that Plaintiff's third wife told Walter, "Walter! Walter! Alex [Plaintiff] killed Alexander [Litvinenko]." Compl. ¶ 85.[7] Plaintiff asserts that Walter, in naming his third wife in this way, "insinuated that her death might be connected to her alleged revelation to him." Compl. ¶ 64. But again, Plaintiff bears the burden of proving, by clear and convincing evidence, that Walter's statement implied a false statement of fact. *Condit v. Dunne*, 225 F.R.D. 100, 106 (S.D.N.Y. 2004). Walter's statements, however, did not assert that Plaintiff killed his wife at all; they merely recounted what he heard. There is not a single word attributable to Defendant that suggests that Plaintiff killed his third wife, and no reasonable listener could imply such an accusation. *See Alfajr Printing & Pub. Co. v. Zuckerman*, 646 N.Y.S.2d 858, 859 (N.Y. App. Div. 1996).

### 4. Asylum Fraud

Plaintiff has adduced no affirmative evidence that Defendant's personnel *subjectively knew* the statements relating to Plaintiff's involvement in possible asylum fraud were untrue, or

---

[6] Plaintiff complains that Defendant "failed to do even the most elementary fact-checking regarding Mrs. Goldfarb's death" because Walter mistakenly thought she was in her late 20s (when she was in fact 51) when she spoke to him and that she died abruptly shortly thereafter (when she in fact died several years later of cancer). Compl. ¶ 90. But none of these statements defame the *Plaintiff* (nor does Plaintiff allege so), and as elaborated *infra*, Defendant has no obligation to fact-check. *St. Amant*, 390 U.S. at 733; *Sullivan*, 376 U.S. at 287-88.
[7] It should be noted that the allegations in paragraph 97 of the complaint relate solely to former co-defendant, RT, not Defendant.

even entertained serious doubts that it was true, thus warranting summary judgment in Defendant's favor. *Anderson*, 477 U.S. at 254. Indeed, as Plaintiff admits, in 2010 the Russian government notified the British Home Secretary that Plaintiff was a "co-conspirator in the alleged 2003 plot to defraud the UK authorities into granting asylum to Mr. Berezovsky." SOF ¶ 9. Similarly, in 2017 (before the relevant broadcasts) the Russian embassy in the UK accused the British government of harboring over fifty Russian criminals for "political motivations," stating, "It never fails to amaze us that the Russian citizens who fled the UK as fugitives, while here become British subjects." Press Release, Embassy of the Russian Federation to the United Kingdom (Mar. 16, 2017) (Wangsgard Decl. Ex. 22). Even if the Russian embassy's allegations are not true, they elucidate Russians' subjective state of mind, confirming that Defendant's personnel did not know the statements about asylum fraud were false. Plaintiff has adduced no clear and convincing evidence to the contrary.

     *5.*    *Subornation of Perjury*

Plaintiff claims that Defendant committed libel per se by publishing a single statement that Plaintiff "persuaded Marina Litvinenko to give false testimony" during the UK Inquiry (discussed extensively below), Compl. ¶¶ 101, 128 or, in other words, commit "perjury." *Id.* ¶ 130. Plaintiff himself describes this as merely a "vague assertion," Compl. ¶ 130, and thus not the type of concrete statement actionable as defamatory. *See, e.g., Rinaldi*, 42 N.Y.2d at 383-84. More fundamentally, Plaintiff fails to explain how this is libel per se,[8] given that (as elaborated *infra* Section II.D), an "inquiry" under British law is not a judicial proceeding. There is nothing

---

[8] Under New York law, libel per se is limited to four categories, none of which are applicable here. *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001). As elaborated above, the statements do not allege that Plaintiff committed a "serious crime," as Plaintiff has not carried his burden to either: (1) show that Marina Litvinenko's statement before the UK Inquiry was under oath (and thus constitutes "perjury"); or (2) demonstrate or identify any other crime that may be involved. Moreover, the statements do not "tend to injure the plaintiff in his or her trade, business or profession." *Id.*

in either the Inquiries Act of 2005[9] or the Inquiry Rules of 2006[10]—which governed the Inquiry—that make it a *crime* to give false statements. The Inquiries Act states that the Inquiry chair "*may* take evidence on oath, and for that purpose *may* administer oaths." Inquiries Act (2005), § 17(2) (Eng.) (hereinafter "Inquiries Act") (emphasis added). Sir Owen's detailed recitation of the procedures he adopted for his inquiry do not mention witnesses being placed under oath. ROBERT OWEN, THE LITVINENKO INQUIRY: REP. INTO THE DEATH OF ALEXANDER LITVINENKO (Jan. 2016) (hereinafter "UK Inquiry"), App'x 1, pp. 247-63. Accordingly, Plaintiff has not carried his burden to show that the statements are libel per se, much less clear and convincing evidence of falsity or actual malice.

Indeed, the context in which "Let Them Talk" guest Dmitry Kovtun spoke the words completely undercuts any assertion of actual malice, even if capable of defamatory meaning. First, it was clear that the discussants were speaking in light of the "warm relationship" between Marina Litvinenko and Plaintiff. The existence of this relationship is uncontested: Plaintiff describes himself as "close friends" with Mrs. Litvinenko, SOF ¶¶ 39, 131 n.13; they wrote a book together, *id.* ¶ 5; they remain in close contact, make appearances and take meetings together, travel together, are invested emotionally in this suit together, and have a joint internet presence. *See, e.g.,* Goldfarb Dep. 15:10-19:17, 207:20-208:19, 235:6-236:9, 258:15-259:3. The suggestion of a close relationship—even if capable of defamatory meaning—is true.

Second, Plaintiff takes a very active role in their activities including, for example, the GoFundMe page, updates on this suit, public appearances, a proposed podcast, and media interactions. This extends to the Inquiry:

---

[9] The full text of the Inquiries Act of 2005 can be found on the UK government's legislation website, at https://www.legislation.gov.uk/ukpga/2005/12/contents.
[10] The full text of the 2006 Inquiry Rules can be found at https://www.legislation.gov.uk/uksi/2006/1838/made.

> I met her many, many times in London . . . during the Litvinenko inquiry and before the Litvinenko inquiry, during the preparation of the inquiry -- it was 2015-- 2012, 2016, I guess where -- when I went to London all the time, and took a very active part in working with the lawyer and with her and communicating with the judge and giving evidence, and at that same time talking to the police investigating the murder.

Goldfarb Dep. 20:10-25. In light of the foregoing, there is ample basis for Mr. Kovtun's belief[11] that Plaintiff influences Mrs. Litvinenko which, in fact, he does.[12] Therefore, the crux of Plaintiff's claim is the single phrase "convinces her to make false statement in the Public Inquiry hearings." But, as detailed throughout, the Russian speakers *subjectively believe* that the testimony and conclusions of the Inquiry are wrong and false, and thus that Mrs. Litvinenko's testimony was false. Plaintiff can adduce no evidence of actual malice in this regard.

### B.    Walter Litvinenko's Prior Statements Do Not Establish Actual Malice

Plaintiff claims that actual malice can be shown because "Channel One producers knew of Walter's public statements in 2012, in which he first uttered these allegations." Compl. ¶ 87; *see also id*. at ¶ 121.[13] But the only evidence put forth to support this conclusory allegation is that another Russian broadcast company, RT (which was originally named as a co-defendant)— not Defendant—published Walter's accusations in May 2012. Compl. ¶ 48. Paragraph 121 of the complaint quotes a reporter of the Defendant only as stating, "One cannot be at all sure that Walter Litvinenko wouldn't instantly change his view if someone in the West would all of a sudden help him." *Id*. at ¶ 121. This statement contains no actionable, defamatory statement of fact, nor does it emanate from an individual with editorial responsibilities at Defendant, whose actual malice must be proved here.

---

[11] Kovtun cited some of these same facts as the basis for his opinion. Compl. Ex. 2 at 31 ("we saw them together all the time, they wrote a book together, they prepared for the hearings together . . .").

[12] The statement that Plaintiff "commands her respect" certainly is not defamatory, and in fact sounds complimentary.

[13] Plaintiff also alleges that actual malice is shown by knowledge of the 2016 UK Inquiry conducted by retired judge Owen. That allegation is addressed in detail in Section II.D.

The evidentiary record shows that Defendant's personnel were not aware of Walter Litvinenko's prior statements about Plaintiff and were genuinely shocked and surprised by Walter's statements. SOF ¶¶ 72, 75. The head of the Special Projects directorate testified that neither she nor her team "had the slightest idea that Walter Litvinenko might mention Dr. Goldfarb. So this idea did not come across my mind. It just did not." *Id.* ¶ 72. She testified that Walter was invited to the show because the topic was recent poisonings of Russians on British soil—triggered by the Skripal poisoning—and Walter "was in a similar situation" since his "son got poisoned, also poisoned in London." *Id.* ¶ 68. The program wanted guests who would "show emotions" because it was "program of entertainment nature" that "need[ed] participants who can show emotions." *Id.* The producers' surprise was matched by the shows' guests and hosts, who reacted with clear shock to Walter's statements, saying "My gosh!," Compl. Ex. 2 at 12, calling them "incredible," "absolutely sensational," *id.* at 13, and "sensational," *id.* at 19, 26, 27, and proclaiming that "[n]o one was prepared for that version." *Id.* at 26. The evidence similarly shows that Defendant was also surprised by Lugovoy's opinion that Litvinenko had been poisoned by Goldfarb. SOF ¶ 74.

These unrebutted statements directly refute Plaintiff's allegation that "Channel One producers knew of Walter's public statements in 2012, in which he first uttered these allegations." Compl. ¶ 87. Plaintiff's allegation of such knowledge is conclusory and unsupported by clear and convincing evidence. The evidence shows that Defendant's personnel were *not* aware of Walter's prior statements and indeed, were genuinely surprised by them. Plaintiff has failed his "obligation[] to 'bring home' an existing connection between [Defendant's published statements] and [ ] earlier publications." *McDougal v. Fox News Network*, 489 F. Supp. 3d 174, 187 (S.D.N.Y. 2020).

### C.        Plaintiff's Prior Interviews With Defendant Do Not Establish Actual Malice

Actual malice cannot be established by a "failure to investigate before publishing, even when a reasonably prudent person would have done so. . . ." *Harte-Hanks*, 491 U.S. at 688. A defamation defendant is under no obligation to investigate before publishing, and the burden remains squarely on Plaintiff to show clear and convincing evidence of falsity or reckless disregard for truth, even though the actual malice standard "puts a premium on ignorance, [or] encourages the irresponsible publisher not to inquire. . . ." *St. Amant*, 390 U.S. at 731.

Despite this, Plaintiff attempts to establish actual malice by referencing two interviews given to Defendant. The first interview occurred on March 23, 2018, in New York, but never aired. Compl. ¶ 94. The evidence establishes that the taped interview lasted approximately 30 minutes, SOF ¶ 100, of which approximately 28 and a half minutes were "dedicated to Russian foreign and domestic policy generally" and the general topic of Russian involvement in expat deaths. *Id*. Only "approximately 100 seconds" involved a discussion with Plaintiff about his role with respect to the case of Mr. Litvinenko. *Id*.

The March 23 interview, however, is *wholly irrelevant* to this suit. It was *not* an interview undertaken for the Special Projects directorate, which produced the entertainment shows at issue here. The evidence shows that the interview was taken by Zhanna Agalakova, Compl. ¶ 94, at the behest of a *separate directorate*, the Directorate of Information Programs, which is responsible for *news* (not entertainment) programs. SOF ¶¶ 29-32, 87. Ms. Agalakova conducted this interview as a favor to her news division colleague, as she was in the New York. *Id.* ¶¶ 96-97. The evidence shows that the interview was transmitted to the *news* division in Moscow, which ultimately did not use it.[14] *Id.* ¶¶ 101, 103-04. As multiple sources indicate, it was never shared

---

[14] The evidence shows that the news directorate likewise interviewed Walter for this short news segment, but never aired it, either. SOF ¶¶ 95, 102-03. As is typical with nightly news programs, "a significant amount of information

with the Special Projects directorate or "TV Company 'Ostankino,'" which produced the shows forming the basis of Plaintiffs claims here. *Id.* ¶¶ 35, 84, 104-06, 152-53

As the Supreme Court made clear in *Sullivan*, the failure to check the accuracy of a story even against information contained in the defendant's *own* internal files—such as this news directorate interview—is not actual malice. *Sullivan*, 376 U.S. at 287. "[T]he state of mind required for actual malice [must] be brought home to the persons in the [Defendant's] organization having responsibility for the publication. . . ." *Id.* "When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Dongguk Univ*, 734 F.3d at 123 (2d Cir. 2013); *accord Palin v. N.Y. Times Co.*, 940 F.3d 804, 810 n.9 (2d Cir. 2019).

Here, Plaintiff has failed to adduce any evidence, much less clear and convincing evidence, showing that any individual possessed the requisite knowledge and intent. As such, the March 23 interview cannot form the basis of a finding of actual malice.

The second interview was conducted by phone a few days prior to the April 10 "Let Them Talk" broadcast. Compl. ¶ 95. This interview was conducted because Defendant's producers and editors thought that Plaintiff should have an opportunity to respond to Walter's statements. SOF ¶¶ 145-51.

During this interview, the reporter asked Plaintiff, "Litvinenko's father has accused you of killing his son. How do you respond to him?" *Id.* ¶ 139. Rather than deny the accusations, Plaintiff said only, "I can respond: [Walter] is no father to him, he abandoned him when the boy

that we gather necessarily goes unused for a ten-minute spot." *Id.* ¶ 103. Neither Walter's nor Plaintiff's interviews were used because they did not provide any new details or information relating to the subject-matter of the segment, relating to "strange deaths" of Russians. *Id.* ¶¶ 101-03.

was two years old, later he milked him [financially], and later when Berezovsky stopped giving him money he returned to Moscow. He is worse than Lugovoy because Lugovoy at least carried out an order while the father betrayed his son for an apartment in Moscow." *Id*. In his unrebutted deposition testimony, the show's host, Dmitry Borisov, stated that "he was "surprised" upon hearing the interview, because Plaintiff "was going on and on about the personality of Walter Litvinenko, but didn't give too much of an answer" about the accusations made against him. SOF ¶ 150. He asked his show colleagues who shared the interview, "Is that all?" *Id*.

The second interview thus does not advance Plaintiff's claim of actual malice. If anything, it evinces Defendant's desire to give Plaintiff an opportunity to rebut the statements made against him, although it was under no obligation to do so.[15] When directly asked about the most serious accusation against him, relating to Litvinenko's death, however, Plaintiff provided no direct rebuttal, opting instead to disparage Walter's parenting skills and morals. Thus, the second interview provides no evidence to support Plaintiff's allegation that this interview created "serious doubts as to the truth" of the published statements and thus cannot support a finding of actual malice. *St. Amant*, 390 U.S. at 731.

### D.  The UK Inquiry Does Not Establish Actual Malice

Plaintiff's final argument is that Defendant must have known that the statements were false because in 2016, Sir Robert Owen conducted the UK Inquiry in which he concluded that Litvinenko had been poisoned by Lugovoy and Kovtun at the direction of the Russian government. *See* Compl. ¶¶ 5, 74, 89. Plaintiff goes so far as repeatedly to say that the UK

---

[15] It is also unrebutted that the editors of "Man and Law" attempted to obtain a rebuttal from Plaintiff prior to the March 30 show, but they were unable to locate a phone number for him prior to airtime. SOF ¶ 83. This further evinces Defendant's lack of actual malice.

Inquiry "judicially established" that the Russians murdered Litvinenko "beyond a reasonable doubt as a fact." Compl. ¶ 75; *accord* Compl. ¶¶ 5, 78.

Plaintiff grossly mischaracterizes the UK Inquiry,[16] which was not a "judicial" proceeding at all. The Inquiry itself was authorized "pursuant to Section 26 of the Inquiries Act of 2005." Section 2 of the Inquiries Act makes clear that inquiries are not judicial proceedings: "An inquiry panel is not to rule on, and has no power to determine, any person's civil or criminal liability." UK Inquiries Act 2005 c 12, § 2(1).

The inquiry report is a *legislative* report for the British Parliament. It was initiated at the request of the UK Home Secretary, who appointed a retired British judge, Sir Robert Owen, to conduct the inquiry alone. Inquiries Act, § 1(1) (inquiry initiated by Minister), § 4 (Inquiry panel appointed by Minister), § 3 (Inquiry panel can consist of single individual). Sir Owen was permitted by the Inquiries Act to employ whatever procedure he desired; he was not required to abide by the rules of evidence or procedure applicable to judicial proceedings. Inquiries Act § 17(1); *see also* UK Inquiry ¶ 9.205, p. 242 ("I am not bound by the strict procedural rules that apply in court proceedings"). Indeed, Owen employed numerous procedures that would be impermissible in criminal or civil proceedings. Hearsay evidence was introduced, including that proffered by Plaintiff himself. UK Inquiry p. 219-221, ¶¶ 9.73-9.85 (Potemkin evidence). The accused Russian individuals and government did not have the opportunity to examine or cross-examine evidence. The only "core participants" were Litvinenko's wife and son, the London Metropolitan Police Service, the Home Secretary, the Atomic Weapons Establishment and Mr. Kovtun, UK Inquiry p. 254, ¶¶ 57-62 and only core participants are allowed to make opening and

---

[16] Plaintiff incorporated the entire UK Inquiry report into his complaint. Compl. ¶ 59 n.2. The full text of the UK Inquiry report may be accessed at:
https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/493860/The-Litvinenko-Inquiry-H-C-695-web.pdf.

closing statements. Inquiry Rules (2006) § 11. Only Owen and Inquiry Counsel had a right to

question witnesses or request written or oral evidence. Inquiry Rules (2006), §§ 9-10. In short,

there was no right to confrontation or cross-examination to ensure reliability, as would be typical

in a criminal proceeding. *See, e.g., California v. Green*, 399 U.S. 149, 158 (1970) (cross-

examination is the "greatest legal engine ever invented for the discovery of truth.").

Owen also employed "enhanced measures" during the public portion of the hearings,

excluding the public from hearing certain testimony live and requiring it to be piped into an

annex room that received the testimony via video using a five-minute delay. UK Inquiry, p. 258-

59, ¶¶ 99-100. Sir Owen interestingly used these "enhanced measures" for the Plaintiff's

testimony, as well as two additional individuals, on grounds that "there was a risk that some of

the sensitive information protected by restriction notices[17] or restriction orders[18] might be

disclosed, inadvertently or otherwise . . . ." *Id*. at p. 258, ¶ 97

Plaintiff also repeatedly denotes the Inquiry as a "Public Inquiry," *see, e.g.*, Compl. p. 11

("The Official British Probe: Inquest to Public Inquiry"), ¶¶ 57, 58. Yet British law omits the

"public" moniker, Inquiries Act, § 1, and it expressly allows restrictions on public access to

inquiry proceedings. Inquiries Act § 19. Indeed, as Sir Owen admitted in his report, an Inquiry

was begun into Litvinenko's death because British criminal law "does not allow evidence to be

taken in what are known as 'secret' or 'closed' sessions . . . ." UK Inquiry, p. 9, ¶ 2.5. Thus, as

Owen stated, the "most important feature of the Inquiry" was that it "would permit me to

---

[17] "Restriction notices" were applied to evidence presented by the UK government that "were of such sensitivity that they could not be used in open court" and were thus restricted by notice of the UK's Home Secretary pursuant to Section 19 of the UK's Inquiries Act of 2005. UK Inquiry, p. 255, ¶¶ 69-72.

[18] "Restriction orders" refers to orders granted by Sir Owen to grant anonymity to individuals who testified, of which there were many. UK Inquiry, p. 256-57, ¶¶ 73-86.

consider closed evidence and hold closed hearings, from which the public, most the core participants and the press would be excluded." UK Inquiry, p. 255 ¶ 69; *accord id*. at p. 9 ¶ 2.7.

Owen received "a considerable quantity of closed documentary evidence" submitted and that he "received a number of closed witness statements, some of which are lengthy." *Id.* at p. 181, ¶ 7.4. After receiving and perusing this extensive volume of closed written evidence, Owen held an evidentiary hearing over the course of "several days in May 2015," attended only by himself, "Counsel and Solicitor to the Inquiry and the legal team for the Home Secretary." *Id*. at p. 181, ¶ 7.5. In the course of the closed portion of the Inquiry, Owen took evidence from numerous witnesses who were granted anonymity. *Id*. at pp. 256-57, ¶¶ 73-86.

In short, the UK Inquiry report is just that—a report, representing Owen's own conclusion, as he admits. *Id.* at p. 7, ¶ 1.8 ("The conclusions are mine and mine alone"). It is essentially a white paper, authored by a single individual, who concluded that there was "strong circumstantial evidence" that Russia was responsible for Litvinenko's death, *id.* at p, 240, ¶ 9.199, but who understood that his conclusion was inevitably affected by the absence of the typical, vigorous counter-narrative of the accused. *Id.* at p. 10, ¶¶ 2.17-2.18 (expressing "regret" that he did not hear from the accused), p 194-95, ¶ 8.84 (lack of evidence from accused "may lead me to making findings against them that I would not have made had they given their explanation."), p. 262 ¶ 123 (accused's "failure to participate or give evidence has the obvious consequence that I would make findings of fact without the benefit or otherwise of such a contribution.").

The record shows that Russians were generally aware of the UK Inquiry, but did not give it much credence. Defendants' guests and hosts repeatedly lamented that key evidence had been "classified" by the British government and was thus hidden from the public. *See, e.g.*, Compl.

21

Ex. 2 at 7 (Lugovoy); at 11 (Lugovoy); 19 (Lugovoy), 27 (Lugovoy), 31 (Karapetyan), 33 (Lugovoy), 39 (Borisov); Wangsgard Decl. Ex. 17, COR_000129 (Karaulov), 000131 (Borisov); Wangsgard Decl. Ex. 11, COR_000148 (Borisov). For example. the producer and host of "Man and Law," Alexey Pimanov, stated under oath that he never read the report by Owen or any summaries thereof. Wangsgard Decl. 4, Pimanov Dep. 24:9-16. Mr. Pimanov was aware of "some sort of proceeding in the United Kingdom" back in 2006 to investigate Litvinenko's death, *Id*. 20:5-12, but "Man and Law" did not cover the story in 2006 because "all our attempts to receive any information on -- about it failed. All the information was secret." *Id*. 20:5-12, 21:2-5. Lugovoy referred to Owen as a "clownish ex-judge" whose conclusions "were based exclusively on suppositions and guesswork" and classified (non-public) materials. Compl. Ex. 2 at 11. Guest Dimitry Gladyshev, an expert on toxic substances, declared that "The available data about the poisonings indicate that both the investigations and the court hearings are being rigged." *Id.* at 27.

The UK Inquiry, in short, does not provide clear and convincing evidence of actual malice. Defendant is under no obligation to "disprove" or refute the conclusions of the UK Inquiry; the burden rests with Plaintiff to prove that Defendant acted with actual malice by evidence that is clear and convincing. *Celle*, 209 F.3d at 183-84. The UK Inquiry and its conclusions "prove" nothing—much less clearly and convincingly—relating to actual malice, which demands proof of Defendant's *subjective state of mind*. The evidence shows that to Russians such as Defendant's personnel and its guests, the inquiry's procedures were not trusted and its conclusions were not believed. The UK Inquiry does not foreclose the possibility that Defendant and its guests sincerely *disagreed* with its findings, thereby negating actual malice.

E.      **Re-publication Cannot Establish Actual Malice**

Plaintiff also asserts that Defendant's re-publication of Walter's statements after the first

show on March 20 is sufficient to establish actual malice. Compl. ¶ 94. But re-publication is not

a magic word; it does not relieve the Plaintiff of his heavy burden of proving actual malice

clearly and convincingly. In other words, a defendant is liable for defamation based on re-

publication only if the re-publication was made with actual malice. *Biro v. Conde Nast*, 963 F.

Supp. 2d 255, 276 (S.D.N.Y. 2013). As elaborated above, Plaintiff has not carried this burden

because there is no evidence Defendant subjectively knew the statements were false or recklessly

disregarded the truth.

III.     **A Reasonable Viewer Would Conclude the Statements Were Mere Opinions**

The New York Constitution (unlike the First Amendment) "provides for absolute

protection of opinions." *Celle*, 209 F.3d at 178; *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d

144, 147 (2d Cir. 2000); *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 248 (N.Y. 1991).

Whether a statement is one of fact or opinion is a question of law, *Celle*, 209 F.3d at 178, and

involves consideration of four factors: (1) the specific language used and whether it was

indefinite and ambiguous; (2) whether the statement is capable of being objectively characterized

as true or false; (3) the full context in which the statement was made; and (4) the social context

in which the statement was made, including "any applicable customs or conventions which might

signal to readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Steinhilber v. Alphonse*, 68 N.Y.2d 283, 292 (N.Y. 1986) (citations omitted); *Chau v. Lewis*, 771

F.3d 118, 128-29 (2d Cir. 2014). The New York Court of Appeals has "rule[d] out . . . a

formulistic approach" to these factors, instructing that the "court must have the flexibility to

consider the relevant factors and accord each the degree of importance to which the specific

circumstances warrant." *Steinhilber*, 68 N.Y.2d at 291-92.

Defendant does not contest the second element. The remaining three elements, however, all indicate that the statements were statements of opinion.

### A.      The Language Used Indicates the Statements Were Opinions

The language used in the statements relating to Plaintiff's possible role in Litvinenko's death and involvement with the CIA indicate that the statements were opinions, repeatedly signaling as much via phraseology such as "I think," "I believe," qualifiers such as "could" "probably," "probable," "likely," "maybe," and referring to the "story," "version" and "theories." *See, e.g.*, Compl. Ex. 2 at 12 ("*I think* he was poisoned several times . . . *that's what I believe.*") (emphasis added); at 13 ("We heard *your monologue*. . . . *your testimony* especially you naming Goldfarb") (emphasis added); at 14 ("your *story*") (emphasis added); at 26 ("he said *he believes* the *probable* murderer") (emphasis added); *id.* ("*Theories* multiply like mushrooms after the rain") (emphasis added); at 27 ("We discussed several *versions* very thoroughly"); *id* ("in the case of Litvinenko *I believe* the interests of both Berezovsky and secret services were affected.") (emphasis added); at 28 ("when our editors talked to you about the *version* that Alexander Goldfarb *could be* complicit in the murder of Alexander Litvinenko. . . .") (emphasis added); at 30 ("I am *99% sure* Goldfarb did it. *Maybe 1%.*") (emphasis added); at 38 ("a *likely* CIA agent") (emphasis added).

Moreover, phraseology such as "I had no idea" and "I didn't know" are "particular customs or signals to readers that something is opinion, not fact. *Chau*, 771 F.3d at 129; *see also Steinhilber*, 68 N.Y. 2d at 283, 293. Here, numerous statements employ similar terminology. *See* Compl. Ex. 2 at 12 ("My gosh!"); at 13 ("incredible"); *id.* ("absolutely sensational"); at 22 ("absolutely sensational); at 26 ("No one was prepared for that version."); at 29 ("sensational"). The evidence similarly shows that Defendant's personnel were also surprised by Lugovoy's opinion that Litvinenko had been poisoned by Goldfarb. SOF ¶ 74.

Kovtun's statements relating to supposed subornation of false testimony by Marina Litvinenko, Compl. ¶ 128, are similarly replete with qualifying language indicating the expression of opinion. Compl. Ex. 2 at 28 (close relationship "*makes one think* that she is of course under someone's influence") (emphasis added); *id*. ("So *you think* she is under Goldfarb's influence") (emphasis added); *id*. ("*I think* yes.") (emphasis added); at 30 ("*Probably* because he in some way commands her respect."); *id*. ("Respect, *maybe* more by now, I don't. . . .").

In short, the precise language used in the statements would signal, to a reasonable viewer, that the impromptu comments made on the shows should be "viewed with an appropriate amount of skepticism," as they were conjectural statements of opinion, not fact. *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 141 (N.Y. 1992); *McDougal*, 489 F. Supp. 3d at 183-84.

**B.      Both the Context and Social Context Indicates the Statements Were Opinions**

The context and social context are also important here. "[A]ccusations of crimes are [ ] unlikely to be defamatory when, as here, they are made in connection with debates on a matter of public or political importance." *Id.* at 182. This is "especially true in the context of commentary talk shows like the one at issue here, which often use 'increasingly barbed' language to address issues in the news." *Id.* at 182-83 (citing Rodney A. Smolla, 1 Law of Defamation § 6:92 (2d ed.). Summary judgment is appropriate when the statements are made on a talk show by guests invited to present their personal views because such shows are "widely known as an unrehearsed and unscripted program which generally focuses on controversial current topics of public interest and debate by presenting invited guests with relevant knowledge and background" to share their opinions. *Behr v. Weber*, 568 N.Y.S.2d 948, 949-50 (N.Y. App. Div. 1991); *Hobbs v. Imus*, 698 N.Y.S.2d 25, 26 (N.Y. App. Div. 1999); *see also Huggins v. Povich*, No. 131164/94, 1996 WL 515498, at * 7 (N.Y. Sup. Ct. Apr. 19, 1996).

Here, Plaintiff concedes that the broadcasts involved matters of public and political importance. SOF ¶¶ 5, 154. Statements regarding criminal activity are undoubtedly a matter of public concern. *See Reuland v. Hynes*, 460 F.3d 409, 418 (2d Cir. 2006); *Golub v. City of N.Y.*, 334 F. Supp. 2d 399, 409 (S.D.N.Y. 2004). He also concedes that the statements were made primarily in the context of a give-and-take talk show, analogous to U.S. shows such as Oprah and Geraldo Rivera. SOF ¶ 61. The evidence is undisputed that "Let Them Talk" is an unrehearsed, unscripted programs focusing on current topics of public interest by presenting invited guests with relevant knowledge and background to share their opinions. *Id.* ¶¶ 55-61.

In addition, Walter's and Lugovoy's statements are opinions because they attributed the source of their beliefs. Walter, for example, expressly referenced things he had seen and witnessed, as well as statements he heard from third parties—namely, Plaintiff's third wife and Akhmed Zakayev. *See* Compl. Ex. 2 at 12, 27. Lugovoy's statements about possible asylum fraud similarly attributed them to admissions he heard from Berezovsky, Plaintiff, Felshtinsky and Litvinenko. *Id.* at 33-34.

When a speaker "discloses the facts on which [his statements are] based or does not imply the existence of undisclosed facts, the opinion is not actionable." *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997); *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153 (N.Y. 1993). Walter's and Lugovoy's explicit attribution of the sources of their opinion were the functional equivalent of providing a citation or hyperlink. *See Ganske v. Mensch*, 480 F. Supp. 3d 542, 554-55 (S.D.N.Y. 2020) (citing cases).

For these reasons, a reasonable viewer would have considered the statements to be statements of opinion, and they enjoy "absolute protection" under the New York Constitution. *Celle*, 209 F.3d at 178

**IV.**   <u>**Summary Judgment on Defendant's Anti-SLAPP Counterclaim is Warranted**</u>

Defendant's counterclaim seeks relief under New York's anti-SLAPP law, N.Y. Civ.

Rights §§ 70-a, 76-a, which "independently requires a [public figure] plaintiff . . . to prove actual

malice" by clear and convincing evidence. *Palin v. N.Y. Times Co.*, --- F. Supp. 3d ---, 2022 WL

599271, at *18 (S.D.N.Y. Mar. 1, 2022). Plaintiff has failed to do so, and his suit was

commenced without a substantial basis in fact and law.[19] Instead, Plaintiff's lawsuit has no

purpose other than stifling Defendant's speech, as evidenced by his numerous admissions to that

effect. For that reason, Channel One is entitled to its costs and attorney's fees, and damages.

Plaintiff was motivated to bring this suit to make a statement. SOF ¶ 156. His personal

view is that Channel One is a "propaganda operation" serving the interests of the Russian

government and is "spreading lies and fake news . . . which are politically motivated." *Id.* ¶ 157.

A victory in this suit, per Plaintiff, would give him the possibility to "significantly interfere with

the commercial activities of Channel One . . . in the US, Europe, and elsewhere." *Id.* ¶ 160.

But disagreeing with what Channel One is saying—and indeed his views have been anti-

Russian government for decades, SOF ¶ 158—does not entitle Plaintiff to use the judicial system

and defamation litigation as "a form of counter-propaganda." *See* Def. Counterclaim, ECF No.

117 ¶ 21. Because Plaintiff merely seeks to "deter, " Compl. ¶ 10,  Channel One's speech, and

"punish" (Wangsgard Decl. Ex. 23) it for its viewpoint, such harassment and attempted

intimidation warrants judgment in favor of Channel One on the counterclaim.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant requests that the Court grant summary judgment in

favor of Defendant on all of Plaintiff's claims as well as Defendant's counterclaim.

---

[19] Plaintiff has effectively admitted that success on his claims is precluded by the "guarantees of freedom of speech in a free country." SOF ¶ 162.

Date:   May 31, 2022                              Respectfully submitted,
        Washington, D.C.

                                                  /s/ *David B. Rivkin, Jr.*
                                                  David B. Rivkin, Jr.
                                                  Elizabeth Price Foley
                                                  Kendall E. Wangsgard
                                                  BAKER & HOSTETLER, LLP
                                                  Washington Square, Suite 1100
                                                  1050 Connecticut Ave., N.W.
                                                  Washington, D.C. 20036
                                                  T:  202.861.1500
                                                  F:  202.861.1783
                                                  drivkin@bakerlaw.com
                                                  efoley@bakerlaw.com
                                                  kwangsgard@bakerlaw.com

                                                  *Counsel for Defendant Channel One Russia*