UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                    :

ALEX GOLDFARB,                      :      Index No. 1:18-cv-08128 (JPC)
                                      :

                Plaintiff,        :
                                      :

         -against-                 :
                                      :

CHANNEL ONE RUSSIA,          :
                                      :

                   Defendant.      X
------------------------------------------------------------------

**PLAINTIFF ALEX GOLDFARB'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT CHANNEL ONE'S MOTION FOR SUMMARY JUDGEMENT**

ROTTENBERG LIPMAN RICH, P.C.
The Helmsley Building
230 Park Avenue, 18th Floor
New York, New York 10169
(212) 661-3080

Rodney Alan Smolla
Delaware Law School
4601 Concord Pike
Wilmington, DE 19803
(302) 477-2278

*Attorneys for Plaintiff Alex Goldfarb*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................. 1

INTRODUCTION .......................................................................................................2

    A.  Statement of Facts ........................................................................................2

    B.  Fact Discovery ............................................................................................5

    C.  The Summary Judgment Standard ..............................................................6

SUBSTANTIVE ARGUMENT...................................................................................10

    I.   GOLDFARB HAS MET HIS BURDEN ON FALSITY .................................10

    II.  GOLDFARB HAS MET HIS BURDEN ON ACTUAL MALICE ................................11

    A.  Walter Litvinenko Was an Obviously Unreliable Source...............................11

    B.  Channel One Actors Had a Motive to Lie .................................................14

    C.  The Editing and Staging of the Broadcasts Are Probative of Actual Malice .............17

    D.  The Defamatory Accusations Against Goldfarb Are Inherently Improbable.............19

    E.  Channel One Engaged in Purposeful Avoidance of the Truth....................................22

    III. THE DEFAMATORY STATEMENTS ARE NOT OPINIONS .....................................25

CONCLUSION...........................................................................................................28

TABLE OF AUTHORITIES

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld*,
80 N.Y.2d 130 (1992) ............................................................................................ 27

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .............................................................................................. 7

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir 2000) ................................................................................ 10, 11

*Cianci v. New Times Pub. Co.*,
639 F.2d 54 (2d Cir. 1980) ................................................................................ 12

*Cochran v. Indianapolis Newspapers*,
175 Ind. App. 548, 372 N.E.2d 1211 (1978) ...................................................... 15

*Curtis Publishing Co. v. Butts*,
388 U.S. 130 (1967) .............................................................................................. 22

*Eastwood v. National Enquirer, Inc.*,
123 F.3d 1249 (9th Cir. 1997) ............................................................................ 9

*Gentile v. County of Suffolk*,
926 F.2d 142 (2d Cir.1991) ................................................................................ 10

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .............................................................................................. 28

*Goldwater v. Ginzburg*,
414 F.2d 324 (2nd Cir.1969) .............................................................................. 15

*Gross v. N.Y. Times Co.*,
82 N.Y.2d 146 (1993) ............................................................................................ 27

*Harte-Hanks Communications, Inc. v. Connaughton*,
491 U.S. 657 (1989) ......................................................................................... 16, 22

*Henry v. Media General Operations, Inc.*,
254 A.3d 822 (R.I. 2021) .................................................................................... 23

*Herbert v. Lando*,
441 U.S. 153 (1979) .............................................................................................. 9

*Hogan v. Herald Co.*,
84 A.D.2d 470 (4th Dep't 1982), *aff'd*, 444 N.E.2d 1002 (N.Y. 1982)........................................ 12

*Hoover v. Peerless Publications, Inc.*,
461 F. Supp. 1206 (E.D.Pa.1978) ........................................................................................ 12

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) ........................................................................................................... 9

*Immuno AG. v. Moor-Jankowski*,
77 N.Y.2d 235 (1991) ........................................................................................................ 26

*In re Air Disaster at Lockerbie Scotland*,
37 F.3d 804 (2d Cir.1994) ................................................................................................... 10

*In re Parmalat Sec. Lit.*,
477 F.Supp.2d 637 (S.D.N.Y. 2007) .................................................................................. 10

*ING Bank N.V. v. M/V TEMARA*,
IMO No. 9333929, 892 F.3d 511 (2d Cir. 2018) ................................................................. 6

*June v. Town of Westfield*,
370 F.3d 255 (2d Cir. 2004).................................................................................................. 6

*Karedes v. Ackerley Group., Inc.*,
423 F.3d 107 (2d Cir. 2005)............................................................................................... 19

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984) .......................................................................................................... 28

*Khawar v. Globe International, Inc.*
19 Cal. 4th 254 (1998) ...................................................................................................... 12

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)................................................................................................... 6, 9, 16

*Palin v. New York Times Co.*,
940 F.3d 804 (2d Cir. 2019)......................................................................................... 16, 21

*Prozeralik v. Capital Cities Communications, Inc.*,
82 N.Y.2d 466 (N.Y. 1993) .............................................................................................. 14

*Rosenblatt v. Baer*,
383 U.S. 75 (1966) (Stewart, J., concurring) .................................................................... 28

*Scholz v. Delp*,
83 Mass. App. Ct. 590, 988 N.E.2d 4 (2013) ........................................................................ 15

*Secord v. Cockburn*,
747 F.Supp. 779 (D.D.C.1990) ............................................................................................ 12

*St. Amant v. Thompson*,
390 U.S. 727 (1968) ............................................................................................................... 8

*Stern v. Cosby*,
645 F. Supp. 2d 258 (S.D.N.Y. 2009) ............................................................................. 9, 12

*Tavoulareas v. Piro*,
759 F.2d 90, 98 (D.C. Cir. 1985), *vacated and superseded on other grounds* by *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (en banc), *cert. denied*, 484 U.S. 870 (1987) .................. 15

*Terwilliger v. Wands*,
17 N.Y. 54, 72 Am. Dec. 420 (1858) ................................................................................... 12

**Statutes**

50 Am. Jur.2d § 455 (1970) ................................................................................................... 9

Restatement (2d) Torts § 578 (1977) ................................................................................... 11

**Other Authorities**

David Anderson, *Is Libel Law Worth Reforming?* 140 U. Pa. L. Rev. 487, 511 (1991) ............... 9

Marshall McLuhan, *Understanding Media: The Extensions of Man* 8-13 (1964) ...................... 26

Rodney A. Smolla, 1 *Law of Defamation* § 3:65.50 (2d ed.) (May 2021 Update) ...................... 23

Rodney Smolla, *Law of Defamation* § 4:87 (2020 Update) ............................................ 11

## PRELIMINARY STATEMENT

Plaintiff Alex Goldfarb respectfully submits this memorandum in opposition to the motion of defendant Channel One Russia ("Channel One") for summary judgment.

Channel One, which has been widely recognized as a propaganda arm of the Putin dictatorship, contends that there are no material facts at issue here, and everything is simply a matter of mere "opinion." Channel One asserts that the Russian speakers they broadcast in the United States who defamed Dr. Goldfarb were merely expressing their opinion as to who murdered Alexander Litvinenko "contrary to the view espoused by British authorities" and suggests that the murder of Litvinenko is one of those instances when the issue of truth or falsity is simply incapable of resolution. This perspective is chillingly consistent with the Putin dictatorship's statements about the war in Ukraine: Putin launched a "special military operation" because Ukraine is controlled by Nazis who want to commit genocide against ethnic Russians living in Ukraine; it is the Ukrainians who are committing atrocities, not the Russian army; a Ukrainian children's hospital was not intentionally destroyed by the Russian invaders, and so on. What is the truth about these matters? According to Channel One, the truth cannot be determined, and one "opinion", particularly when presented on a "tabloid" program, is as good as any other.

Channel One is wrong. The relevant facts in this case are capable of determination by this Court. There is ample evidence, including the evidence set forth in the The Litvinenko Public Inquiry Report of January 21, 2016 (the "Public Inquiry Report"). (Cpt.¶58; link to hearings and evidence), and the Decision of the European Court of Human Rights dated September 21, 2021 (Goldfarb Aff., Ex. J) in Litvinenko's widow action against Russia, that would permit this Court as the fact finder to determine that Dr. Goldfarb did not murder Alexander Litvinenko. It is

fundamental that courts in civilized countries are fully competent to weigh evidence and determine who did or did not commit a murder. This Court is also fully capable of assessing the credibility of the witnesses proffered by Channel One by reviewing the record and determining that Channel One's evidence concerning actual malice is not credible. (We respectfully submit that the Court would be assisted in assessing credibility by reviewing the video clips with English captions on DVD included as Exhibit 3 to the Complaint.) Dr. Goldfarb respectfully submits that Channel One's motion for summary judgment should be denied in all respects.

## **INTRODUCTION**

### A.    **Statement of Facts**

This Court is already well-versed in the factual background of this litigation, as evidenced by its detailed factual summary in denying Channel One's Motion for Reconsideration and Petition for an Interlocutory Appeal. *Goldfarb v. Channel One Russia*, No. 18 CIV. 8128 (JPC), 2021 WL 1392850, at *1 (S.D.N.Y. Apr. 13, 2021). The factual summary here is thus brief, taken largely from this Court's own prior recitation, repeated here to remind the Court of the names of the principal participants and salient events.

The case is centered on the murder of Alexander Litvinenko, a former officer of the Russian Federal Security Service, who fled Russia to London on November 1, 2000, on account of political unrest in Russia. While in London, Litvinenko wrote two books critical of the Russian government, and worked as a consultant for the British Secret Service. In connection with his work with the British Secret Service, Litvinenko allegedly uncovered connections between certain Russian criminals and the Russian government. The plaintiff, Alexander Goldfarb, became friends with Litvinenko during trips to Moscow in the 1990s. At the time of Litvinenko's arrival in London

Goldfarb was the Chief Executive Officer of a non-profit corporation which provided grants to Litvinenko for his books.

On November 1, 2006, Litvinenko met at a London bar with Andrey Lugovoy, a former KGB officer, and Dmitry Kovtun.  Litvinenko and Lugovoy had been discussing a possible business venture that would have involved providing due diligence reports on Russian figures. That same night, Lugovoy and Kovtun returned to Moscow, and Litvinenko became sick and was later hospitalized from what was determined to be Polonium-210 poisoning.  Litvinenko died on November 23, 2006. The morning after Litvinenko's death, Goldfarb, standing next to Litvinenko's father, Walter Litvinenko, read a signed statement that Litvinenko wrote on November 21, 2006, which accused Russian President Vladimir Putin of ordering his poisoning.

On May 28, 2007, Russia denied the U.K. government's request that Russia extradite Lugovoy to stand trial for Litvinenko's murder. That same month, Goldfarb and Litvinenko's wife, Marina, published a book titled *Death of a Dissident: The Poisoning of Alexander Litvinenko and Return of the KGB*, which advanced the theory that Lugovoy and Kovtun had poisoned Litvinenko on Putin's orders. In 2011, the U.K. government issued an international arrest warrant for Kovtun stemming from his suspected involvement in Litvinenko's death.

From 2007 to early 2012, Walter Litvinenko publicly blamed the Russian government for his son's murder. This all changed abruptly, however, starting on February 2, 2012, when Channel One aired an interview of Walter Litvinenko during which he accused his son of being a traitor. Then, in an April 25, 2012, interview with Channel One, Walter Litvinenko publicly implicated Goldfarb in his son's murder.  Goldfarb's Complaint asserts that Walter Litvinenko, who was facing a dire financial situation in Italy and had recently lost his wife, changed his story because he received passage to return to Russia as well as an apartment in that country.

3

The United Kingdom investigated the murder. An inquest was conducted by Sir Robert Owen, a High Court judge in the U.K. After conducting an initial sealed inquiry as to Litvinenko's death, Judge Owen found evidence of a prima facie case that Litvinenko was murdered on behalf of the Russian government. Judge Owen then presided over a public inquiry into Litvinenko's death. Judge Owen considered as evidence two conflicting signed statements by Walter Litvinenko: the first, signed one week after his son's death on November 30, 2006, which blamed the Russian government for his son's poisoning, and the second, signed on September 18, 2012, in Italy, which implied, among other things, that Goldfarb was responsible for his son's death. Goldfarb testified at Judge Owen's public inquiry and denied Walter Litvinenko's accusations against him. After considering the evidence, Judge Owen concluded that Lugovoy and Kovtun murdered Litvinenko by placing Polonium-210 in his tea and rejected Walter Litvinenko's allegations against Goldfarb. In response, Channel One allegedly concocted a narrative to discredit Judge Owen's inquiry and shift the blame for Litvinenko's murder away from Lugovoy, Kovtun, and the Russian government.

Litvinenko's murder regained international prominence after the poisoning attack on two Russian nationals, Sergei and Julia Skripal, on March 4, 2018, in Salisbury, England. The British government accused Russia of conducting the Skripal attack and noted the uncanny similarity with the Litvinenko murder twelve years earlier. The Skripal attack precipitated massive expulsions of Russian diplomats from the U.K. and from British allies around the world."

The Complaint asserts that Russian media embarked on a massive propaganda offensive to shift the blame for the March 4, 2018, Skripal poisoning from the Russian government to Western intelligence services. As part of that that effort, the Russian media revived their false narrative of Litvinenko's death, including the accusations against Goldfarb.

This defamation suit was brought by Goldfarb for allegedly false and defamatory statements on four programs broadcasted by Channel One. These were: (1) a March 20, 2018, broadcast of the show *Let Them Talk*; (2) a March 30, 2018 broadcast of the show *Man and Law*; an April 4, 2018 broadcast of *Let Them Talk*; and (4) an April 10, 2018 broadcast of *Let Them Talk*. The Complaint alleged that various statements made during these programs, by either the host or guests, were false and defamatory. The "gist or sting" of the statements alleged to be actionable included five defamatory express or implied statements about Goldfarb: (1) that Goldfarb murdered Litvinenko, (2) that Goldfarb murdered his own wife to cover up his poisoning of Litvinenko; (3) that Goldfarb is a member of the Central Intelligence Agency; (4) that Goldfarb ran an unlawful business aiding Russian criminal asylum-seekers; and (5) that Goldfarb convinced Litvinenko's wife to commit perjury at the public inquiry overseen by Judge Owen.

### B.    Fact Discovery

Written fact discovery yielded very little evidence of any probative value to either side.[1] The principal source of useful evidence produced during discovery consisted of three depositions of key employees of Channel One: Dmitry Borisov, host of *Let Them Talk*, Natalia Nikonova, the General Manager of *Let Them Talk*, and Aleksey Pimanov, the host of *Man and Law*. Dr. Goldfarb was also deposed. In this opposition brief Goldfarb relies principally on material garnered from the four depositions, his own affidavit, and various documents of public record referenced in his Complaint, such as public testimony from Judge Owen's U.K. inquiry.

---

[1] There was a paucity of documents internal to Channel One produced in this litigation. It is arguable that Channel One did not take its production obligations seriously, through some combination of negligence, spoliation, or stonewalling. Dmitry Borisov, for example, insouciantly claimed that nobody ever asked him for documents, and that he did not look for documents. Sellier Dec. Ex. B; Borisov Tr. at 12.

## C.      The Summary Judgment Standard

The general standard for summary judgment under Rule 56 is familiar and straightforward. "Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *ING Bank N.V. v. M/V TEMARA,* IMO No. 9333929, 892 F.3d 511, 518 (2d Cir. 2018).   The court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *June v. Town of Westfield*, 370 F.3d 255, 257 (2d Cir. 2004).

The pivotal issue here is the "actual malice" standard emanating from *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), imposing on Goldfarb the ultimate burden at trial of proving with clear and convincing evidence that Channel One broadcast its falsehoods with knowledge of their falsity or reckless disregard for their truth or falsity.  *Id.* at 280.  Goldfarb's demonstration of actual malice must be "brought home" to the person or persons within the "organization having responsibility for the publication."  *Id.* at 287.   In opposing Channel One's Motion, Goldfarb maintains that he has easily met his "bring home" burden here at the summary judgment stage.  As would be expected, the allegedly offending programs aired by Channel One such as *Let Them Talk* were created by a team of individuals.  Borisov described this as a "team effort" in which there was a "chief editor" and "group of editors responsible for compiling the news for the program." (Id.; Borisov Tr. at 16).   The substantive arguments presented by Goldfarb "bring home" his accusations of actual malice by focusing on various key members of Channel One's team, including, among others, such pivotal players as Borisov, Nikonova, Pimanov, and Elvira Shigapova, and their supporting staff, Larisa Nazarnova, Anastasia Orlyanskaya, and Zhanna Agalakova.

Application of the summary judgment standard of Rule 56 in the context of actual malice defamation determinations is governed by the principles announced by the Supreme Court in *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury *could* return a verdict for the nonmoving party."  *Id.* at 248 (emphasis added).

Of particular importance to the pending motion are issues of credibility, weighing of evidence, and the drawing of inferences.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."  *Id.* at 255.  This stern admonition from *Anderson* does not mean, however, that Goldfarb is precluded from attacking the credibility of Channel One's witnesses for the purposes of bringing to the Court's attention serious questions regarding the credibility of their various professions of ignorance or innocence, for the purpose of demonstrating that issues of material fact as to actual malice are in play.

The "trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant."  *Id.* It stated that "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not."  *Id*. at 256-57.  Apparently concerned that it not be misunderstood, the Court stated yet again: "We repeat, however, that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial."  *Id*. at 257.

If the Court denies Channel One's Motion for Summary Judgment, the Court will likely be the ultimate trier-of-fact, as Goldfarb has, for the purpose of expediting the litigation, waived his demand for a jury trial.  At this summary judgment stage, the Court is not determining credibility, or weighing evidence, or the strength of competing inferences, but merely determining whether Goldfarb has done enough to present serious questions of credibility, the weight of evidence, and favorable inferences to meet the forgiving standard of Rule 56, requiring more than a mere "scintilla" of evidence, but only enough more to judge that a trier-of-fact "*could* reasonably find for the plaintiff." *Id.* at 252.  Throughout this Brief, Goldfarb thus invokes phrases such as "the Court could find," to encapsulate the minimal burden he bears at this summary judgment stage.

In deciding whether Goldfarb has met his minimal burden, the Court should bear in mind the peculiar dynamics of actual malice determinations in defamation cases.  Put simply, defendants *always* engage in protestations of innocence, as Channel One does here.  But the Court is not required to believe Channel One.  "The defendant in a defamation action brought by a public official cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). In this case, there were clearly "obvious reasons to doubt the veracity "of Walter Litvinenko's defamatory statements and therefore Channel One acted in reckless disregard of the truth. Id.

"'The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts

tending to show a reckless disregard of the plaintiff's rights.'" *Herbert v. Lando*, 441 U.S. 153, 164, n. 12 (1979), *quoting* 50 Am. Jur.2d § 455 (1970). "*New York Times* and its progeny made it essential to proving liability that the plaintiff focus on the conduct and state of mind of the defendant." *Herbert*, 441 U.S. at 160.   In *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), the Supreme Court recognized that "[t]he proof of 'actual malice' calls a defendant's state of mind into question . . . and does not readily lend itself to summary disposition." *Id.* 120, n.9. Determining whether a defendant published with actual malice "is a complex factual issue." David Anderson, *Is Libel Law Worth Reforming?* 140 U. Pa. L. Rev. 487, 511 (1991).

*Direct* evidence of actual malice virtually never exists in any serious and significant defamation case. (If it does exist, the case is typically not litigated, but settled.) The reality is that plaintiffs must always prove actual malice through indirect and circumstantial evidence. In the words of the Ninth Circuit: "As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence. By examining the editors' actions we try to understand their motives." *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997). "The fact that we can't look inside the editors' minds doesn't stop us from reaching conclusions about their thoughts; subjective standards are nearly always satisfied by circumstantial proof (as in most criminal prosecutions)." *Id.* at 1256. n. 20.

Finally, the Court's task here is cumulative.   "In determining whether a plaintiff has adduced sufficient evidence to reach a jury, the Court may consider plaintiff's evidence of actual malice in the aggregate." *Stern v. Cosby*, 645 F. Supp. 2d 258, 278 (S.D.N.Y. 2009).

## SUBSTANTIVE ARGUMENT

### I.    GOLDFARD HAS MET HIS BURDEN ON FALSITY

The evidence that the defamatory statements concerning Dr. Goldfarb's alleged role in the murder of Alexander Litvinenko are false is clear and convincing. Channel One, obviously well aware of the devasting power of the Public Inquiry Report, which established Russia's responsibility for the murder of Alexander Litvinenko "beyond a reasonable doubt", devotes much of its brief to a futile attempt to undermine the Report. That effort fails.

As a threshold matter, the Public Inquiry Report is admissible to establish the truth of the matters it contains establishing Russia's responsibility for Alexander Litvinenko's death pursuant to Fed. R, Evid. 803(8)(C). In order to fit within the Rule, the evidence must contain factual findings and be based upon an investigation made pursuant to legal authority. "Factual findings include not only what happened, but how it happened, why it happened, and who caused it to happen." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir 2000) (citation omitted). "The rule therefore renders presumptively admissible 'not merely…factual determinations in the narrow sense, but also…conclusions or opinions that are based upon a factual investigation. Id., *quoting Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir.1991). Rule 803(8) is equally applicable to reports of foreign public offices and agencies. *In re Air Disaster at Lockerbie Scotland*, 37 F.3d 804,827 (2d Cir.1994) (admitting Scottish official police report); *In re Parmalat Sec. Lit*., 477 F.Supp.2d 637, 640 (S.D.N.Y. 2007).[2]

Because the Public Inquiry Report clearly satisfies the minimum requirements of the Rule, "the admissibility of such factual findings is presumed "and it is Channel One's burden to show

---

[2] The decision of the English Court of Appeals dated December 15, 2011 in Terluk v. Berezovsky is also relevant concerning the falsity of statements published by Channel One concerning Dr. Goldfarb's alleged involvement with Boris Berezofsky in alleged asylum fraud. See Cpt.¶¶ 27,40-42.

that "a lack of trustworthiness". <u>Id</u>. Channel One cannot satisfy that burden. The trustworthiness of the Public Inquiry Report is supported by the fact that it was issued after lengthy hearings conducted by Sir Robert Owen, a distinguished High Court judge. See *Bridgeway Corp*., 201 F.3d at 143 (listing relevant factors for assessing trustworthiness of a factual report).

The trustworthiness of the Public Inquiry Report is further supported by the decision of the European Court of Human Rights in <u>Carter v. Russia</u>. Goldfarb Aff., Ex. J. Marina Carter, Alexander Litvinenko's widow, brought an action against the Russian State for the murder of her husband. The Court reviewed, among other evidence, the Public Inquiry Report, and concluded that "there is no reason to doubt the quality of the domestic investigative process, or the independence, fairness and transparency of the inquiry proceedings…." <u>Id</u>. ¶110 The court went on to conclude that "the circumstances of Mr. Litvinenko's death are now no longer a matter of speculation and assumption. It has been established, beyond reasonable doubt, that he was poisoned with polonium 210 …by Mr. Lugovoy and Mr. Kovtun … and they acted as agents of the [Russian] State. <u>Id</u>. ¶¶154,169 Therefore the Court awarded Marina Carter judgment against Russia for the murder of Alexander Litvinenko in violation of Article 2 of the European Convention on Human Rights.

## II.   GOLDFARB HAS MET HIS BURDEN ON ACTUAL MALICE

### A.   Walter Litvinenko Was an Obviously Unreliable Source

In featuring Walter Litvinenko as a guest and providing him with a platform for his outlandish allegations, Channel One adopted Walter's allegations as its own.  The rule is that "one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." Restatement (2d) Torts § 578 (1977); *see also* Rodney Smolla, *Law of Defamation* § 4:87 (2020 Update) (collecting cases and authorities). New York has long adhered to the rule.

In the words of the Second Circuit: "A federal court has recently referred to the 'black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement.'" *Cianci v. New Times Pub. Co*., 639 F.2d 54, 60–61 (2d Cir. 1980), *quoting Hoover v. Peerless Publications, Inc*., 461 F. Supp. 1206, 1209 (E.D.Pa.1978). *See also Terwilliger v. Wands*, 17 N.Y. 54, 72 Am. Dec. 420 (1858); *Hogan v. Herald Co.*, 84 A.D.2d 470, 477 (4th Dep't 1982), *aff'd*, 444 N.E.2d 1002 (N.Y. 1982). Moreover, the hosts and other journalists on the Channel One broadcasts repeatedly endorsed and adopted Walter Litvinenko's statements in their own voices, independently repeating and vouching for his accusations. Walter Litvinenko, however, was an obviously biased and unreliable source. His allegations were explosive. Yet Channel One rode his allegations to the hilt, paying him to appear and repeatedly reverberate his preposterous allegations. This Court may find that Channel One did not simply "rely" on Walter Litvinenko but went beyond reliance to procurement and encouragement. Yet even seen through the prism of "reliance," Walter was so obviously tainted that only a reckless media outlet would broadcast his outlandish allegations. *Stern,* 645 F. Supp. 2d at 281. ("A reasonable jury could find that Cosby's reliance on these two sources for such an explosive allegation is evidence of actual malice, because Cosby was aware of their possible bias and/or unreliability."), *citing Secord v. Cockburn*, 747 F.Supp. 779, 789 (D.D.C.1990) (holding that actual malice requirement met where "author was subjectively aware that the source was unreliable"). *See also Khawar v. Globe International, Inc.* (1998) 19 Cal. 4th 254, 276 ("Nonetheless, the actual malice finding may be upheld 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports' and the republisher failed to interview

obvious witnesses who could have confirmed or disproved the allegations . . . or to consult relevant documentary sources.") (Internal citations omitted).

Walter Litvinenko's credibility as a source is so obviously and transparently biased, that no media outlet, including Channel One, could have based its story on his accusations without harboring obvious reasons to doubt his credibility.  Walter is a sad victim of the Putin regime and its long-standing assault on truth and the rule of law.  He is, as Goldfarb expressed in his deposition, "a pawn in the propaganda war that Russian media, and Channel One in particular, is waging against me and Marina." Sellier Dec. Ex. A; Goldfarb Tr. at 224.

To begin, Walter spent years publicly accusing Vladimir Putin, and Russian spy operatives, of murdering his son.  For six years after Alexander Litvinenko's death, his father Walter was outspoken in repeatedly and publicly blaming President Putin for his son's murder.  Goldfarb Aff. ¶ 2.  On November 22, 2007, in an interview with *The Guardian* Walter said: "As a reward, the chief executioner of my son, Mr. Lugovoy, has now been given a seat in the Duma. The main executioner, Mr. Putin, is afraid to leave his position, as he wants to maintain his power in order to cover up this crime." Cpt.¶45.

Then, suddenly, after years of accusing Putin, he reversed course, to save himself from financial ruin and exile.  Goldfarb Aff. ¶ 7.  The inherent unreliability of Walter's sudden conversion experience was documented at the time by Channel One itself, in which Channel One correspondent Anton Vernitsky expressed stated that "One cannot be at all sure that Walter Litvinenko wouldn't instantly change his view if someone in the West would all of a sudden help him."  Goldfarb Aff. ¶ 9.  Walter himself described his sudden reversal in terms that this Court could conclude constitute obvious reasons to doubt his veracity, stating in a Russian newspaper interview that he had repented in exchange for his return. Cpt.¶ 51. quoting Walter Litvinenko

("After I repented, they forgave me… People came to talk… Now I am in Moscow, happy.  They gave me the apartment. I can live here as long as I wish, but it belongs to the agency.")

Walter Litvinenko was paid a stipend to appear on *Let Them Talk*.  The payment was 137,932 Rubles for three appearances within a month, nearly three months of the average Russian salary at the time of 43,000 Rubles. Goldfarb Aff. 16; Sellier Dec. Ex. B; Borisov Tr. at 37.  This was unusual and suspicious.  Typically guests on *Let Them Talk* were not paid for appearances, but merely reimbursed for expenses, such as travel. (Borisov Tr. at 42.  It was Natalia Nikonova who authorized the special payment to Walter Litvinenko. *Id.* at 43.  The payments further undercut Walter's credibility and are probative of actual malice.  Evidence of a financial motive to defame can support a finding of actual malice. *See Prozeralik v. Capital Cities Communications, Inc.*, 82 N.Y.2d 466, 475 (N.Y. 1993).

The entire world knows that Vladimir Putin is a demagogue who seeks to hide the truth from the Russian people, subjecting them to unremitting brainwashing—what in Russian circles is sometimes referred to as *Zombo Yashik*, the "zombie box" or the "brainwashing box," in idiom translation.  Sellier Dec. Ex. A; Goldfarb Tr. at 226.  The sad and tragic reality is that many Russian viewers of Channel One have been systematically brainwashed, to the point that they are unable to discern the truth even in the face of grotesque lies.  *Id.* at 220.  Walter Litvinenko may be understood by this Court as a tragic puppet on a string, cynically manipulated by puppeteers such as Putin and Channel One, *Id.* at 222.

### B.   Channel One Actors Had a Motive to Lie

It is axiomatic that common-law "ill will" malice, such as defendant's motive to "get" a plaintiff, is not the same as constitutional "actual malice," which focuses on knowledge of falsity or reckless disregard for truth or falsity.  It is *also* axiomatic, however, that evidence of a hostile

motive is *probative* of actual malice, and often powerful evidence of actual malice. *See, e.g.,*

*Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2nd Cir.1969) ("evidence of ... motive and intent" may

help establish actual malice); *Scholz v. Delp*, 83 Mass. App. Ct. 590, 596, 988 N.E.2d 4 (2013)

("[T]he jury, in determining whether a plaintiff has met his burden of demonstrating malice, may

consider evidence of hostility."); *Cochran v. Indianapolis Newspapers*, 175 Ind. App. 548, 560,

372 N.E.2d 1211, 1220 (1978).("'While 'ill-will' is not an element of the legal definition of 'actual

malice,' . . . it is nevertheless relevant and admissible as evidence in the determination of whether

defendant possessed a state of mind highly conducive to reckless disregard of falsity."); *Bentley v.*

*Bunton*, 94 S.W.3d at 602 ("Moreover, while a defendant's ill will toward a plaintiff does not

equate to, and must not be confused with, actual malice, such animus may suggest actual malice.")

Consider the cogent observations of Judge McKinnon from the D.C. Circuit, in an opinion joined

by then-Judge Antonin Scalia:

> The mere existence of a preconceived plan to "get" the subject of a defamatory
> story does not prove that the publisher acted knowingly or recklessly in publishing
> false information. But it is beyond question that one who is seeking to harm the
> subject of a story—whether motivated by simple ill will (*Cochran*), or partisan
> political considerations (*Sprouse*), or otherwise laudable concern for the safety of
> the nation (*Ginzburg*), or a mere desire to attract attention and boost circulation
> (*Butts*)—is more likely to publish recklessly than one without such motive.

*Tavoulareas v. Piro*, 759 F.2d 90, 98 (D.C. Cir. 1985), *vacated and superseded on other*

*grounds* by *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc), *cert. denied*, 484

U.S. 870 (1987).  As the opinion of Judges McKinnon and Scalia explained, the "idea that motive

can be evidence of actual malice when it is not an element of the tort" is sound, for the distinction

"is akin to that between motive to kill (*e.g.*, greed or hatred) and *intent* to kill in a murder

prosecution. They are not the same thing. The second is an element of the crime of murder; the

first is evidence admissible to prove that element." *Tavoulareas*, 759 F.2d at 98 n.34 (emphasis in

original). Thus "a plaintiff is entitled to prove the defendant's state of mind through circumstantial

evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Harte-Hanks*, 491 U.S. at 668 (internal citations omitted).

So too, the Second Circuit's decision in *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) is instructive. Sarah Palin, the former Governor of Alaska and Republican nominee for Vice President, brought a defamation action against the *New York Times*. The court in *Palin* held that the district court failed to properly credit the probative value of allegations that political bias by the *Times* editor may have led to reckless disregard for the truth, holding that "[w]hen properly viewed in the plaintiff's favor, a reasonable factfinder could conclude this amounted to more than a mistake due to a research failure." *Palin*, at 815.

In assessing motive, the Court could conclude that triable issues of fact exist on the extent to which key actors within Channel One were slavish beholden to Vladimir Putin. Borisov, for example, in 2017 hosted a program entitled "Direct Line with Vladimir Putin." Sellier Dec. Ex. B; Borisov Tr. at 17. Borisov was decorated by Putin, awarded a Medal for Merit to the Homeland by Putin's edict. *Id.* at 18. The Court could conclude that the devotion to Putin and his lies were powerful motivators for all the actors at Channel One, who were influenced by that devotion to communicate a knowingly false narrative to deflect international outrage over the Skripal poisonings. Goldfarb Aff. ¶¶ 41-43. Moreover, the Court could conclude that any trier-of-fact could find that Lugovoy, who like Borisov, had been awarded a Medal by Putin for service to the Russian Fatherland, were acting in deliberate, pre-meditated combination to do Putin's bidding, jointly seeking to deflect Russian responsibility for the Skripal poisonings, as well as for the Litvinenko poisoning, by reviving the bogus story that it was Goldfarb, not Russian operatives working for Putin, who killed Litvinenko.

**C.      The Editing and Staging of the Broadcasts Are Probative of Actual Malice**

An inference of actual malice may be drawn from the orchestrated sensationalism with which Channel One presented its broadcasts.  It was Borisov who invited Walter Litvinenko to appear on *Let Them Talk* to discuss the murder of Alexander Litvinenko.  Sellier Dec.Ex. B; Borisov Tr. at 37-38.  Borisov knew that in inviting Andrei Lugovoy to be a guest on the March 20 broadcast of *Let Them Talk*, he was inviting to the show one of the very persons accused of murdering Litvinenko.  *Id.* at 51.  The Court is entitled to find that Borisov's explanation for this seemingly bizarre invitation, that Lugovoy was invited only in his capacity as a member of the Duma, the Russian Parliament, was utterly lacking in all credibility.  At the time there were some 450 of members of the Russian Parliament.  *Id.* at 52.  Not a word of Lugovoy's statements on the program had anything to do with the Russian Parliament, or his role as a member, as Borisov in his rambling and dissembling testimony revealed.  *Id.* at 52-54. Rather, Borisov introduced Lugovoy on the March 20,2018 program as "one of the main protagonists of [the Litvinenko] case". Sellier Dec. Ex. E; COR000094 The Court is entitled to decide that Lugovoy was intentionally invited to appear on the program for one reason and one reason only: to add verisimilitude to the false accusations that the murder was not committed by Lugovoy but by Goldfarb.

Though not central to the allegations to the case, as additional coloration, the Court may find that Channel One, through Borisov and others, deliberately communicated to viewers that Goldfarb was complicit in the murder of Litvinenko by implying that Goldfarb was romantically involved with Litvinenko's wife Marina.  Sellier Dec. B; Borisov Tr. at 100.  The communication of this innuendo was intended to further prejudice viewers against Goldfarb.

Borisov's deposition is filled with internal contradictions probative of actual malice. Borisov admitted that he was aware of the international condemnation of Russia for the Skripal poisonings. Id. at 25. The Court could find that Borisov lied under oath when he claimed in his deposition that he was caught by surprise when Walter Litvinenko repeated his outlandish and demonstrably false accusations against Goldfarb. Id. at 57. This utterly incredible claim is, the Court may find, completely implausible. To begin, the editors who arranged for guests to speak on the show were, as is customary throughout the spectrum of television around the world, routinely asked in advance what guests planned to say. Indeed, Goldfarb was contacted on March 14 by Channel One employee Larisa Nazarnova, who worked for Natalia Nikonova, and invited to appear on the March 20 program via Skype. Sellier Dec. Ex. C; Nikonova Tr. at 20; Goldfarb Aff. ¶ 33. In that phone call she told Goldfarb that Walter Litvinenko and Lugovoy would be appearing, and in turn asked Goldfarb what he would say to them in response. Id.¶. Not mincing words, Goldfarb told her that Lugovoy should be in prison for murder and Walter should be ashamed of himself. Id.

The Court could find that the encounter between Walter Litvinenko and Lugovoy on stage and their embrace and seating arrangement was clearly pre-arranged, scripted and rehearsed. Goldfarb Aff. ¶¶19, 20. Borisov's detailed, specific questioning of Walter Litvinenko, such as questioning Walter on whether he had learned that Goldfarb was the murderer by hearing that allegation directly from Alexander Litvinenko's own wife Marina. (Sellier Dec. Ex.B; Borisov Tr. at 59) are also evidence of advance preparation for Borisov.

The Court may find additional inferences of advance orchestration of the broadcasts given the bizarre fact that Borisov would ask Walter Litvinenko how he would feel if the other accused killer of his son Alexander Litvinenko, Dmitry Kovtun, showed up in the studio, asking if Walter

would greet him.  In what the Court could find was a deliberately staged scenario, Kovtun then did appear, and the two warmly embraced.  Id. at 76.  In an understatement, even Borisov conceded that this was "unusual."  _Id._  Borisov defended the sequence as an effort to display human emotions.  _Id._  The Court, however, need not except that bowdlerized and improbable excuse, and instead determine that the Court may see it as it is—a scripted effort to dramatize and sensationalize a defamation campaign pinning the blame for Litvinenko's death on Goldfarb.  The Court could find that Channel One, acting through the likes of Nikonova and Borisov, cast Walter as hero and Goldfarb as villain.  Borisov candidly conceded that Walter could be "considered as the hero of that program."  _Id._ at 84.

Finally, the Court could find that Borisov's protestations of innocence lack credibility, and Goldfarb's accusations of deliberate pre-meditated attack are overwhelmingly likely, from the simple and irrefutable fact that at the *same second* that Alexander Goldfarb's name was first mentioned in the March 20 broadcast, his picture *instantly* appeared on the screen.  Id. at 96-97.  Borisov would have the Court believe that the technicians at Channel One were so lightning-quick that they managed in a split second to Google it and get Goldfarb's picture on the screen. *Id.* at 97.  The Court may be permitted incredulity and may hold that instead the more probable inference that Channel One had the photo ready to tee up on cue presents a fact issue ¶trial.

### D.    The Defamatory Accusations Against Goldfarb Are Inherently Improbable

Actual malice may be established when the "allegations are so inherently improbable that only a reckless person would have put them in circulation." *Karedes v. Ackerley Group., Inc*., 423 F.3d 107, 115 (2d Cir. 2005).  If ever there was a defamation action in which the accusations were so inherently improbable that only a reckless actor would have put them in circulation, this is it.

To begin, there were numerous fundamental flaws in Walter Litvinenko's account of events, flaws that must have alerted Channel One to the fact that his account was fabricated. For example, Walter made the sensationalist claim that he learned of Goldfarb's complicity in Litvinenko's murder when Goldfarb's wife, sobbing, said to him in English that Goldfarb had done the killing. Yet Goldfarb's wife was a native Russian speaker and had no reason to address Walter in English, a language Walter did not understand. Goldfarb Aff. ¶ 20.. Walter claimed that Goldfarb's wife was 28 at the time of Litvinenko's death. But she was actually 51. _Id._. Walter said that Goldfarb's wife was killed by Goldfarb a month after Litvinenko's death in order to cover up Goldfarb's crimes. But Goldfarb's wife did not die a month after Litvinenko's poisoning. She died of cancer three and a half years later. _Id._ The allegation of fraud in connection with Berezovsky's asylum application was conclusively rejected in 2010 by an English judge in _Berezovsky v. Terluk._ Cpt.¶41, Ex.1. The allegation that Goldfarb had operated an illegal business to help criminal asylum-seekers has never been supported by a shred of evidence, which Channel One well knew. Similarly, the vague assertion that Marina Litvinenko committed perjury at the urging of Goldfarb has never been supported by any specific allegation, let alone by any evidence.

Aleksey Pimanov was the host of Channel One's _Man and Law_, a position he held from 1997 to the present. Sellier Dec. Ex.D; Pimanov Tr. 14. The program is entirely about criminality. _Id._ Elvira Shigapova was the Chief Editor and a principal journalist for _Man and Law_, whom Pimanov described as "running" the program. _Id._ 16, 35. Pimanov knew of the United Kingdom investigation and the conclusions it reached, including that Andrei Lugovoy and Dmitry Kovtun were the murderers of Alexander Litvinenko. _Id._ at 20, 24.

Borisov was also aware of the United Kingdom inquiry into the poisoning of Litvinenko. Sellier Dec. Ex. B; Borisov Tr. at 35. He admitted that Channel One had reported on the United

Kingdom inquiry, and that he might personally have been involved in that reporting but claimed he could not recall particulars about his participation. *Id*. at 37. He did recall, however, that the inquiry had concluded that Litvinenko was murdered by Lugovoy and Kovtun, using Polonium-210. *Id*. at 46-47.

The Second Circuit's decision in *Palin* is once again especially salient. The court held that it was error for the district court to choose between the two possible inferences, once innocent and one culpable. *Palin*, 940 F.3d *at* 814. More importantly for the purposes of the pending Motion, the Second Circuit held that a media outlet's opportunity to know a widespread journalistic consensus regarding the falsity of an accusation gave rise to a permissible inference that the defendant in fact knew of that falsity. *Id.* ("By crediting Bennet's testimony, the district court rejected a permissible inference . . . That Palin's complaint sufficiently alleges that Bennet's opportunity to know the journalistic consensus that the connection was lacking gives rise to the inference that he actually did know.").

Indeed, Pimanov conceded that he was not aware of any link between the death of Alexander Litvinenko and Boris Berezovsky. Sellier Dec. Ex. D; Borisov Tr. at 29. In his deposition Pimanov sought to dismiss the statements that Russia was not responsible for Litvinenko's death has simply his "personal opinion." Sellier Dec. Ex. D; Pimanov Tr. at 24. But when pressed on what the basis of for his opinion was, he dissembled, answering only vaguely that it was based on his reading of "the Western and Russian press." *Id*. Perhaps one of the testiest exchanges in the Pimanov deposition came when counsel for Goldfarb, seeking to challenge Pimanov's evasive answers and lack of credibility, asked Pimanov point-blank whether Russia had invaded Ukraine. Pimanov refused to speak the manifest truth, which was that Russia had invaded Ukraine, willing to state only that he knew that Russia and Ukraine "were in a state of conflict."

21

Id. at 25.  Despite repeated efforts by Counsel for Goldfarb to extract from Pimanov an admission of the obvious truth that Russia had invaded Ukraine, Pimanov refused to admit the point and was ultimately instructed by Counsel for Channel One not to answer.  *Id.*

When asked about his knowledge of the circumstances surrounding Litvinenko's death Pimanov first answered evasively, admitting only that he knew he "died in a hospital."  *Id.*  Pressed, he conceded he knew of the claim that the death was caused by Polonium-210 poisoning but claimed that there were "lots of versions" and that "We were not confirming any of those versions." *Id.* at 30.  The court may find this testimony manifestly false, as in fact in characterizing the allegations against Lugovoy, Kovtun, and Putin as "outrageous allegations" and orchestrating the entire show as a demonstration of Goldfarb's guilt, Pimanov, Shigapova, and the others responsible for the *Man and Law* broadcasts clearly *were* endorsing and confirming the version that exonerated the Russians and inculpated Goldfarb.

In another telling body-blow to Pimanov's credibility, when pressed on whether he knew that the assertions made in the broadcast by Shigapova that while Litvinenko was in the hospital, Goldfarb flew to the United States "several times" were false, he dissembled into a bizarre assertion that somehow any correction of Shigapova's defamatory falsehood would have violated Russian laws against censorship—an utterly incoherent claim.  *Id.* at 31.

### E.     Channel One Engaged in Purposeful Avoidance of the Truth

"Although failure to investigate will not alone support a finding of actual malice, . . . the purposeful avoidance of the truth is in a different category." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989).  *See also Curtis Publishing Co. v. Butts*, 388 U.S. 130, 169-70 (1967). ("The slipshod and sketchy investigatory techniques employed to check the veracity of the source and the inferences to be drawn from the few facts believed to be true are

22

detailed at length in the opinion of Mr. Justice HARLAN. Suffice it to say that little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account to be published was absolutely untrue. Instead, the Saturday Evening Post proceeded on its reckless course with full knowledge of the harm that would likely result from publication of the article.").

The deliberate avoidance of the truth is evidenced by Channel One's repeated failure to air Goldfarb's detailed refutations of the allegations against him. Goldfarb's detailed refutations were not lame, obligatory denials. Rather, they were in the form that "serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality." *Henry v. Media General Operations, Inc*., 254 A.3d 822, 843 (R.I. 2021), quoting Rodney A. Smolla, 1 *Law of Defamation* § 3:65.50 (2d ed.) (May 2021 Update). In the interregnum between the March 20 *Let Them Talk* program and the second March 30 *Let Them Talk* program, key persons responsible for the programming at Channel One were subjectively aware that they should provide Alexander Goldfarb with an opportunity to appear on the show and contest Walter Litvinenko's allegations. Borisov, for example, admitted in his deposition that he had questioned editors as to why Goldfarb was not invited to appear on the first March 20 program, and expressed the view to the editors that Goldfarb should be invited to appear on the second March 30 program. Sellier Dec.Ex. B; Borisov Tr. at 63-64.

And indeed, obviously Borisov was not alone at Channel One in recognizing that Goldfarb's views should be aired in Goldfarb's own words. As already noted, an employee of Channel One, Larisa Nazarova, who worked for Natalia Nikonova, had contacted Goldfarb as early as March 14, to ask him to be on the first March 20 show appearing via Skype. Sellier Dec. Ex.

C; Nikonova Tr. at 20; Goldfarb Aff.¶ 33.  After hearing from Goldfarb what he planned to say, Channel One cancelled the appearance. Id.

The same thing then happened again.  On March 21, Larisa Nazarova contacted Goldfarb again to participate in a Channel One program that would be aired on March 23. Sellier Dec. Ex. B; Borisov Tr. at 74; Goldfarb Aff. ¶34.  Nazarova even sent Goldfarb an agreement form from the production company "Direkt," which Goldfarb signed and emailed back on the morning of March 23.   Id. Nazarova then asked Channel One's New York-based associate, Anastasia Orlyanskaya, to arrange a camera to film Dr. Goldfarb while he spoke on Skype. However, on the morning of March 23, 2018, Nazarova and Orlyanskaya informed Dr. Goldfarb that his appearance had been cancelled. Id.

As to any attempt to provide Goldfarb with an opportunity to respond the defamatory allegations against him, Pimanov would say only that "We were even trying to reach him over the phone."  Sellier Dec. Ex.D; Pimanov Tr. at 38.  Pimanov conceded, however, that this attempt was not made until "the eve of airing the program," but failed because they had not found Goldfarb's phone number.  Id.   The Court may find this account at once utterly lacking in credibility and fatally damning.  To begin, Channel One had in fact telephoned and text-messaged Goldfarb on numerous occasions, had interviewed him at length by phone, had interviewed him for over an hour in its New York studio, and had detailed information in its possession definitively refuting the allegations Channel One was making against him.  Pimanov's explanation is thus entirely lacking in credibility.

More substantively, the complete failure of Channel One through actors such as Nikonova, Borisov, Pimanov and Shigapova to provide viewers in three of the four offending programs with any of Goldfarb's detailed refutations (the one minor exception being the highly truncated 80

24

second snippets of phone conversation in the fourth broadcast) could be found by the Court to be highly probative of actual malice, evidencing a deliberate distortion of the truth through intentional omission, and a conscious turning of a blind eye to conflicting evidence of the sort courts often find to be purposeful avoidance of the truth.

While eventually Channel One did air a short portion of a phone call with Goldfarb, that airing was too little too late, and was manipulatively and cynically positioned to make matters for Goldfarb even worse.  Among the most egregious indicia of actual malice by Channel One was the decision to air 80 seconds of phone conversation with Goldfarb, selectively plucked from some 10 minutes of actual interview time, and deliberately positioned in the broadcast amidst mocking derision by others to make it appear that Goldfarb was lying.  When the highly truncated excerpts from the phone call with Goldfarb were aired, Borisov openly mocked Goldfarb by saying, "Alexander Goldfarb says he trusts British authorities 100%, absolutely does not trust what Russia says and if this is what Britain says, then . . ."  To which Mikhail Ignatov exclaimed derisively, "What else can he say?" And Igor Nikulin piled on, adding, "Nothing else could be expected from him!"  Sellier Aff. Ex. E; COR 000174.

Nikonova, following the "pass the buck" script of all the Russian players here, disclaimed any understanding of why those particularly 80 seconds were used.  Sellier Dec. Ex. C; Nikonova Tr. at 26. Yet Nikonova played the key role in selecting topics for the program.  Id. at 14. Nikonova, of course, well-knew that Lugovoy was accused by the United Kingdom of murdering Litvinenko.  Id. at 22. Nikonova can run but she can't hide, and the buck stops with Channel One.

## III.   THE DEFAMATORY STATEMENTS ARE NOT OPINIONS

The efforts by Channel One and its operators such as Pimanov to cast its broadcasts as mere expressions of opinion should be rejected out of hand.  Channel One's characterization of

*Let them Talk* as a tabloid program and not a news program is both factually disputable and legally

non-dispositive.  Nikonova and Borisov both tried to diminish the news content of *Let Them Talk*

by describing the show as tabloid, and even as a variant of "yellow press."  *Id.*  This may be a rare

point on which Goldfarb and Channel One agree.  Channel One was engaged in yellow journalism,

and its time-honored aphorism never to let the facts get in the way of a good story.  But as New

York Senator Daniel Patrick Moynihan trenchantly noted, while everyone is entitled to his or her

own opinion, they are not entitled to their own facts.

The philosopher Marshall McLuhan famously wrote that "[t]he medium is the message."

Marshall McLuhan, *Understanding Media: The Extensions of Man* 8-13 (1964).  The American

law of defamation, however, does not follow McLuhan's dictum.  In libel law, it is the message

not the medium that matters.  Channel One's message was factual: Goldfarb did it.

The seminal opinion of the New York Court of Appeals applying the distinction between

non-actionable opinion and actionable false statements of fact is *Immuno AG. v. Moor-Jankowski*,

77 N.Y.2d 235, 252-254 (1991). *Immuno* and its progeny established a multi-factor test. As later

summarized in *Brian v. Richardson*, 660 N.E.2d 1126 (N.Y. 1995): "The factors to be considered are:

(1) whether the specific language in issue has a precise meaning which is readily understood; (2)

whether the statements are capable of being proven true or false; and (3) whether either the full

context of the communication in which the statement appears or the broader social context and

surrounding circumstances are such as to signal readers or listeners that what is being read or heard

is likely to be opinion, not fact." *Id.* at 1129.  New York decisions have repeatedly cabined the

role of "context" in separating fact from opinion.  This has occurred on two levels.  First, New

York decisions have been careful to caution that merely couching statements in the *language* of

"opinion" or "hyperbole" or "abuse" does not confer immunity from defamation liability.  Second,

New York decisions have been careful to caution that the mere *placement* of otherwise defamatory statements in settings where the expression of opinion is common does not confer immunity. "The dispositive inquiry, under either Federal or New York law, is 'whether a reasonable [reader] could have concluded that [the articles were] conveying facts about the plaintiff.' " *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152 (1993), *quoting 600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 139 (1992).

Under the New York test, the statements were plainly actionable.  First, the words used to accuse Goldfarb had precise meaning.  Murder is murder.  Poisoning is poisoning.  Running a corrupt business is running a corrupt business.  Being an agent of the CIA is being an agent of the CIA.  Suborning perjury is suborning perjury.  Second, the statements are capable of objective proof or disproof.  Goldfarb either did or did not murder Litvinenko, or his own wife.  The U.K. Inquiry conducted by Judge Owen, which applied Britain's well recognized criminal justice standards, concluded that Lugovoy and Kovtun poisoned Alexander Litvinenko, and that Dr. Goldfarb did not. Judge Owen's work demonstrates that responsibility for the murder of Alexander Litvinenko is capable of objective determination by civilized tribunals applying law and evidence. The immediate context of Channel One's programs, and the editing and staging sequence, would lead viewers to understand that Channel One's editors, hosts, and journalists were vouching for the credibility of the accusations as *facts*, not opinions, as they often stated in their own voices. Exhibits --. Shigapova, in her own words and own voice, described the allegations ascribing responsibility for Litvinenko's poisoning by Russian operatives as "outrageous accusations." Sellier Ex. E; COR 000116.  Pimanov claimed that he agreed with Shigapova's characterization asserting that the allegations against Russia were not true.  (Sellier Dec. Ex. E; Pimanov Tr. at 23). Finally, the larger social context—the backdrop of Putin's lifelong habit of lying to the world and

disclaiming responsibility for his murderous decisions would tend to convince *reasonable* viewers that Channel One's outrageous attacks on Goldfarb were fully intended to be understood as factual.

## <u>CONCLUSION</u>

This case is about human dignity, the rule of law, accountability, and truth.  The protection of  person's "own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'" *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 341 (1974), *quoting Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring).  But this case is not just about the human dignity of Alex Goldfarb. Civilized societies have a cherished interest in the distinction between truth and falsity in public discourse.  Defamation law serves not just to protect victims, but to protect the integrity of public discourse itself.  *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 777 (1984) ("New Hampshire has clearly expressed its interest in protecting such persons from libel, as well as in safeguarding its populace from falsehoods.")

The entire law of defamation has for centuries been grounded on the fundamental judgment that judges and juries are competent to distinguish true facts from false ones.  Tragically, Vladimir Putin may believe himself above the law, and beyond accountability to the tribunals of the civilized world.  Channel One, however, is subject to the jurisdiction of this Court, and subject to this nation's laws.  That some actors in society may be losing a grip on truth does not mean that courts of law should lose their grip.  Our fundamental notions of due process and the rule of law presuppose that there is truth and there is falsehood, and that the legal tribunals of a decent society committed to ordered liberty have the competency and duty to distinguish between them.

Dated: June 21, 2022
New York, New York

ROTTENBERG LIPMAN RICH, P.C.

By: _____

        Bertrand C. Sellier
        The Helmsley Building
        230 Park Avenue, 18th Floor
        New York, NY  10169
        (212) 661-3080 ext. 275
        bsellier@rlrpclaw.com

        -   and –
        -

        Rodney Alan Smolla
        Delaware Law School
        4601 Concord Pike
        Wilmington, DE 19803
        (302) 477-2278
        rodsmolla@gmail.com

        *Attorneys for Plaintiff Alex Goldfarb*

29