UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ALEX GOLDFARB,                                                      :
                                                                   :
                                        Plaintiff,                 :
                                                                   :
                        -v-                                        :
                                                                   :
CHANNEL ONE RUSSIA,                                                :
                                                                   :
                                        Defendant.                 :
                                                                   :
------------------------------------------------------------------X            18 Civ. 8128 (JPC)
                                                                   :
CHANNEL ONE RUSSIA,                                                :            OPINION AND ORDER
                                                                   :
                                        Counter Claimant,          :
                                                                   :
                        -v-                                        :
                                                                   :
ALEX GOLDFARB                                                      :
                                                                   :
                                        Counter Defendant.         :
                                                                   :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Alex Goldfarb claims that Defendant Channel One Russia ("Channel One") libeled him and intentionally inflicted emotional distress upon him through statements made during four television programs it broadcast in 2018. Dkt. 5 ("Compl.") ¶¶ 115-34. Those statements, Goldfarb claims, either asserted or implied six claims about him that constitute libel *per se*: that he murdered Alexander Litvinenko ("Litvinenko"), a Russian dissident who was killed in London in 2016; that he murdered his own wife; that he is a CIA operative; that he persuaded Marina Litvinenko ("Marina"), Litvinenko's widow, to give false testimony to a parliamentary inquiry that was carried out in the U.K. into Litvinenko's death (the "Owen Inquiry"); that he and Litvinenko together operated an illegal business helping criminal asylum-seekers; and that he

conspired with Boris Berezovsky, an exiled Russian oligarch, to defraud the U.K. into granting asylum to Berezovsky. *Id.* ¶¶ 116, 128. In response, Channel One brings three counterclaims against Goldfarb under New York's anti-SLAPP statute, N.Y. Civ. Rights Law § 70-a (2022), Dkt. 117 at 30-37, alleging that his suit lacks a substantial basis in fact or law, *id.* ¶¶ 31, 35, 41, and that it was brought for the purpose—indeed, the sole purpose—of inhibiting Channel One's free speech, *id.* ¶¶ 37, 42. On its counterclaims, Channel One seeks attorneys' fees and costs, *id.* ¶ 33, compensatory damages, *id.* ¶ 38, and punitive damages, *id.* ¶ 43.

Now before the Court is Channel One's motion for summary judgment on all causes of action in Goldfarb's Complaint and on all of its counterclaims. Dkt. 130. Channel One advances a number of arguments for why it is entitled to prevail on Goldfarb's claims. First, Channel One argues that three particular statements alleged in the Complaint as libels were not actionable defamation, each for a distinct reason: the statement that Goldfarb killed his wife, it argues, was not broadcast, expressly or through implication, on any of its programs, Dkt. 135 ("Deft. Br.") at 11; the statement that Goldfarb induced Marina to lie to the Owen Inquiry, it argues, did not constitute libel *per se*, *id.* at 12-13 & n.8; and the statement that Goldfarb was a member of the CIA, it argues, was not defamatory at all, *id.* at 8. Second, Channel One claims that all the alleged libels it broadcast were statements of opinion rather than of fact, and thus not actionable under New York law. *Id.* at 23-26. Third, Channel One claims that the evidence in the record is insufficient to establish a genuine dispute as to whether its statements were broadcast with actual malice, which Goldfarb must prove by clear and convincing evidence to prevail on both his libel claims and his intentional infliction of emotional distress claim. *Id.* at 1 n.1, 5-23. Lastly, Channel One seeks summary judgment on its three anti-SLAPP counterclaims. *Id.* at 27.

For reasons that follow, Channel One's motion for summary judgment is granted in part and denied in part. Because an accusation of membership in the CIA is not defamatory on its face,

and because Goldfarb has not alleged any extrinsic facts that would make that accusation defamatory, his claim that Channel One libeled him as a CIA member is dismissed. Channel One's motion is denied in all other respects. A reasonable person could understand certain statements that were made on Channel One's broadcasts to imply that Goldfarb killed his wife, and a false accusation that Goldfarb influenced Litvinenko's wife to lie to the Owen Inquiry constitutes libel *per se*. Further, when considered in context, the statements Channel One broadcast were statements of fact rather than of opinion. And because the evidence disclosed in the record raises a genuine issue of fact as to whether Channel One acted with actual malice, the question of actual malice must be resolved at trial. Lastly, Channel One's motion for summary judgment also is denied with respect to its anti-SLAPP counterclaims, given the genuine disputes of fact as to Goldfarb's entitlement to relief.

## I.  Background[1]

### A.  The Litvinenko Killing

Channel One's alleged libels were all broadcast during programs that discussed Litvinenko's death. Litvinenko was born in Russia in 1962, attended military college, served in

---

[1] These facts are mainly drawn from Channel One's statement of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 131 ("Deft. 56.1 Stmt."), Goldfarb's counter-statement under Rule 56.1(b), Dkt. 139 ("Pl. Counter 56.1 Stmt."), and the exhibits filed by the parties. Unless otherwise noted, the Court cites only to Channel One's statement of undisputed material facts when Goldfarb does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add his own "spin" on the fact or otherwise dispute the inferences drawn from it.

The contents of the broadcasts at issue are cited to the translated transcripts filed as Exhibit 2 to the Complaint. *See* Dkt. 5 at 87-126. In its reply, Channel One objects that "Plaintiff presents and relies upon uncertified translations of foreign language materials, which should also be excluded from evidence." Dkt. 142 at 2 n.2. It is unclear whether this objection is directed only against the exhibits attached to the affidavit Goldfarb submitted in opposition to Channel One's motion for summary judgment, *see generally* Dkt. 136 ("Goldfarb Aff."), or whether Channel One also means to object to the uncertified translations attached to the Complaint. In any event, the absence of certification does not bar consideration of the transcripts. On a motion for summary judgment, parties may object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c). But none of the Federal Rules of Evidence explicitly require that translated foreign documents be certified to be

3

the armed forces of the Russian Interior Ministry, and then joined the KGB.  Owen Report ¶¶ 3.3,

3.6-.7.  Following the collapse of the Soviet Union and the subsequent restructuring of the Soviet

government, Litvinenko was employed by the KGB's various successor agencies.  *Id.* ¶¶ 3.9-.10,

.30, .38.  During that period, he became friendly with Boris Berezovsky.  *Id.* ¶ 3.19.  Berezovsky

gained "great wealth and considerable political influence" in Russia during the 1990s through his

business activities, *id.* ¶¶ 3.20-.21, but left Russia in 2000 to claim asylum in the U.K., after which

he became a prominent critic of Russian President Vladimir Putin, *id.* ¶ 3.21.  In November 1998,

Litvinenko and Berezovsky publicly accused the FSB, a successor organization to the KGB, of

plotting to kill Berezovsky.  *Id.* ¶¶ 3.48-.64.  Litvinenko was dismissed from the FSB in December

1998, *id.* ¶ 3.66, and was arrested and charged with assaulting a suspect in March 1999, *id.* ¶ 3.68.

---

admissible.  Furthermore, even were Federal Rule of Evidence 604 to apply to translators of documents as well as to interpreters of live testimony, *see Lakah v. UBS AG*, 996 F. Supp. 2d 250, 258 (S.D.N.Y. 2014) (applying Rule 604), it would not bar consideration of the uncertified transcripts here, for Rule 56(c) excludes evidence that "*cannot* be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c) (emphasis added), and the transcripts *could* be presented in evidence with an accompanying certification or affirmation from the translator. Furthermore, Channel One has given no reason to dispute the accuracy of the translations; indeed, since Channel One's own Local Civil Rule 56.1 statement cites those translations extensively to support its claims about the contents of the broadcasts, Channel One appears to accept that the translations are accurate.  *See, e.g.*, Deft. 56.1 Stmt. ¶¶ 107-09, 111-19, 121-24, 127-34, 136-41.

Widely known, undisputed background facts about Litvinenko's death are cited to Sir Robert Owen, *The Litvinenko Inquiry: Report into the Death of Alexander Litvinenko* (2016) (the "Owen Report"), which was commissioned by and presented to the Parliament of the U.K.  While parts of the Owen Report are disputed, the Court takes judicial notice only of the basic timeline surrounding Litvinenko's death, which is "not subject to reasonable dispute" because it both "is generally known within [this Court's] territorial jurisdiction" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"—namely, the extensive contemporaneous reporting on Litvinenko's death.  *See* Fed. R. Evid. 201(b). Furthermore, the Owen Report is itself admissible into evidence under the hearsay exception for public records, Fed. R. Evid. 803(8), since it presents "factual findings from a legally authorized investigation," *id.* 803(8)(A)(iii), and since Channel One has not shown "that the source of information or other circumstances indicate a lack of trustworthiness," *id.* 803(8)(B).  *See F.A.A. v. Landy*, 705 F.2d 624, 633 (2d Cir. 1983); *In re Vitamin C. Antitrust Litig.*, Nos. 06 Md. 1738, 05 Civ. 453 (BMC) (JO), 2012 WL 4511308, at \*1-4 (E.D.N.Y. Oct. 1, 2012); *In re Parmalat Secs. Litig.*, 477 F. Supp. 2d 637, 640-42 (S.D.N.Y. 2007).

Following his acquittal on those charges in November 1999, *id.* ¶ 3.69, Litvinenko was charged with mishandling suspects and stealing goods during an operation, *id.* ¶¶ 3.70-.71.   After Litvinenko was not convicted on those charges, he was charged once more, this time with planting evidence on a suspect. *Id.* ¶ 3.72.  In October 2000, while those charges were pending, Litvinenko left Russia. *Id.* ¶ 3.74.  On November 1, 2000, he arrived in the U.K. and sought asylum, *id.* ¶ 3.93, which was granted in May 2001, *id.* ¶ 3.95.

Litvinenko and his family remained in the U.K. until his death in November 2006.  *Id.* ¶ 3.94.  On November 3, 2006, he was admitted to the hospital, *id.* ¶ 3.118, and was initially diagnosed with a gastrointestinal infection, *id.* ¶ 3.120(a).  His failure to respond to treatment for such an infection caused doctors to explore alternative diagnoses. *Id.* ¶ 3.120.  In particular, they considered radiation poisoning as a possible diagnosis, *id.* ¶ 3.120(e), and on November 16, 2006, they began treating him for thallium poisoning, *id.* ¶ 3.120(f).  On November 17, 2006, he was transferred to University College Hospital. *Id.* ¶ 3.120(g).  Over the next six days, as his condition continued to deteriorate, doctors concluded that thallium poisoning was not the cause of his illness. *Id.* ¶ 3.129.  He was pronounced dead on the evening of November 23, 2006. *Id.* ¶ 3.129(q).

In the days before Litvinenko's death, medical testing identified the presence of polonium-210 in his urine. *Id.* ¶¶ 3.129(k)-(p), 3.157.  Further postmortem testing found elevated levels of polonium-210 throughout his tissues. *Id.* ¶¶ 3.158-.159.  Based on both that testing and on Litvinenko's autopsy, doctors concluded that he died from the intake of polonium-210. *Id.* ¶¶ 3.169-.181.  In particular, they concluded that more than one intake took place; the second of which was dramatically larger than the first. *Id.* ¶ 3.182.  To determine when this fatal polonium-210 intake took place, British police attempted to reconstruct Litvinenko's movements before he became ill and tested for the presence of radioactivity in locations where he had been. *Id.* ¶¶ 6.1-.4.  Based on that investigation, they concluded that he ingested polonium-210 while drinking tea

on the afternoon of November 1, 2006. *Id.* ¶ 8.27. They further concluded that the polonium-210 was administered by Andrey Lugovoy and Dmitry Kovtun. *Id.* ¶¶ 8.60-.68; *see also id.* ¶ 2.17. The former, who had a history of involvement with the Russian security services, *id.* ¶¶ 4.142-.144, and whom Litvinenko regarded as a business associate and "good friend," *id.* ¶¶ 4.151, 4.153-.154, arrived in London from Moscow on October 31, 2006, *id.* ¶ 6.232-.233. The latter, who had a history of involvement with the Russian military, *id.* ¶¶ 6.29-.32, arrived in Hamburg from Moscow on October 28, 2006, then left Hamburg for London on November 1, 2006, *id.* ¶ 6.194. Lugovoy and Kovtun left London for Moscow together on November 3, 2006. *Id.* ¶ 6.334.

## B. Alexander Goldfarb[2]

Goldfarb "was an associate and close friend of Alexander Litvinenko." Compl. ¶ 1. He is a microbiologist by profession, and he was a professor of microbiology at Columbia University from 1982 to 2006. *Id.* ¶ 11. During the 1990s, he was an advisor to the well-known philanthropist, George Soros, and he spent considerable time in Moscow during that period directing various projects affiliated with Soros. *Id.* ¶ 20. While working in that capacity in Moscow, Goldfarb became friends with both Litvinenko and Berezovsky. *Id.* As mentioned, both Berezovsky and Litvinenko left Russia in 2000. Goldfarb helped facilitate Litvinenko's departure from Russia and eventual transit to the U.K., where Litvinenko sought asylum. Owen Report ¶¶ 3.89-.93; Compl. ¶ 24. Goldfarb and Litvinenko remained in contact during the years when Litvinenko lived in London. For example, at that time, Goldfarb was involved in managing a non-profit funded by Berezovsky, which in turn provided Litvinenko with grants that he used to write two books alleging

---

[2] This discussion of Goldfarb's background is provided solely as context to help the reader understand his alleged connection to Litvinenko; the legal analysis contained in this Opinion and Order does not depend in any way on this section. Because the contents of this section do not affect that legal analysis, and because Goldfarb's background is not set out clearly elsewhere on the docket, *see generally* Deft. 56.1 Stmt.; Goldfarb Aff., this section consists primarily of allegations from the Complaint, even though Channel One has denied having knowledge or information sufficient to form a belief as to the truth of most, *see generally* Dkt. 109.

wrongdoing on the part of the Russian intelligence agency that had formerly employed him. Compl. ¶¶ 25, 30.  Goldfarb's connection with Litvinenko continued through the latter's death. Goldfarb flew from New York to London on November 13, 2006, shortly after Litvinenko became ill and was hospitalized due to the radiation poisoning that would ultimately kill him.  Owen Report ¶ 3.125; Compl. ¶ 33.  Goldfarb was one of the few individuals who visited Litvinenko in the hospital during his final days.  Owen Report ¶ 3.126; Compl. ¶ 34.  Prior to his death, Litvinenko signed a statement accusing Putin of responsibility for his death; Goldfarb read that statement at a press conference the day after Litvinenko died.  Owen Report ¶ 3.142; Compl. ¶ 36.  Shortly thereafter, in 2007, Goldfarb and Marina, Litvinenko's widow, published a book that "advanced the theory that Lugovoy and Kovtun poisoned Litvinenko on Putin's orders."  Compl. ¶ 38.

## C.  The Channel One Programs

Channel One's allegedly libelous statements were broadcast during four programs that aired in the spring of 2018.  Deft. 56.1 Stmt. ¶¶ 107, 120, 125, 135; *see* Compl., Exh. 2 at 2-16 ("3/20/18 Tr."); *id.* at 17-21 ("3/30/18" Tr."); *id.* at 26-31 ("4/4/18 Tr."); *id.* at 32-40 ("4/10/18 Tr.").[3]  A key participant in those programs was Walter Litvinenko ("Walter"), Alexander Litvinenko's father.  Deft. 56.1 Stmt. ¶ 109.  Walter had accused Putin of being responsible for his son's murder in the years immediately after his son's death, but beginning in 2012, Walter retracted that accusation, instead accusing Goldfarb of committing the murder and his son of being a traitor. Goldfarb Aff. ¶ 2; Deft. 56.1 Stmt. ¶¶ 49-50.  Walter appeared on all four of the programs at issue in this case, *see* 3/20/18 Tr., Participants, at 2; 3/30/18 Tr., Participants, at 17; 4/4/18 Tr., Participants, at 26; 4/10/18 Tr., Participants, at 32, and many of the allegedly libelous statements

---

[3] Pincites for these transcripts refer to the pagination of Exhibit 2 to the Complaint, which is displayed on the lower right-hand corner of each page.

were either uttered by Walter himself or uttered by other participants on those shows when responding to or otherwise discussing Walter's statements.

The first of the four programs, an episode of a Channel One show called *Let Them Talk*, was broadcast on March 20, 2018.  Deft. 56.1 Stmt. ¶ 107; 3/20/18 Tr. at 2.  *Let Them Talk* features a talk show format in which the show's host, Dmitry Borisov, engages in discussion with a panel of invited guests.  Deft. 56.1 Stmt. ¶¶ 53-55.  On the March 20 episode, Walter made a number of statements that, Goldfarb claims, libeled him.  First, describing a rally that occurred shortly after Litvinenko's death, Walter said:  "Goldfarb's wife is sitting there, a young girl sitting on the bed, crying, weeping: 'Walter, Walter.  Alex killed Alexander'. . . .  Alex is Goldfarb, she openly told me that Goldfarb killed."  *Id.* ¶ 113; 3/20/18 Tr. at 12-13.  And when Borisov then clarified, "So you believe an associate of Boris Berezovsky killed your son?", Walter responded, "Goldfarb!"  Deft. 56.1 Stmt. ¶ 114; 3/20/18 Tr. at 13.  Walter then claimed that Goldfarb was a member of the CIA:  "While [Litvinenko] was at hospital [Goldfarb] flew to the USA three times.  I come to Akhmed [Zakayev][4] and say 'Akhmed what is this?'  And Akhmed says 'Listen he is CIA'.  Alex is."  3/20/18 Tr. at 13; Deft. 56.1 Stmt. ¶ 114.  A few minutes later, Borisov recapped this exchange, explaining that Walter "even said you know who specifically did it?"  Deft. 56.1 Stmt. ¶ 118; 3/20/18 Tr. at 14.  Walter confirmed:  "Yes Goldfarb.  It was his work."  Deft. 56.1 Stmt. ¶ 118; 3/20/18 Tr. at 14.  Borisov continued his summary:  "And you know that it was Alexander Goldfarb . . . from what you've heard from Alexander's own wife."  Deft. 56.1 Stmt. ¶ 118; 3/20/18 Tr. at 14.  Walter again confirmed:  "Yes the wife.  She told me about that."  Deft. 56.1 Stmt. ¶ 118; 3/20/18 Tr. at 14.  Walter then engaged in a brief exchange about Goldfarb's wife:  "[Walter:] And a month later she herself died suddenly.  [Unidentified Guest:]  She died suddenly.

---

[4]  Akhmed Zakayev is an "[e]xiled former senior official/government minister in [the] Chechen Republic of Ichkeria," which attempted to break away from Russia in the 1990s, and was a "close friend and neighbour of [Litvinenko]."  Owen Report at 294; *see also id.* ¶ 3.33.

[Unidentified Guest:]  Was she a young woman?  [Walter:]  28 years old.  She was very young."
3/20/18 Tr. at 14.

The next broadcast at issue was an episode of a different program, *Man and Law*, that aired on March 30, 2018.  Deft. 56.1 Stmt. ¶ 120.  *Man and Law* is not produced by Channel One but rather licensed by Channel One from a separate production company, Ostankino.  *Id.* ¶ 78.  During that episode, a reporter described the accusations Walter had made on the March 20 episode of *Let Them Talk*, *id.* ¶ 121, and then conducted an interview of Walter during which he repeated the accusations, *id.* ¶ 122.  First, the reporter explained that "the father of fugitive Lt. Colonel of FSB Alexander Litvinenko who in 2006 was poisoned with Polonium, named the murderer of his son." *Id.* ¶ 121; 3/30/18 Tr. at 19.  Then, once Walter had denied that other individuals suspected by British authorities had anything to do with the killing, he answered the reporter's question, "And who had?", by saying, "So far I think there is only one who had, Goldfarb personally."  Deft. 56.1. Stmt. ¶ 122 (emphasis omitted); 3/30/18 Tr. at 19.  The reporter next elaborated, "Walter Alexandrovich is positive: Goldfarb is a CIA agent," 3/30/18 Tr. at 20-21, and Walter again recounted his alleged conversation with Akhmed Zakayev, saying that "I went to Akhmed and asked, 'How can this be?'  And he said, 'What to expect of him?  He is CIA.  Has been CIA for a long time.'"  3/30/18 Tr. at 21.  Lastly, Walter repeated that Goldfarb's wife had been "sitting there crying, weeping: 'Walter, Walter, Alex killed Alexander,'" and that then "[s]he died within a month."  *Id.*  A narrator concluded with the pointed observation:  "She confessed that her husband killed Alexander and herself died a month later at the age of 28.  That's strange."  *Id.*

The third broadcast, another episode of *Let Them Talk*, was aired on April 4, 2018, Deft. 56.1 Stmt. ¶ 125, and also featured Walter as a guest, 4/4/18 Tr., Participants, at 26.  Borisov began the relevant segment by reminding the audience that "[o]n the previous show [Walter] said he believes the probable murderer of his son was Goldfarb who, he said, could be a CIA agent."  Deft.

56.1 Stmt. ¶ 127 (emphasis omitted); 4/4/18 Tr. at 26.  Kovtun, one of the individuals accused by British authorities of killing Litvinenko, then joined the guests in the studio, and the discussion turned to the relationship between Goldfarb and Litvinenko's widow, Marina.  Deft. 56.1 Stmt. ¶ 131.  Prompted by Borisov, Kovtun explained that "from the first days after Litvinenko's death Goldfarb was near her[,] we saw them together all the time, they wrote a book together, they prepared for the hearings together and all those statements she made during Public Inquiry makes one think that she is of course under someone's influence and does not make her own decisions."  Deft. 56.1 Stmt. ¶ 132; 4/4/18 Tr. at 28.  When Borisov then asked, "So you think she is under Goldfarb's influence?", Kovtun replied, "I think yes."  Deft. 56.1 Stmt. ¶ 132 (emphasis omitted); 4/4/18 Tr. at 28.  After a few minutes and a commercial break, Borisov and Kovtun continued discussing the relationship between Goldfarb and Marina:

> [Borisov:]      You said she is influenced by him.
>
> [Kovtun:]       I said he influences her in a certain way directs her.
>
> [Borisov:]      How?
>
> [Kovtun:]       He formulates her position her opinions, convinces her to make false statement in the Public Inquiry hearings, for example.  And she does that.  She is making absolutely ill-advised, easily disprovable . . . .

Deft. 56.1 Stmt. ¶ 133; 4/4/18 Tr. at 29-30 (ellipsis in original).  Lastly, Walter returned to the subject of Litvinenko's death, saying:  "You know, I will tell you, I am 99% sure Goldfarb did it.  Maybe 1%, I'd give to criminals.  Maybe."  Deft. 56.1 Stmt. ¶ 134 (emphasis omitted); 4/4/18 Tr. at 30.

     The fourth and final broadcast, also an episode of *Let Them Talk*, aired on April 10, 2018. Deft. 56.1 Stmt. ¶ 135.  The relevant segment of that broadcast began with Lugovoy, the other individual accused by British authorities of causing Litvinenko's death, recounting allegations previously made by Russian prosecutors that Berezovsky had fraudulently secured asylum in the

U.K. following his departure from Russia, and further describing Goldfarb's alleged participation in that fraud. *Id.* ¶¶ 136-37; 4/10/18 Tr. at 32-34.   This initial immigration fraud involving Berezovsky, Lugovoy explained, grew into a business of fraudulently procuring asylum and citizenship in the U.K. for Russians:

> Using as a model the way Berezovsky got his asylum, Goldfarb, Felshtinsky[5] and Litvinenko decided to set up a trade selling British citizenship. They told me - Dmitry Kovtun will confirm: Guys, let's find someone in Russia who has been pursued by the Russian law; we'll strike a deal with that person; the price will be one million dollars; he will make several harsh statements against Russian authorities, make sure he is photographed preferably as he is being detained in one of the skirmishes that we all see.  Then we get him over to London via a third country; he makes appropriate statements, the Foundation for Civil [L]iberties - it has been registered in New York - endorses him; and he gets asylum.

Deft. 56.1 Stmt. ¶ 136; *see also* 4/10/18 Tr. at 34.  After a few minutes of other discussion and a commercial break, the program returned to the topic of Litvinenko and played a pre-recorded telephone interview with Goldfarb.  During that interview, Goldfarb was asked to respond to Walter's accusations and replied:

> I can respond: Walter is no father to him, he abandoned him when the boy was two years old, later he milked him financially, and later when Berezovsky stopped giving him money he returned to Moscow.  He is worse than Lugovoy because Lugovoy at least carried out an order while the father betrayed his son for an apartment in Moscow.

Deft. 56.1 Stmt ¶ 139 (brackets omitted); *see also* 4/10/18 Tr. at 37.  Subsequently, Borisov reminded Lugovoy of his accusation that Goldfarb was likely a CIA agent, to which Lugovoy replied:  "Well, a CIA agent, firstly Litvinenko's father said that . . . ."  Deft. 56.1 Stmt. ¶ 140 (emphasis omitted); 4/10/18 Tr. at 38.

---

[5] Yuri Felshtinsky is a "Russian dissident, author and historian" who "[a]ssisted [Litvinenko] in leaving Russia."  Owen Report at 286.

### D.  Procedural History

Goldfarb filed the Complaint that initiated this lawsuit on September 6, 2018, bringing two counts of libel and one count of intentional infliction of emotional distress against Channel One. Dkt. 1; Compl. ¶¶ 115-134.   The Complaint also alleged libel and intentional infliction of emotional distress against RT America, a separate media company, based on an interview during which Walter made statements similar to those broadcast by Channel One.  Compl.  ¶¶ 97-98, 115-26, 132-34.  RT America appeared on November 2, 2018, Dkt. 14, and following unsuccessful settlement discussions, *see* Dkt. 36 at 1, moved to dismiss on February 11, 2019, Dkts. 30-31. Channel One initially failed to appear, and a Clerk's Certificate of Default was entered against it on December 12, 2018.  Dkt. 25.  Channel One then appeared on March 12, 2019, Dkt. 39, and moved to dismiss on April 12, 2019, Dkts. 59-62.  On March 4, 2020, the Honorable Valerie E. Caproni, to whom this case was then assigned, denied both motions to dismiss.   Dkt. 74. Defendants then moved for reconsideration on March 18, 2020.  Dkts. 75-78.  On April 9, 2020, Judge Caproni held that motion in abeyance pending jurisdictional discovery.  Dkt. 84.  On September 1, 2020, Goldfarb filed a notice of dismissal with respect to RT America only, Dkt. 91, which was approved by the Court that day, Dkt. 92, leaving Channel One the sole remaining Defendant.

On September 29, 2020, this case was reassigned to the undersigned.  *See* Notice of Reassignment dated Sept. 29, 2020.   After jurisdictional discovery concluded, Channel One renewed its motion for reconsideration on November 6, 2020.  Dkt. 96.  Following full briefing on the motion, *see* Dkts. 97-101, the Court denied it on April 13, 2021, Dkt. 105.  On May 27, 2021, the United States Court of Appeals for the Second Circuit denied Channel One's motion for an emergency stay of proceedings in this case pending consideration of its petition for a writ of prohibition, Dkt. 108, and on the same day Channel One answered the Complaint, Dkt. 109.

Subsequently, on August 10, 2021, Channel One amended its Answer to assert anti-SLAPP counterclaims, Dkt. 117, which Goldfarb answered on September 2, 2021, Dkt. 118.  The Second Circuit then denied Channel One's petition for a writ of prohibition on September 22, 2021.  Dkt. 119.  Following the close of discovery, Channel One moved for summary judgment on May 31, 2022, Dkts. 130-35; Goldfarb opposed that motion on June 21, 2022, Dkts. 136-39; and Channel One replied on June 28, 2022, Dkts. 141-44.[6]

## II.  Legal Standards

### A.  Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts

---

[6] While Channel One moves for summary judgment on all of Goldfarb's causes of action, it argues that Goldfarb cannot prevail on his claim for intentional infliction of emotional distress only on the ground that he cannot establish actual malice. Deft. Br. at 1 n.1.  Accordingly, the Court addresses that cause of action only in the context of assessing whether a genuine dispute of fact exists as to actual malice.  *See infra* III.A.3.

showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings." *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[A] nonmoving part[y] . . . may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering what may reasonably be inferred from witness testimony, the court should not accord the nonmoving party the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Taylor*, 2022 WL 744037, at *7 (internal quotation marks omitted).

## B. Libel

Claims for defamation through statements that are spoken aloud rather than published in writing ordinarily sound in slander rather than libel. *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) ("Generally, spoken defamatory words are slander; written defamatory words are libel."). But because of the permanence and reach that television and radio broadcasts attain, broadcast speech bears closer similarities to writing than to fleeting, ordinary spoken language, and therefore if spoken defamation is broadcast rather than merely uttered, most American jurisdictions treat it as libel rather than slander. Sack on Defamation: Libel, Slander, and Related Problems § 2:3 (5th ed. 2017) ("Most [jurisdictions] treat broadcasts as libel."). New York follows the majority rule. *Matherson v. Marchello*, 473 N.Y.S.2d 998, 1004 (App. Div. 1984) ("[D]efamation which is

14

broadcast by means of radio or television should be classified as libel."), *abrogated on other grounds by Laguerre v. Maurice*, 138 N.Y.S.3d 123 (App. Div. 2020).  Thus, Channel One's allegedly defamatory broadcasts are governed by the law of libel rather than the law of slander. To prevail on a claim for libel under New York law, a plaintiff must plead and prove the following five elements:  "1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

The statements for which Goldfarb seeks to recover were uttered on Channel One's programs by various individual persons, but Goldfarb brings this action against Channel One itself rather than against any of those individuals.  Nonetheless, the law permits a defamed plaintiff to recover not only from the individual who initially uttered or wrote the defamatory words but also from any person or entity that subsequently disseminates them:  "It is well settled that [d]efendants cannot escape liability simply because they are conveying someone else's defamatory statements . . . ." *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012); *see also Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 60 (2d Cir. 1980) (citing "the black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally" (internal quotation marks omitted)); Restatement (Second) of Torts § 581(2) (Am. Law Inst. 1977) ("One who broadcasts defamatory matter by means of radio or television is subject to the same liability as an original publisher.").  Thus, Channel One may be liable for broadcasting the defamatory utterances of others.

While the cause of action for libel arises from New York common law, the Supreme Court has held that "the First Amendment places limitations on the States' power to enforce their libel laws."  *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 66 (1976).  In particular, the First

Amendment forecloses plaintiffs from recovering for defamatory speech absent a showing that the defendant published the speech with some degree of fault. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974).  In New York, plaintiffs must prove different degrees of fault depending on whether they are public or private figures.  "In order to prevail on a defamation claim against a public figure, a plaintiff must demonstrate by clear and convincing evidence that the defendant acted with 'actual malice.'" *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 277 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015) *and* 622 F. App'x 67 (2d Cir. 2015).  Channel One argues that Goldfarb is a public figure, and thus that the actual malice standard applies.  Deft. Br. at 4-5.  While Goldfarb does not explicitly concede that he is a public figure, *see generally* Dkt. 138 ("Pl. Opp."), his briefing likewise presumes that the actual malice standard applies, *id.* at 11 ("Goldfarb has met his burden on actual malice." (capitalization omitted)).  Thus, the Court too will presume that the actual malice standard applies for purposes of this Opinion and Order.

A defendant publishes a statement with actual malice, in turn, by acting "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).  Mental states, such as knowledge or reckless disregard, can be possessed only by individuals, not by corporate entities.  Thus, where "there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013).

## III.  Discussion

### A.  Goldfarb's Claims

The Court will address first Channel One's arguments that three of the alleged libels it broadcast did not constitute actionable defamation, each for a different reason, then the question

of whether the statements Channel One broadcast asserted facts or only opinions, and then finally the question of whether Channel One broadcast those statements with actual malice.

### 1. Defamation

#### a. The Accusation that Goldfarb Killed his Wife

Goldfarb and Channel One disagree about whether Channel One's broadcasts accused Goldfarb of killing his wife. The transcripts of the relevant programs contain no express allegation that Goldfarb killed her; instead, his theory is that the accusation was implied by the discussion of Walter's purported conversation with her and her subsequent death. First, the following exchange took place during the March 20, 2018 episode of *Let Them Talk*:

| | |
|---|---|
| [Borisov:] | Good evening to everyone again. . . .  So Walter Alexandrovich said he considers CIA complicit in the murder of Alexander Litvinenko and you even said you know who specifically did it? |
| [Walter:] | Yes Goldfarb.  It was his work |
| [Borisov:] | And you know that it was Alexander Goldfarb, an associate of Boris Berezovsky from what you've heard from Alexander's own wife. |
| [Walter:] | Yes the wife.  She told me about that.  And a month later she herself died suddenly . . . |
| [Unidentified Guest:] | She died suddenly. |
| [Unidentified Guest:] | Was she a young woman? |
| [Walter:] | 28 years old.  She was very young. |

3/20/18 Tr. at 14 (second ellipsis in original).  Second, Walter participated in a similar exchange during the March 30, 2018 episode of *Man and Law*:

| | |
|---|---|
| [Walter:] | There was a woman weeping, Goldfarb's wife.  She was about your age, very pretty.  She was sitting there crying, weeping: "Walter, Walter, Alex killed Alexander." |
| [Reporter:] | That was Goldfarb's wife? |
| [Walter:] | Goldfarb's wife.  She died within a month. |

[Narrator:]          She confessed that her husband killed Alexander and herself
died a month later at the age of 28.  That's strange.

3/30/18 Tr. at 21.  Thus, the question is whether the accusation that Goldfarb killed his wife was

expressed during these exchanges.

Under New York law, "it is for the court to decide whether the words are susceptible of the

meaning ascribed to them." *James v. Gannett Co.*, 353 N.E.2d 834, 837 (N.Y. 1976).  In particular,

the court must decide whether "there is a reasonable basis for drawing the defamatory conclusion"

from those words.  *Id.*  Nonetheless, while the question of whether the words could express the

alleged defamatory meaning must "be resolved by the court in the first instance," *Aronson v.

Wiersma*, 483 N.E.2d 1138, 1139 (N.Y. 1985), the actual meaning of those words must ultimately

be determined at trial:  "If the contested statements are reasonably susceptible of a defamatory

connotation, then it becomes the jury's function to say whether that was the sense in which the

words were likely to be understood by the ordinary and average reader."  *James*, 353 N.E.2d at

837-38 (internal quotation marks omitted); *see also Mencher v. Chesley*, 75 N.E.2d 257, 259 (N.Y.

1947) (holding that a libel case should be submitted to the jury so long as a "reasonable basis exists

for [the defamatory] interpretation").[7]  In evaluating the published words, the court must give them

---

[7]  New York recognizes a distinction between "a defamatory connotation from
statements . . . that are alleged to be expressly false . . . [and] '. . . false suggestions, impressions
and implications arising from otherwise truthful statements.'"  *Biro*, 883 F. Supp. 2d at 463-64
(quoting *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y. 1995)).  "The concern
that substantially truthful speech be adequately protected has led courts to embrace different
standards for" claims involving such speech.  *Armstrong*, 649 N.E.2d at 829.  For example, the
Appellate Division of the New York Supreme Court has held that a plaintiff must make "a rigorous
showing that the language of the communication [expressing truthful statements] as a whole can
be reasonably read both to impart a defamatory inference and to affirmatively suggest that the
author intended or endorsed that inference."  *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 44
(App. Div. 2014).  Those heightened standards do not apply, however, to a case, such as this one,
"of allegedly false statements of verifiable fact, with inferences flowing from those facts."
*Armstrong*, 649 N.E.2d at 829.  For instance, Channel One has not argued that Walter's literal
statements about the death of Goldfarb's wife—*i.e.*, that she was 28 years old and died suddenly
one month after her conversation with Walter about Goldfarb killing his son—were substantially
true.  And Goldfarb expressly denies the factual accuracy of those statements.  *See* Pl. Opp. at 20

a "fair reading" and must "not strain to place a particular interpretation" on them.  *James*, 353

N.E.2d at 838.

    The conversations that Channel One broadcast on March 20, 2018 and March 30, 2018

about the death of Goldfarb's wife are "reasonably susceptible of a defamatory connotation."  *Id.*

at 837.  During the March 20 episode of *Let Them Talk*, immediately after citing a purported

conversation with Goldfarb's wife as his primary evidence for the accusation that Goldfarb killed

Litvinenko, Walter claimed that she, a young, 28-year-old woman, died suddenly only a month

after she told Walter that Goldfarb had killed Litvinenko.  3/20/18 Tr. at 14.  This discussion first

alleged that Goldfarb was a murderer through Walter's accusation that he killed Litvinenko.  Then,

Walter suggested a motive that Goldfarb might have for killing his wife—namely, to prevent her

from telling others of his alleged responsibility for Litvinenko's death.  Furthermore, by claiming

that she was young and died suddenly, Walter implied that no plausible innocent explanation

existed for her death, since ordinarily young women do not die suddenly.  And by highlighting the

supposed close temporal connection between her death and Litvinenko's, Walter implied a causal

connection between the two.  The conversation aired during the March 30 episode of *Man and*

*Law* was very much in the same spirit.  Walter once again conveyed to a reporter that Goldfarb's

wife told him that Goldfarb had killed Litvinenko, and that she then died within a month.  3/30/18

Tr. at 21.  This was immediately followed by the narrator's conspiratorial commentary:  "She

confessed that her husband killed Alexander and herself died a month later at the age of 28.  That's

strange."  *Id.*  Taken collectively, these purported facts—Goldfarb's motive for killing his wife,

the temporal proximity between her death and the events from which that motive arose, and the

_____

("[Goldfarb's wife] was actually 51. . . .  Goldfarb's wife did not die a month after Litvinenko's
poisoning.  She died of cancer three and a half years later." (citing Goldfarb Aff. ¶ 20)).  Thus,
Goldfarb need only make the ordinary showing that Channel One's statements were reasonably
susceptible to the defamatory connotation that he killed his wife.

absence of any alternative innocent explanation for her death—constitute "a reasonable basis for drawing the defamatory conclusion" that Goldfarb killed her. *James*, 353 N.E.2d at 837.

In other cases, the New York Court of Appeals has found published words defamatory when they would justify analogous inferences. *See, e.g.*, *November v. Time, Inc.*, 194 N.E.2d 126, 128-29 (N.Y. 1963) (holding the statements "[w]ith D'Amato somewhat out of the Patterson picture November has filled the vacuum" and "November does all he can to keep Patterson content with his services" reasonably susceptible to the connotation that November, an attorney, intentionally gave incorrect legal advice to D'Amato, his client, in order to displace D'Amato as Patterson's advisor); *Mencher*, 75 N.E.2d at 259 (holding statements that the plaintiff had been employed at the *Daily Worker* and as the campaign manager for a communist candidate for office to be reasonably susceptible to the defamatory connotation that the plaintiff was a communist).[8] And the defamatory connotation of the words uttered during the March 20, 2018 *Let Them Talk* episode is further reinforced by the exchange that immediately followed. After describing Goldfarb's wife's death, Walter continued: "That's how it started. Then it went on and on. Also Berezovsky. The death of Boris Berezovsky brings about many questions." 3/20/18 Tr. at 14. Other guests then speculated that Berezovsky, who died in "mysterious circumstances" in 2013, Deft. 56.1 Stmt. ¶ 133, was the victim of foul play. 3/20/18 Tr. at 14-16. The claim that what began with the death of Goldfarb's wife "went on and on" to culminate in Berezovsky's death, which in fact occurred in sufficiently mysterious circumstances that the coroner could not rule out foul play, Deft. 56.1 Stmt. ¶ 8, clearly suggests that Goldfarb's wife, too, died from foul play.

---

[8] Because *November* and *Mencher* predate the Supreme Court's application of the First Amendment to state defamation law in *New York Times Co. v. Sullivan*, those decisions considered only whether the alleged libels were reasonably susceptible to a defamatory connotation, not whether they met a higher standard applicable to statements that were literally true. *See supra* note 7. It might have been plausible to argue in those cases that the relevant statements were literally true.

In short, because the words Channel One broadcast on March 20, 2018 and March 30, 2018 are susceptible to being interpreted as conveying the accusation that Goldfarb killed his wife, Goldfarb's claim that Channel One libeled him with respect to those statements survives summary judgment.  It is for the factfinder to decide at trial whether that defamatory meaning would likely have been "understood by the ordinary and average" viewer.  *James*, 353 N.E.2d at 838 (internal quotation marks omitted).

### b.   The Accusation that Goldfarb Induced Marina Litvinenko to Lie to the Owen Inquiry

During the April 4, 2018 broadcast of *Let Them Talk*, Kovtun accused Goldfarb of convincing Marina to lie to the Owen Inquiry.  4/4/18 Tr. at 30 ("[Kovtun:]  [Goldfarb] formulates [Marina's] position her opinions, convinces her to make false statement in the Public Inquiry hearings, for example."); *see also* Deft. 56.1 Stmt. ¶ 133.  Goldfarb's Complaint brings claims for libel *per se*.  *See* Compl. ¶¶ 127-31.  If alleged defamation is defamatory *per se*, a plaintiff is exempt from having to prove "special damages" in the form of a pecuniary or economic loss caused by the defamation.  *See* Sack on Defamation §§ 2:8.1, 10:3.2; Restatement (Second) of Torts § 575 cmt. b.  Since Goldfarb has not pled special damages, Channel One argues that his claims must fail with respect to the accusation of inducing Marina to lie to the Owen Inquiry because that accusation is not libelous *per se*.  Deft. Br. at 12-13.  In making this argument, however, Channel One mistakenly applies the law of slander, which does not govern Goldfarb's libel claims.  *See supra* II.B.  Citing *Albert* for the proposition that "[u]nder New York law, libel per se is limited to four categories, none of which are applicable here," Deft. Br. at 12 n.8 (citing *Albert*, 239 F.3d at 271), Channel One argues that the accusation of inducing Marina to lie was not libel *per se* because Goldfarb has not shown that conduct to be a crime under British law, *id.* at 12-13.  But *Albert* was a slander case, *see* 239 F.3d at 265 ("[Plaintiff's] defamation claim is explicitly directed at words spoken by [Defendant] . . . .  It is therefore a claim for slander."), and the law of slander *per se*,

*see id.* at 271, differs from the law of libel *per se*.  *See* Sack on Defamation § 2:8.3[B].  An accusation need not fall into one of the four categories mentioned by Channel One to constitute libel *per se*.

Instead, American jurisdictions employ one of two approaches to determine whether a defamatory publication is libelous *per se*.  On the traditional approach, followed by the Second Restatement, all libel is defamatory *per se*:  special damages need never be proven to recover for libel, and only in some circumstances to recover for slander.  Restatement (Second) of Torts § 569 ("One who falsely publishes matter defamatory of another in such a manner as to make the publication a libel is subject to liability to the other although no special harm results from the publication."); Sack on Defamation § 2:8.3.  By contrast, the more modern approach, followed in a majority of jurisdictions, distinguishes two types of libel:  libel *per se*, for which a plaintiff may recover regardless of proof of special damages, and libel *per quod*, for which a plaintiff cannot recover absent proof of special damages.  Sack on Defamation § 2:8.3.  In such jurisdictions, the distinction between the two turns on "whether the defamatory nature of the libelous statement is apparent on its face."  *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 397 (S.D.N.Y. 1998); Sack on Defamation § 2:8.3.  Certain statements convey a defamatory meaning about the plaintiff in themselves—for example, the claim that Max Braun's kosher butcher shop sells bacon.  *See Braun v. Armour & Co.*, 173 N.E. 845 (1930).  Such statements are libel *per se* and actionable without proof of special damages.  *Jewell*, 23 F. Supp. 2d at 397; Sack on Defamation § 2:8.3.  By contrast, other statements convey a defamatory meaning only given additional extrinsic facts not communicated in the statement itself—for example, the claim that Max Braun's butcher shop sells a particular brand of bacon does not in itself convey a defamatory meaning, but it would do so given the further fact, not contained in the statement, that Max Braun operates a kosher butcher

shop.  Such statements are libel *per quod* and not actionable absent proof of special damages. *Jewell*, 23 F. Supp. 2d at 397; Sack on Defamation § 2:8.3.[9]

Unfortunately, the New York Court of Appeals has not been particularly clear about which approach New York follows—that is, whether New York requires proof of special damages to recover for a libel whose defamatory nature is apparent only given additional extrinsic facts.  *See, e.g.*, *Matherson*, 473 N.Y.S.2d at 1002 n.3 ("In the view of some writers, libel *per quod* does not exist in New York. . . .  Other commentators decline to interpret *Hinsdale* [*v. Orange County Publications, Inc.*, 217 N.E.2d 650 (N.Y. 1966)][10] as obliterating the special harm requirements in extrinsic fact cases."); Sack on Defamation § 2:8.6[D] ("New York law, meanwhile, remains in disarray.").  This Court was unable to identify any Second Circuit opinion addressing the question, and courts in this District ordinarily note that the question remains unsettled under New York law. *See, e.g.*, *Henry v. Fox News Network LLC*, No. 21 Civ. 7299 (RA), 2022 WL 4356730, at *4 (S.D.N.Y. Sept. 20, 2022) ("[I]t is not entirely clear whether there is a separate cause of action for defamation *per quod* in New York."); *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 249 n.8 (S.D.N.Y. 2014) ("According to the Second Department, it is unclear whether there even is a separate cause of action for libel *per quod* in New York." (citing *Matherson*, 473 N.Y.S.2d at 1002 n.3)); *Jewell*, 23 F. Supp. 2d at 398 (describing the question as "an area of some debate").

Nonetheless, it is unnecessary to determine whether New York requires proof of special damages for libel in extrinsic fact cases or whether it instead treats all libels as libel *per se*, for

---

[9] Further exceptions apply that are not relevant here.  *See* Sack on Defamation § 2:8.3.

[10] In *Hinsdale*, the New York Court of Appeals held that a newspaper announcement of a wedding between two individuals who were already married (to different people) was libel *per se*, even though the fact of their preexisting marriages was not contained within the announcement itself and was thus an extrinsic fact.  217 N.E.2d at 651-52.  Some commentators, however, have argued that the rule in *Hinsdale* applies only when the relevant extrinsic facts are widely known among the publication's audience—as was the case in *Hinsdale*—and that proof of special damages is otherwise still required.  *See, e.g.*, Sack on Defamation § 2:8.3[D].

Channel One's accusation that Goldfarb induced Marina to lie to the Owen Inquiry is defamatory on its face.  Under New York law, a defamatory publication "tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community."  *Golub v. Enquirer/Star Grp., Inc.*, 681 N.E.2d 1282, 1283 (N.Y. 1997) (internal quotation marks omitted).  "Not all (or even most) maligning remarks can be considered defamatory," but maligning remarks do "rise to the necessary level of derogation" if "reasonable minds . . . would think the speech attributes odious or despicable characterizations to its subject."  *Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014).

Kovtun's statements about Goldfarb's actions toward Marina, which Channel One broadcast during the April 4, 2018 episode of *Let Them Talk*, meet this standard.  Kovtun claimed that Goldfarb induced the widow of his close friend, who was murdered in a prominent, contentious geopolitical incident, to lie to the official government inquiry into the circumstances of the murder.  It is highly derogatory to accuse an individual of using deceit to undermine the integrity of an official inquiry into such an important event, particularly when the method by which he allegedly did so was to manipulate the widow of the close friend whose murder was the subject of the inquiry.  Reasonable minds could certainly deem this accusation, which maligned Goldfarb for breaching both his public duties and his interpersonal obligations, to be "odious or despicable." *Chau*, 771 F.3d at 127.  Furthermore, no facts in addition to the allegations made during the April 4 episode are needed to appreciate the defamatory nature of the accusation; thus, the accusation would constitute libel *per se* even were New York to recognize a separate action of libel *per quod* for circumstances when the defamatory meaning of a statement depends on extrinsic facts.  For that reason, Channel One's motion for summary judgment is denied with respect to its argument that the accusation of inducing Marina to lie to the Owen Inquiry fails to constitute libel *per se*.

### c. The Accusation that Goldfarb was a Member of the CIA

During the Channel One programs at issue, Walter and other guests repeatedly stated that Goldfarb was a member of the CIA. *See* 3/20/18 Tr. at 13-14; 3/30/18 Tr. at 20-21, 23; 4/4/18 Tr. at 26; 4/10/18 Tr. at 32, 38. Channel One argues that these statements fail to be defamatory at all. Deft. Br. at 8. The Court agrees: Channel One is entitled to summary judgment with respect to this alleged libel because the accusation of membership in the CIA is not defamatory on its face, and because Goldfarb has not alleged any extrinsic facts in light of which the accusation would be defamatory.

As mentioned, the Second Circuit has explained that "[n]ot all (or even most) maligning remarks can be considered defamatory." *Chau*, 771 F.3d at 127. A negative statement about a plaintiff constitutes defamation only if it "rise[s] to the necessary level of derogation," which requires that the statement do "more than cause discomfort or affront" such that "reasonable minds . . . would think the speech attributes odious or despicable characterizations to its subject." *Id.* While obviously individuals differ in their attitudes towards the CIA, one is hardly maligned at all by the accusation of membership in the prestigious institution entrusted with the important task of uncovering foreign intelligence necessary to preserve our nation's security. And even if the accusation of CIA membership caused some degree of discomfort or affront, it cannot plausibly rise to the high level of derogation at which reasonable minds would understand it to "attribute[] odious or despicable characterizations to its subject." *Id.* Furthermore, even assuming extrinsic facts could exist that would make the accusation of CIA membership sufficiently derogatory to constitute defamation, Goldfarb has not offered proof of any such extrinsic facts showing that he was defamed through the accusation of CIA membership. Goldfarb's claim that Channel One libeled him through that accusation must therefore be dismissed.

### 2.  Fact and Opinion

"To make a case of libel under New York law, a plaintiff must establish . . . a . . . defamatory statement of fact."  *Leidig v. Buzzfeed, Inc.*, 371 F. Supp. 3d 134, 142 (S.D.N.Y. 2019), *aff'd*, 788 F. App'x 76 (2d Cir. 2019).  Channel One argues that Goldfarb cannot carry this burden because the alleged libels it broadcast were statements of opinion, not of fact, which are not actionable under New York law.  Deft. Br. at 23; *see Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1166 (N.Y. 1993).  Under New York law, the inquiry into whether allegedly defamatory statements assert facts or merely state opinions "must be made by the court."  *Gross*, 623 N.E.2d at 1167; *accord Celle*, 209 F.3d at 178 ("The court must also decide as a matter of law whether the challenged statement is opinion.").  Whether broadcasts convey facts or opinions depends on "whether a reasonable reader could have concluded that [they] were conveying facts about the plaintiff."  *Gross*, 623 N.E.2d at 1167 (internal quotation marks and brackets omitted).  To conduct that inquiry, a court must employ a three-factor test that considers:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.[11]

*Id.* (internal quotation marks and ellipsis omitted).  Channel One concedes that the statements it broadcast are capable of being proven true or false and thus that the second factor weighs in favor of finding them to be statements of fact.  Deft. Br. at 24.  Nonetheless, it argues that the remaining two factors weigh in its favor, and on that basis urges the Court to hold that its alleged libels were

---

[11] Channel One cites to an earlier version of the test that separates the third factor into two distinct factors relating to the context of the allegedly libelous statements, one focusing on context within the communication and the other focusing on the context of the communication itself.  *See* Deft. Br. at 23 (citing *Steinhilber v. Alphonse*, 501 N.E.2d 550, 554 (N.Y. 1986)).  This difference in the form of the test does not affect the Court's analysis.

nonactionable statements of opinion. *Id.* at 24-26. The Court disagrees, finds that the first and third factor weigh in Goldfarb's favor as well, and therefore holds that Channel One's alleged libels were actionable statements of fact.

### a. Precise Meaning

The first factor inquires "whether the specific language in issue has a precise meaning which is readily understood." *Gross*, 623 N.E.2d at 1167. As the Court of Appeals for the D.C. Circuit explained in the opinion first setting forth the test that New York would later adopt, *see Steinhilber*, 501 N.E.2d at 554 (quoting *Ollman v. Evans*, 750 F.2d 970, 978-84 (D.C. Cir. 1984)), certain statements are "so ambiguous that the average reader would not fairly infer any specific factual content from it." *Ollman*, 750 F.2d at 980 n.18. For example, where concepts are "referable to a whole range of meanings and characteristics," the content of statements using those concepts is "so debatable, loose and varying, that they are insusceptible to proof of truth or falsity." *Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir. 1976), *cited in Ollman*, 750 F.2d at 980-81.

This reasoning clearly does not apply to the statements that Channel One broadcast, each of which employed language that did not convey some ambiguous, loose, or varying content, but rather conveyed a precise meaning clearly susceptible to proof of truth or falsity. When Borisov noted during the March 20, 2018 episode of *Let Them Talk* that Walter "considers CIA complicit in the murder of Alexander Litvinenko and you even said you know who specifically did it," and Walter then replied, "Yes Goldfarb. It was his work," Walter conveyed the precise meaning that Goldfarb committed Litvinenko's murder. 3/20/18 Tr. at 14. As the Court has already held, when Walter claimed that Goldfarb's wife died suddenly at a young age one month after she told Walter that Goldfarb killed Litvinenko, 3/20/18 Tr. at 14, his statements were reasonably susceptible to the precise meaning that Goldfarb killed his wife. *See supra* III.A.1.a. The same is true of the statements during the March 30, 2018 episode of *Man and Law*, when Walter claimed that

Goldfarb's wife died within a month of confessing to Goldfarb's role in Litvinenko's murder and when the narrator then noted how strange it was for a 28-year-old to die so soon after making that confession. 3/30/18 Tr. at 21. Likewise, when Kovtun said that "[Goldfarb] formulates [Marina's] position her opinions, convinces her to make false statement in the Public Inquiry hearings, for example" during the April 4, 2018 episode of *Let Them Talk*, he conveyed the precise meaning that Goldfarb had influenced Marina to lie to the Owen Inquiry. 4/4/18 Tr. at 30. Lastly, during the April 10, 2018 episode, when Lugovoy claimed that "Goldfarb, Felshtinsky and Litvinenko decided to set up a trade selling British citizenship," then described how the three would produce fraudulent evidence to be used in asylum proceedings, he conveyed the precise meaning that Goldfarb and his associates engaged in asylum fraud in exchange for payment. 4/10/18 Tr. at 34. And when Lugovoy said they set up their trade "using as a model the way Berezovsky got his asylum," he conveyed the precise meaning that Goldfarb assisted in fraudulently procuring Berezovsky's U.K. asylum and subsequent British citizenship. *Id.* None of these statements are too vague to convey a precise meaning susceptible to proof of truth and falsity, *see Buckley*, 539 F.2d at 894, and thus for each the first factor weighs in Goldfarb's favor.

Channel One's arguments as to the first factor rely primarily on the use of qualifiers that, it argues, indicated the statements were speculative hypotheses rather than factual assertions. Deft. Br. at 24-25. Such arguments, however, are better considered under the third *Gross* factor, which analyzes context rather than the precision of meaning: qualifiers do not render the statement's meaning any less precise but instead arguably "signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross*, 623 N.E.2d at 1167 (alternation and internal quotation marks omitted). The Court thus turns to that factor.

### b. Context

Channel One advances three arguments for why factors properly understood as contextual weigh in favor of holding its statements to be opinions.  First, it notes that Walter and Lugovoy provided "explicit attribution of the sources of their opinion," then argues that their "statements are opinions because they attributed the source of their beliefs."  Deft. Br. at 26.  This argument, however, misunderstands New York libel law.  New York does "recognize and utilize the important distinction between a *statement of opinion* that implies a basis in facts which are not disclosed to the reader or listener and a *statement of opinion* that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying facts."  *Gross*, 623 N.E.2d at 1168 (emphasis added) (citations omitted).  Only the former is actionable.  *Id.*  But crucially, as the emphasized portions of the quotations show, the disclosure of underlying facts does not mark a distinction between statements of opinion and statements of fact but rather draws a distinction between two kinds of statement of opinion, only one of which is actionable.  Thus, the question of whether the underlying factual support was disclosed would be relevant only after Channel One had already shown that the challenged statements were statements of opinion rather than of fact.  *See, e.g.*, *Chau*, 771 F.3d at 129 ("[I]f a statement is found to contain opinion, the court must next determine whether the statement is 'pure opinion' (and thus non-actionable) or 'mixed opinion' (and therefore actionable)."); *Jewell*, 23 F. Supp. 2d at 377 ("Assuming that a statement is one of opinion, a second level of inquiry is required concerning the stated factual basis, if any, for the opinion . . . .").  The disclosure of an underlying factual basis does not itself transform assertions of fact into opinions.  Therefore, the claim that the underlying factual bases for the alleged libels were disclosed, even if true, is irrelevant to the question of whether those alleged libels were statements of fact or of opinion.

Second, relying on *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174 (S.D.N.Y. 2020), Channel One argues that the various statements accusing Goldfarb of criminal activity are "unlikely to be defamatory when, as here, they are made in connection with debates on a matter of public or political importance[,] . . . especially . . . in the context of commentary talk shows like the one at issue here, which often use increasingly barbed language to address issues in the news." Deft. Br. at 25 (internal quotation marks omitted) (quoting *McDougal*, 489 F. Supp. 3d at 182-84). *McDougal*, however, is plainly distinguishable from this case.  In *McDougal*, the court found explicitly that "[t]he context in which the offending statements were made here make it abundantly clear that [the speaker of the alleged libels] was not accusing [the plaintiff] of actually committing a crime."  489 F. Supp. 3d at 183.  In particular, "accusations of 'extortion,' 'blackmail,' and related crimes, such as the statements . . . made here, are often construed as merely rhetorical hyperbole when they are not accompanied by additional specifics of the actions purportedly constituting the crime."  *Id.* at 182; *see also Gross*, 623 N.E.2d at 1169 ("[A]ssertions that a person is guilty of blackmail, fraud, bribery and corruption could, in certain contexts, be understood as mere, nonactionable rhetorical hyperbole or vigorous epithets." (internal quotation marks and brackets omitted)).  The context of the statements Channel One broadcast, however, could hardly be more different, since the programs gave detailed specifics of Litvinenko's poisoning, *e.g.*, 3/20/18 Tr. at 12-13, and the alleged asylum-fraud scheme, 4/10/18 Tr. at 32-34.  These specific details about how Goldfarb's alleged crimes were committed indicated that the accusations of criminality were not hyperbolic flourishes included for rhetorical effect but rather genuine accusations that he committed the identified crimes.  Thus, while "simply invoking a criminal act or accusing a person of a crime does not transform an otherwise nonfactual statement into a factual assertion if the accusation, in light of the surrounding context, is rhetorical hyperbole or where the record is devoid of evidence that anyone thought a crime was actually committed," *McDougal*,

489 F. Supp. 3d at 182 (internal quotation marks omitted), this principle would deem the accusations of criminal conduct Channel One broadcast about Goldfarb to be statements of fact, not of opinion, because the context clearly suggests that participants on the show believed crimes were committed and did not mention criminality merely for hyperbole.

Third, as mentioned Channel One argues that the statements it broadcast constitute opinion rather than fact because they contained qualifiers—"phraseology such as 'I think,' 'I believe,' qualifiers such as 'could' 'probably,' 'probable,' 'likely,' 'maybe,' and referring to the 'story,' 'version' and 'theories.'" Deft. Br. at 24.  This argument is likewise unavailing.  To be sure, news outlets do not commit libel simply by drawing uncertain, speculative hypotheses from the facts they report:  for example, "accusations of criminality could be regarded as mere hypothesis and therefore not actionable if the facts on which they are based are fully and accurately set forth and it is clear to the reasonable reader or listener that the accusation is merely a personal surmise built upon those facts." *Gross*, 623 N.E.2d at 1169; *see also Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact.").  But a defamatory statement of fact "cannot be immunized by pairing it with 'I believe.'" *Thomas H. v. Paul B.*, 965 N.E.2d 939, 943 (N.Y. 2012).  In particular, "an accusation of criminality that, read in context, is set forth as a fact is not transformed into a nonactionable expression of opinion merely because it is couched in the form of an opinion." *Gross*, 623 N.E.2d at 1169 (internal quotation marks and brackets omitted).  For example, "if the statement 'John is a thief' is actionable when considered in its applicable context, the statement '*I believe* John is a thief' would be equally actionable when placed in precisely the same context." *Id.*  Thus, simply adding qualifiers to the accusations against Goldfarb that Channel One broadcast would not immunize them as opinions rather than facts.

Furthermore, even on its own terms, the principle set forth in *Gross* to which Channel One appeals does not apply to its allegedly libelous statements.   Under *Gross*, "accusations of criminality could be regarded as mere hypothesis and therefore not actionable *if the facts on which they are based are fully and accurately set forth*."   *Id.* (emphasis added).   But, at the very least, Channel One has not shown that no genuine questions of fact exist as to whether its broadcasts accurately set forth the facts underlying the statements that it identifies as opinions.   Goldfarb does not concede, for example, that his wife did tell Walter, "Walter, Walter!  Alex killed Alexander," Goldfarb Aff. ¶ 13, or that she was a young woman who died suddenly one month after that supposed conversation with Walter, *id.* ¶ 12, or that he told Lugovoy and Kovtun that he committed asylum fraud in the U.K., Pl. Counter 56.1 Stmt. ¶ 136.   And Channel One, which on this motion bears the burden of proving the assertion that the truthfulness of these underlying facts is not or cannot be genuinely disputed, *see* Fed. R. Civ. P. 56(c)(1), has not shown "that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," *id.* 56(c)(1)(B).   Indeed, Channel One does not appear even to claim that all of these underlying facts are true.   Thus, its statements would not qualify as nonactionable hypothesis under the principle articulated in *Gross*.

Lastly, even were the mere inclusion of qualifiers sufficient to transform facts into opinions, Channel One's statements would still be actionable, for although qualifiers were used in some portions of the programs, the allegedly libelous statements for which Goldfarb seeks to recover did not themselves contain qualifiers that would signal to readers that they should treat those statements as conjectural or speculative opinion rather than factual assertion.   *E.g.*, 3/20/18 Tr. at 13 ("[Walter:]  . . . [Goldfarb's wife] openly told me that Goldfarb killed.  'Walter, Walter' – that is me, Walter.  [Borisov:]  So you believe an associate of Boris Berezovsky killed your son? [Walter:]   Goldfarb!"); *id.* at 14 ("[Borisov:]   Walter Alexandrovich said he considers CIA

complicit in the murder of Alexander Litvinenko and you even said you know who specifically did it?  [Walter:]  Yes Goldfarb. It was his work."); *id.* ("[Walter:]  Yes [Goldfarb's] wife.  She told me about that.  And a month later she herself died suddenly . . .  [Unidentified Guest:]  She died suddenly.  [Unidentified Guest:]  Was she a young woman?  [Walter:]  28 years old.  She was very young."); 4/4/18 Tr. at 29-30 ("[Borisov:]  You said [Marina] is influenced by [Goldfarb]. [Kovtun:]  I said he influences her in a certain way directs her.  [Borisov:]  How?  [Kovtun:]  He formulates her position her opinions, convinces her to make false statement in the Public Inquiry hearings, for example.   And she does that.   She is making absolutely ill-advised, easily disprovable . . . ." (ellipsis in original)); 4/10/18 Tr. at 34 ("[Lugovoy:]  Using as a model the way Berezovsky got his asylum, Goldfarb, Felshtinsky and Litvinenko decided to set up a trade selling British citizenship.").   These statements all employed the ordinary language of assertions conveying fact rather than the ordinary language of speculation conveying hypotheses.   Indeed, Walter even used language that conventionally signals not hypothesis or speculation but rather virtual certainty:  "You know, I will tell you, I am 99% sure Goldfarb did it.  Maybe 1%, I'd give to criminals.  Maybe."  4/4/18 Tr. at 30.  While language marking statements as speculation or hypothesis may in certain circumstances render them nonactionable, these statements were all marked as actionable fact.  And even had the qualifiers employed by Channel One's own reporters, such as Borisov, been sufficient to make clear that they and the network did not endorse the statements uttered on the programs, Channel One would still be liable for broadcasting them, for New York law rejects "a privilege to repeat the statements of third parties so long as no endorsement was given."  *Weiner v. Doubleday & Co., Inc.*, 549 N.E.2d 453, 456 (N.Y. 1989).

Thus, although Channel One cites multiple aspects of context in urging the Court to hold that its allegedly libelous statements were opinions, none weigh in favor of that holding.  And, as discussed, the first two factors of the test articulated in *Gross* governing whether statements are

fact or opinion each weigh in favor of holding those statements to be assertions of fact.  The Court concludes that the statements asserted facts.  Therefore, they are actionable.

### 3.  Actual Malice

As mentioned, the parties agree that this case is governed by the standards applicable to public figures, who can prevail only by proving that the defendant acted with actual malice. Channel One seeks summary judgment on all causes of action alleged in the Complaint, including Goldfarb's claim for intentional infliction of emotional distress, on the grounds that no genuine dispute of fact exists as to whether it broadcast the alleged libels with actual malice.  *See* Deft. Br. at 1 n.1; 14-23.

Actual malice requires "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not."  *N.Y. Times Co.*, 376 U.S. at 280.  This test is subjective, not objective.  Reckless disregard "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.  Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Nonetheless, "[a]lthough actual malice is subjective, a court typically will infer actual malice from objective facts," *Celle*, 209 F.3d at 183 (internal quotation marks omitted), for actual malice "is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted," *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987).  Furthermore, as mentioned, "whatever evidence is relied upon, actual malice must be supported by clear and convincing proof."  *Celle*, 209 F.3d at 183.

Channel One argues that "the unrebutted evidence shows Defendant's personnel neither knew the statements were false nor recklessly disregarded the truth."  Deft. Br. at 6 (footnote

omitted).  The Court disagrees.  Taken as a whole, a reasonable factfinder could conclude that direct and circumstantial evidence in the record constitutes clear and convincing proof that Channel One's personnel "entertained serious doubts as to the truth of" the alleged libels.  *St. Amant*, 390 U.S. at 731.  Thus, a genuine issue of fact exists as to whether Channel One broadcast those statements with actual malice.

   **a.  Direct Evidence**

   Perhaps the strongest evidence that Channel One broadcast the accusations concerning Goldfarb despite serious doubts as to their truth comes directly from Borisov's deposition testimony about his subjective attitudes towards the statements broadcast on *Let Them Talk*.  During the deposition, Borisov was asked, "[D]id you ask any of your staff to look into [Walter's] allegations . . . ?"  Dkt. 137-2 ("Borisov Dep.") at 84:8-9.  In explaining why he had not made any such request after Walter's first appearance on *Let Them Talk*, Borisov explained that "[d]uring the first program, [Walter's] allegations sounded so strange and unfounded, that in my opinion they did not require looking into."  *Id.* at 84:12-15; *accord* Deft. 56.1 Stmt. ¶ 71.  This statement describes Borisov's subjective evaluation of Walter's accusations, and reveals that he concluded they were not credible:  he described them as "strange and unfounded," and his determination that the allegations "did not require looking into" would be puzzling unless he believed that they were not, in fact, true.  On its face, then, this statement indicates that Borisov "entertained serious doubts as to the truth of" Walter's statements.  *See St. Amant*, 390 U.S. at 731.  This direct evidence of Borisov's doubts about the truth of Walter's accusations is further supported by other statements made during the deposition.  For example, Borisov explained his response to Walter's accusations by saying that "quite often in our program . . . people who lose their members of the family tend to blame their relatives, their friends, or even secret world governments and come up with improbable theories as a result of that."  Borisov Dep. at 57:24-58:5.  In context, this statement

indicates that Borisov viewed Walter's accusations as one such "improbable theor[y]" typically developed by individuals in Walter's position. And, obviously, to view a theory as improbable is to have serious doubts about its truth.

Furthermore, Borisov's deposition testimony indicated that ordinarily he entertained doubts as to the truth of many claims made on *Let Them Talk*. In describing how the program chose its topics, he explained that "what makes our program interesting is when it is not obvious and it's not clear what the actual facts are." Borisov Dep. at 27:9-12; *accord* Deft. 56.1 Stmt. ¶ 59. And, obviously, an individual who lacks doubt as to the truth would not find the actual facts unclear. It is true that in this testimony, Borisov characterized *Let Them Talk*'s programming in general, without specifying whether the characterization applied in particular to the accusations about Goldfarb. On a motion for summary judgment, however, the Court must "draw all justifiable factual inferences in favor of the party against whom summary judgment is sought," *Major League Baseball Props.*, 542 F.3d at 309, here Goldfarb. And Channel One can hardly dispute the reasonableness of inferring from this answer that Borisov found the actual facts unclear with respect to the allegedly libelous accusations levelled against Goldfarb, since Channel One's own briefing argues that to Borisov "it was 'unclear' who had committed the poisonings, including [the poisoning of] Litvinenko." Deft. Br. at 7. Given that Borisov aimed to present discussions on *Let Them Talk* about facts that he found unclear, a reasonable factfinder could conclude that he found the facts about Goldfarb unclear, and thus that he entertained doubts about the allegations Channel One broadcast.[12] These statements thus provide evidence to support the reasonable conclusion

---

[12] The Court's holding does not call into question the freedom of media organizations to publish speculative opinions or hypotheses when the facts are unclear. Such statements are protected as nonactionable opinion, however, only if, "read in context, [they] are readily understood as conjecture, hypothesis, or speculation, [which] signals the reader that what is said is opinion, and not fact." *Levin*, 119 F.3d at 197. But whatever Borisov may have believed about Walter's accusations, they were broadcast on *Let Them Talk* as facts, devoid of signals that would

that Borisov recklessly broadcast the alleged libels despite serious doubts about their truth, which would constitute actual malice.

### b. Circumstantial Evidence

A libel plaintiff may additionally provide evidence to support the existence of actual malice by pointing to the objective circumstances in which the alleged libels were published. Such reliance on objective facts does not expand the substantive scope of liability and does not undermine the requirement that "[a] reckless disregard for the truth requires more than a departure from reasonably prudent conduct." *BYD Co. v. VICE Media LLC*, 531 F. Supp. 3d 810, 822 (S.D.N.Y. 2021) (internal quotation marks omitted), *aff'd*, No. 21-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022). Rather, as in many other areas of law, "[a]lthough the defendant's state of mind [regarding actual malice] is a subjective fact, it can be shown by indirect or circumstantial evidence. . . . Sufficient indirect evidence of actual malice can defeat a defendant's unsupported statement that he did act in good faith." *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1070 (5th Cir. 1987) (citation omitted); *see also Celle*, 209 F.3d at 190 (citing *Zerangue*, 814 F.2d at 1070). To show actual malice, a plaintiff must "provide evidence of negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." *Celle*, 209 F.3d at 183 (internal quotation marks and emphasis omitted). Courts have cited various types of circumstantial evidence to justify a factual finding that a defamation defendant acted with actual malice. *See Biro*, 963 F. Supp. 2d at 277-78 (collecting cases). Goldfarb has identified multiple such types of circumstantial evidence that, to a reasonable factfinder, could constitute clear and convincing proof of actual malice. Particularly when

---

have indicated to viewers that they were not intended as an accurate account of Goldfarb's conduct. *See supra* III.A.2.b.

combined with Goldfarb's direct evidence of actual malice, *see supra* III.A.3.a, this circumstantial

evidence creates a genuine question of fact as to whether Channel One acted with actual malice.

First, although the legal concept of actual malice differs from malice in the ordinary sense

of the term, and thus evidence of ill-will cannot on its own suffice to show actual malice, *see*

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667-68 & n.8 (1989), a defendant's

"motive for defaming the plaintiff," *Biro*, 963 F. Supp. 2d at 277, can constitute circumstantial

evidence of actual malice.  *See also Celle*, 209 F.3d at 183 ("Evidence of ill will combined with

other circumstantial evidence indicating that the defendant acted with reckless disregard of the

truth or falsity of a defamatory statement may also support a finding of actual malice.").  The

transcripts of the Channel One programs at issue reveal that such a motive existed.  Participants

on the shows clearly shared the objective of discrediting the British allegations that the Russian

government was responsible for both the 2006 death of Litvinenko and the 2018 poisoning of

Sergei Skripal, a former Russian intelligence officer. *E.g.*, 3/20/18 Tr. at 1 ("[Lugovoy]:  Later in

2016 there appeared, sorry for the expression, a clownish ex-judge who allegedly conducted a

public inquiry where all his statements were based exclusively on suppositions and guesswork,

where they accuse our state of ordering it and the two of us carrying it out."); 4/4/18 Tr. at 27

("[Lugovoy:]  [T]he whole media machine of Great Britain jumped upon me with questions and

ready analogies.  This whole story is being run, managed, and coordinated as a singular system, a

sing[l]e organism.  Specific recommendations to the topmost British media have been issued and

they went running to carry out the orders.  Period.  A provocation.  Action of the British side.

Consent from the UK top leadership.  Involvement of the Secret service.  All of that is absolutely

clear to me."); *id.* at 29 ("[Public Activist:]  The totality of material demonstrates that under the

control  of  British  secret  services,  their  recruited  .  .  .  agent,  the  fugitive  oligarch

Berezovsky, . . . handled  radioactive  material  on  the  British  territory.   This  is  the  gravest

indictment of Theresa May who at the time virtually controlled all secret services of Britain, as well as a violation of international agreements on handling nuclear materials, and a violation of the international agreement against nuclear terrorism.").  And because the alternative theory that a Russian dissident living in the West had poisoned Litvinenko would tend to discredit British narratives, Channel One had a clear motive to defame Goldfarb by naming him as Litvinenko's poisoner.  That motive alone cannot establish actual malice, of course:  news outlets do not necessarily publish falsehoods, knowingly or even accidentally, simply because they have an agenda.  But in conjunction with other circumstantial evidence, the existence of an independent motive to level accusations at Goldfarb suggests that Channel One would have broadcast the challenged statements even had it entertained substantial doubts as to their truth, since that independent motive could have given it a reason to broadcast false accusations.  *Cf. Palin v. N.Y. Times Co.*, 940 F.3d 804, 814-15 (2d Cir. 2019) (finding that an author's personal bias against a defamation plaintiff's ideological positions could support the inference that he was untruthful in testifying that he was unaware that the alleged libels published were untrue); *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (approving a district court's finding that "bias would be relevant to show a purposeful avoidance of the truth if it were coupled with evidence of an extreme departure from standard investigative techniques").

Next, "whether the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation" is "relevant to a showing that the defendant harbored actual malice."  *Id.* (citing *St. Amant*, 390 U.S. at 732).  The allegations leveled against Goldfarb on Channel One's programs were inherently improbable—he was accused of murdering both his close friend and his wife for reasons arising from his participation in a convoluted, far-fetched

scheme to sell asylum and citizenship in the U.K. to Russian dissidents.[13]  Furthermore, Channel

One can hardly deny the improbability of these statements, because multiple participants on *Let*

*Them Talk* themselves highlighted the "incredible" or "sensational" nature of the allegations.  *See,*

*e.g.*, 3/20/18 Tr. at 13 ("[Channel One Contributor:]  An incredible account . . . .  Absolutely

sensational."); 4/4/18 Tr. at 26 ("[Borisov:]  A sensational statement was made on the last program

by Walter Alexandrovich, the father of Alexander Litvinenko."); *id.* at 28 (transcribing Borisov's

description of the accusation that Goldfarb convinced Marina to lie as "a sensational supposition");

*see also* Deft. Br. at 24 (collecting additional examples).  Given that the incredible and sensational

nature of the allegations was immediately noted by Channel One's own television personalities, a

reasonable factfinder could infer that Channel One recognized their improbability but recklessly

published them regardless.  Thus, the nature of the allegations Channel One broadcast about

Goldfarb provides further circumstantial evidence of actual malice.  *Cf. Stern v. Cosby*, 645 F.

Supp. 2d 258, 279, 281-82 (S.D.N.Y. 2009) (denying summary judgment on actual malice in part

because of the "explosive" and "improbable" nature of allegations concerning the sex life of Anna

Nicole Smith and Howard K. Stern).

Lastly, relevant to a showing of actual malice is "whether there are obvious reasons to

doubt the veracity of the informant or the accuracy of his reports."  *Church of Scientology Int'l*,

238 F.3d at 174 (citing *St. Amant*, 390 U.S. at 732).  The key informant Channel One relied upon

in its accusations was Walter Litvinenko.  And Channel One personnel had obvious reasons to

doubt Walter's veracity and the accuracy of his reports.  First, as Borisov testified in his deposition,

---

[13] In its briefing, Channel One argues at length that Russians, including the individuals it employed, "subjectively believed that Western intelligence, not Russia, was complicit in Litvinenko's death."  Deft. Br. at 8.  But the statements broadcast did not merely deny Russian complicity in the killing; they further accused a particular individual, Goldfarb, of betraying his close friend and wife by murdering them.  Such inherently improbable accusations are not made probable simply by the belief that some Westerner, not a Russian, was responsible for Litvinenko's death, since countless other Westerners could have committed the murder instead.

"we"—referring, presumably, to Channel One personnel generally—"gave him a break because he spoke as a father who lost his son, and people who found themselves in a similar situation find themselves in the position where they can assume and evolve various theories of that kind." Borisov Dep. at 56:22-57:3.  Thus, Borisov recognized that due to Walter's emotional involvement with the case—"the fact that he was a father who lost his son and who was wallowing in sorrow," *id.* at 57:18-20—Walter was less likely to be credible.  Second, particularly strong reasons existed to doubt Walter's credibility because he had prominently and publicly changed his views about Litvinenko's true killer in 2012, recanting his previous accusations that Putin had been responsible for the killing and instead accusing his son of being a traitor and Goldfarb of being his son's killer. *See, e.g.*, Goldfarb Aff. ¶ 3.  And Channel One was aware of these reasons to doubt Walter, since in an interview conducted with Channel One and broadcast on *Let Them Talk*, Goldfarb himself alleged that Walter betrayed his son and returned to Moscow because he needed money.  4/10/18 Tr. at 37 ("[Goldfarb:]  [L]ater when Berezovsky stop[p]ed giving him money he returned to Moscow.  He is worse than Lugovoy because Lugovoy at least carried out an order while the father betrayed his son for an apartment in Moscow.").

These reasons to doubt Walter's credibility support a finding of actual malice.  *See Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 688 ("In a case such as this involving the reporting of a third party's allegations, 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" (quoting *St. Amant*, 390 U.S. at 732)). Given that Channel One was aware of those reasons, a reasonable factfinder could infer that Channel One doubted Walter's credibility based on those reasons but recklessly broadcast his accusations anyway.  Indeed, the Supreme Court has upheld findings that a news organization acted with actual malice when the subject of a story explicitly denied the relevant allegations and the organization then published them without first engaging in further investigative steps that were

41

obvious and that could have confirmed or disproved that denial. *See id.* at 691-92 ("There is no dispute that [the informant's] charges had been denied not only by [the plaintiff], but also by five other witnesses before the story was published. . . . It is also undisputed that [the plaintiff] made the tapes of the Stephens interview available to the Journal News and that no one at the newspaper took the time to listen to them. Similarly, there is no question that the Journal News was aware that Patsy Stephens was a key witness and that they failed to make any effort to interview her."); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 169-70 (1967) (Warren, C.J., concurring) ("Suffice it to say that little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account, to be published was absolutely untrue."). In such circumstances, the Supreme Court has explained, "it is likely that the [defendant's] inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the published statements. *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 692. In this case, once Goldfarb denied Walter's allegations and identified Walter's alleged financial motive for lying, Channel One failed to take basic, obvious steps to investigate his denial—indeed, the staff of *Let Them Talk* did not even consult stories that Channel One itself had earlier produced about Walter's changing views as to who killed Litvinenko. Deft. Br. at 15; Borisov Dep. at 44:9-45:7. A reasonable factfinder could infer, from this failure to take obvious investigative steps following Goldfarb's denials, that Channel One either wished to avoid learning that Walter was unreliable or was determined to broadcast his accusations regardless of his reliability. And either inference would provide evidence that Channel One acted recklessly, which would constitute actual malice.

       Summary judgment might well be warranted were Goldfarb's case for actual malice to rest on only one of these types of circumstantial evidence. But a reasonable factfinder could consider all the types of circumstantial evidence present in the record and conclude that the "accumulation

of the evidence and appropriate inferences supports the existence of actual malice." *Celle*, 209

F.3d at 183 (internal quotation marks and emphasis omitted).  Taking the circumstantial evidence

in conjunction with the direct evidence of actual malice discussed above, then, a genuine issue of

fact exists as to whether Channel One broadcast the alleged libels about Goldfarb with recklessness

sufficient to constitute actual malice.  Channel One's motion for summary judgment therefore must

be denied with respect to its arguments that Goldfarb cannot establish the actual malice required

for both his libel claims and his intentional infliction of emotional distress claim.

**B. Channel One's Counterclaims**

Under New York's anti-SLAPP statute, a defendant in "an action involving public petition

and participation" may "recover damages, including costs and attorney's fees. . . (a) upon a

demonstration . . . that the action . . . was commenced or continued without a substantial basis in

fact and law."  N.Y. Civ. Rights Law § 70-a(1).  The Court finds herein, however, that a genuine

issue of material fact exists as to whether Goldfarb is entitled to relief on his claims.  To say the

least, then, Channel One has not shown that no genuine issue of fact exists as to whether Goldfarb's

suit lacks a substantial basis in fact and law.  And because that showing is required to recover

under the anti-SLAPP statute, Channel One's motion for summary judgment on its anti-SLAPP

counterclaims is denied.

### IV.  Conclusion

For the foregoing reasons, Channel One's motion for summary judgment on Goldfarb's

claims is granted with respect to the statements it broadcast accusing Goldfarb of membership in

the CIA, and is denied in all other respects.  Channel One's motion for summary judgment on its

anti-SLAPP counterclaims is likewise denied.  The parties are directed to appear for a status

conference at 3:00 p.m. on April 5, 2023 to discuss a trial date.  The conference will take place in

Courtroom 12D of the Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, New York 10007.

The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 130.

SO ORDERED.

Dated: March 21, 2023
       New York, New York

_____
JOHN P. CRONAN
United States District Judge